# PAUL A. ARGENTIERI
ATTORNEY AT LAW
188 MAIN STREET
HORNELL, NEW YORK 14843
-------
(607) 324-3232
Paul.Argentieri@gmail.com

CELL: (323) 919-4513
FAX: (607) 324-6188

May 7, 2017

Hon. Vernon S. Broderick
Chambers
United States District Judge
U.S. Courthouse
40 Foley Square
New York, NY 10007

Re: United States v. Ceglia
    12 Cr. 876 (VSB)

Dear Judge Broderick,

As a preamble, in my capacity as an attorney, I have never engaged in this type of process as proposed in this letter, but after reading the Hazel-Atlas Glass Co. v. Hartford-Empire Co. 322 U.S. 238 (1944) case, I submit that Mark Zuckerberg has perjured himself, and his civil lawyers, Orin Snyder, Alexander Southwell and Mathew Benjamin, et al, have not only suborned his perjury, but have promoted, with him, many falsehoods before you in your court that qualify as extrinsic frauds on the court.

I'm seeking permission from you, as an officer of the court, for a formal application of these charges to challenge Mark Zuckerberg's status as a "victim" under the Crime Victims' Rights Act, that he sought in June 2014, when his lawyers, Snyder, Southwell and Benjamin, had previously petitioned your predecessor, Judge Carter, and ultimately received that "victim" status by Judge Carter's order.

Attorneys Snyder and Southwell authored a letter dated June 30, 4014, on behalf of Zuckerberg and Facebook, that repeat and re-allege syllogistic falsehoods that are nothing more than frauds on this court.

This letter, supported with exhibits, are submitted to your chambers, in camera, as I, and I alone, without the advice, consent, support or any involvement of any kind from Mr. Ceglia's past and present defense attorneys, or anyone else, have any knowledge of my application.

2.

Furthermore, there are Orders of Protection that Attorney David Patton, Paul Ceglia's first defense counsel, had me agree thereto in order to assist him with the defense of Paul Ceglia, which further compels me to submit my application to you in camera.

I am the first attorney that represented Paul Ceglia and commenced his civil action, by an Order to Show Cause, with his Verified Complaint, exhibits, and a TRO against Mark Zuckerberg and Facebook, Inc. on June 30, 2010, in the New York State Supreme Court, Allegany County, Belmont NY, before the Hon. Thomas P. Brown.

Paul Ceglia's lawsuit was to enforce his written contract, the "Work For Hire" Contract, (hereinafter referred to as WFH) with Mark Zuckerberg, that was signed and initialed by both parties on April 28, 2003, and entered into in Boston MA, see Exhibit A

In October 2014, Zuckerberg and Facebook sued me, and some, but not all of, Paul Ceglia's prior civil lawyers, under Judiciary Law sec. 487, and for malicious prosecution, alleging we knew Paul Ceglia's WFH contract with Zuckerberg was fraudulent.

Zuckerberg's complaint was dismissed, with prejudice, by a unanimous Decision of the Appellate Division of the Supreme Court of New York, First Department, on December 29, 2015.

Zuckerberg's motion for reargument, and leave to the Court of Appeals, were denied, 2016 NY Slip Op 73671(U), see Exhibit B.

As the court is aware, the Appellate Division is the final court to establish the facts in a case.

Despite having the benefit of four years of litigation, Zuckerberg never filed a verified complaint, or his sworn affidavit, to plead facts to support his phony accusations and lawsuit.

In opposition, the Appellate Court Judges were presented the opportunity to review, evaluate and consider our very extensive public record of the facts, Zuckerberg's admissions, expert reports, expert depositions, affidavits, including, but not limited to, Paul Ceglia's and mine, that were in opposition to the Magistrate's personal findings in his Report & Recommendation.

The Appellate Judges established facts that in their essence, rejects the "clear and convincing" legal conclusion of fraud or forgery in our civil case.

The Appellate Court Decision is Res Judicata.

The Appellate Court, among others, properly found on page 62 in its Decision:

"Here, the Allegheny (sic) court's granting of a TRO at the inception of the Ceglia action, prior to any of the defendants' representation of Ceglia, created a presumption that Ceglia had probable cause to bring the case. This presumption must be overcome by specifically pleaded facts."

3.

"Despite plaintiff's claims that the Work for Hire Contract was an obvious forgery, the Allegheny court granted a TRO after reviewing it."

I am the only fact witness to the WFH contract's condition, before, during and after its testing, by our experts, and Zuckerberg's experts, in July/August 2011, pursuant to the Magistrate's court order to authenticate the WFH.

The WFH contract was authenticated in the civil court with our experts filing their reports in June 2012.

The WFH contract was re-authenticated, after Paul Ceglia's Indictment, with the filing of two more expert reports: Katherine Koppenhaver and Joan Winkleman, see Exhibits L & M.

Paul Ceglia's expert reports have removed all questions in authenticating the WFH, to wit:

A. The signatures, initials and staple holes on the WFH contract are genuine on both pages, by James Blanco.

B. The WFH contract has the same, ink, toner, fonts, formatting and paper on both pages, by Larry Stewart.

C. The 2 pages of the WFH paper were chemically tested to be uniquely the same, as they came from the same paper run, at the same paper mill. according to Walter Rantenan lab report.

D. ESDA tests that confirm the indentations on the 2nd page of the WFH, came from the 1st page of the WFH, according to the 1st report by John Paul Osborn, and the last ESDA test recorded by Katherine Koppenhaver, Exhibit L. after the Government's expert, Exhibit K, couldn't or wouldn't determine these indentations observable by the naked eye.

E. Joan Winkleman's expert report, see Exhibit M. demonstrates and explains why the "Kato" contract, Exhibit D., by analyzing the consistent inconsistencies of their fonts and formatting to the WFH, presents new & additional irrefutable evidence for the WFH's authenticity.

The Federal Government has no experts, or reports, to refute ours, thus authenticating the WFH contract by their default.

The Federal Government, in classic unintended consequences, have exposed Zuckerberg, and his lawyers, many falsehoods.

Attorneys Snyder, Southwell and Benjamin originally appeared in the Federal Court in Buffalo, NY, in August 2010, before Judge Arcara, as lead counsel over Attorney Lisa Simpson, of the Orrick law firm.

4.

The Orrick law firm had previously represented Zuckerberg against his lawsuits with the Winklevosses and Eduardo Saverin.

Paul Ceglia's second lawyers were Buffalo attorneys, Lawrence J. Vilardo and Terrence M. Connors, of their firm, Connors & Vilardo, who became lead counsel after my state action was removed on July 9, 2010.

In 2015, Lawrence J. Vilardo was appointed and confirmed as U.S. District Court Judge for the Western District in Buffalo NY, where he presently sits.

From August 2010 to the present, Zuckerberg's lawyers have stated, in and out of court, that Paul Ceglia had committed forgery, and a scheme to defraud, with his WFH contract, but have never provided any dispositive proof held by Zuckerberg.

After the First Amended Complaint was filed by Paul Ceglia on April 11, 2011, Zuckerberg filed his motion for expedited discovery by Attorneys Snyder, Southwell, and Benjamin in June 2011, before the Magistrate.

Zuckerberg's motion was to compel the testing of the authenticity of the WFH, which we agreed to, and the one-sided expedited discovery from Ceglia to Zuckerberg, that we did not agree to.

Zuckerberg, and his lawyers, have never produced any written contracts, or electronic images of any contracts, signed or unsigned, in support of Zuckerberg's Declaration that he signed a contract with Paul Ceglia.

Paul Ceglia produced for the court ordered testing, not only the original WFH, but the original 2nd written contract that was signed by both parties in Boston on April 28, 2003.

Zuckerberg prepared and produced this 6 page contract entitled, "StreetFax Back-End Technical Specification", at their only face to face meeting, in Boston, on April 28, 2003, see Exhibit C.

At their meeting in Boston, Zuckerberg demanded from Paul Ceglia two pre-conditions before he would sign the WFH contract to develop the StreetFax software, by May 31, 2003, to wit:

A. That Paul Ceglia hire a web designer.

B. The Web designer's work must be completed by May 24, 2003.

Before signing the WFH, Paul Ceglia hand wrote, in ink, the interlineations upon the front page of the WFH, Zuckergerg's two pre-conditions: "Providing web designer is finished by May 24, 2003".

Both Zuckerberg and Paul Ceglia initialed these interlineations on the front page.

Within a week, Paul Ceglia satisfied the first pre-condition in the WFH contract by hiring Randy Kato as the "web designer" on May 5, 2003.

5.

Paul Ceglia produced this 3rd written contract, "STREET FAX", which was signed by Randy Kato, hereinafter referred to as the "Kato" contract, see Exhibit D.

Zuckerberg's lawyers proffered an image of a purported contract entitled "STREET FAX" that was originally recovered from a computer owned by Vera Ceglia (Paul Ceglia's mother) and claimed that this was the "authentic" contract between Zuckerberg and Paul Ceglia, hereinafter referred to as the STREET FAX contract, see Exhibit E.

Mark Zuckerberg has never authenticated this image of the STREET FAX document as the authentic contract in the civil case.

Mark Zuckerberg has never produced the original paper STREET FAX contract for testing as his lawyers claimed that it was lost or destroyed.

Mark Zuckerberg has never produced a signed, or unsigned, electronic copy of his purported STREET FAX contract with Paul Ceglia from his 28 computer hard drives and/or electronic devices stored and preserved from the Winklevoss, and Saverin lawsuits, at the McManis Faulkner law firm located in San Jose CA, see Deposition of Zuckerberg's computer expert, Michael McGowan, at page 62, Exhibit F.

A second set of Zuckerberg's original 28 computer hard drives and electronic devices are also being held and stored at Parmet & Associates in Chicago IL, at pages 91-92, Exhibit F.

The Magistrate granted Zuckerberg's Motion to Dismiss on March 26, 2013, because he made the following fact finding: "clear and convincing evidence establishes the StreetFax Document is the authentic contract and the Work for Hire Document is a recently created fabrication ...", see Exhibit G.

The Magistrate was misled into this conclusion by Zuckerberg, and his lawyers, Snyder, Southwell, and Benjamin's misrepresentations

In June 2011, Zuckerberg, his lawyers, along with their experts' affidavits, filed their expedited discovery motion asserting that the WFH contract was a 1st page forgery, created by Paul Ceglia, and substituting it onto the authentic 2nd page "STREET FAX" contract before the Magistrate, see Exhibit H.

Attorney Snyder repeated to the Magistrate what Zuckerberg had told Snyder, and what Zuckerberg afterwards admitted to the Government investigators in November 2011, that his signature on page 2 of the WFH was genuine, to wit,

Exhibit H:

Page 56.

The Court: So the question is whether it's his signature on this agreement.

6.

    Mr. Snyder: That's not a disputed issue in the case.

Page 57.

    Mr. Snyder: The signature appears on Page 2 of the agreement.

Page 8.

    Mr. Snyder: Page 1 of the agreement is the page that contains the fraudulent and doctored language about Facebook.

Page 58.

    Mr. Snyder: I'm conceding that Mr. Zuckerberg recognizes that to appear to be his signature, or someone who copied what looks very much like his signature.

Page 60.

    Mr. Snyder: Page 1, which is the doctored contract that this Plaintiff made up, is replete with

    The Court: Page 2 is not just a form document.

    Mr. Snyder: Page 2 refers to StreetFax, so this Plaintiff would have to insert StreetFax, so this Plaintiff would have had to insert StreetFax on Page 2...

Pages 142, 143.

    Mr. Snyder: The authentic page 1 may be gone forever, your Honor.

    Mr. Snyder: The real Page 1 that existed in the real world that related only to StreetFax.

Page 143.

    Mr. Snyder: We don't know whether that original document contained Mark Zuckerberg's intials MZ. We don't know whether the Plaintiff forged Mark Zuckerberg's MZ.

    We don't know whether he took Mark Zuckerberg's MZ from the orginal page 1 and plastered onto the bogus page 1 that's in front of this Court.

7.

Michael McGowan, Zuckerberg's IT expert from Stroz Friedberg, in his deposition, verifies that the 2nd page of the WFH and the 2nd page of the StreetFax contracts see,

Exhibit F:

Pages 106-107, to wit:

McGowan: We were actually speaking about the second page.

I believe the second page of the Work For Hire, the Work For Hire document and the StreetFax contract are the same.

Mr. Boland: So it's your opinion, based on your analysis, that the second page of the StreetFax contract is the same as the second page of the paper contract that was evaluated in this case: is this true?

McGowan: I haven't conducted a paper document analysis of it.
From, my review of the text I believe that the contract is the same on the second page.

Michael McGowan had no expert opinion whether Page 2 of StreetFax TIFF image was created from page 2 of the WFH paper contract, Exhibit F. page 108.

On June 30, 2011, Zuckerberg and his lawyers demanded, and were granted, an order for unlimited for testing and discovery with no counter reciprocal discovery to Paul Ceglia.

Later the Magistrate's order was expanded for Zuckerberg's lawyer to depose Ceglia's experts, after Ceglia's experts had filed their reports authenticating the WFH in June 2012.

Despite our requests, no testimonial hearing was ever held by the Magistrate.

It should be noted that Zuckerberg, and his lawyers, had the right to depose Paul Ceglia in their one-sided expedited discovery order, but he and his lawyers took a pass.

Apparently, the fear that true facts from Paul Ceglia's testimony would be memorialized under oath, and thus self-defeating to Zuckerberg's self-serving narrative.

Without justification, in August 2012, Zuckerberg's lawyers abruptly abandoned their 1st page substitution forgery, by having one of their experts, Gus Lesnevich, recant his original opinion from a 1st page, to an invented "2"page forgery, of the WFH, that was the original basis of the Magistrate's expedited testing and discovery order.

The US Justice Department categorically rejected this 2 page forgery theory.

8.

## First Fraud on the Court by Zuckerberg and His Lawyers

Zuckerberg, in his criminal complaint to the USPIS Investigator, Douglas Veatch, declared that the 1st page of the WFH contract was forged.

Douglas Veatch, relying upon Zuckerberg's statements to him, filed his affidavit on October 25, 2012, affirming Zuckerberg's 1st Page forgery claim of the WFH, see Exhibit I.

It should be noted that Zuckerberg didn't file his criminal complaint in July 2010, when he got served in the civil case, but 18 months later in November 2011.

Forgery = Handwriting.

In other words, when the Government produced no forensic report as to the genuineness of the signatures in the WFH contract, the legal issue of forgery was foreclosed because forgery refers to handwriting.

The Magistrate's fantastic finding of fact that the WFH paper contract is a "recently created fabrication", or essentially a 2 page forgery, has been rendered a legal, factual and logical impossibility, to wit:

1. Mark Zuckerberg <u>admitted</u> that his signature upon the 2nd page of the WFH was his to the USPIS Investigator, Veatch, and probably to the prosecutors.

    The 2nd page signature of the StreetFax image is conceded by Zuckerberg as the 2nd page of the paper WFH.

2. The Bill of Particulars from Paul Ceglia's Indictment establishes that the 2nd page of the WFH contract is the same as the 2nd page of the StreetFax image, see Exhibit J.

3. The USPIS expert report of John Cawley, dated September 27, 2013, is devoid of any forensic conclusions of the WFH to support of the Magistrate's findings, and accordingly refutes it, see Exhibit K.
   Cawley's report is void of opinion or findings for the following issues, thus authenticating the WFH:

    A. The WFH is a "recently created fabrication" of a 2 page forgery, as the Magistrate opined.

    B. No handwriting analyses = no forgery.

    C. No "amateurish" forgery as Zuckerberg's lawyer told the Magistrate in June 2011.

    D. The ESDA test to determine whether the indentations on the 2nd page of the WFH match the handwritten interlineations on the 1st page of the WFH could not be determined by him visually or by his instruments.

9.

    4. The StreetFax image has a different interlineation, and location of parties' initials, as opposed to the WFH, see Exhibit E, to wit:

    "Providing web designer has finished by May 24, 2003"

    The change of the verb "is" to "has", along with the location of the parties initials, from Paul Ceglia's WFH, in comparison to Zuckerberg's StreetFax, confirms that Zuckerberg, or one of his agents, photo shopped a made up 1st page StreetFax onto the image of the 2nd page of the authentic WFH.

    Zuckerberg and Paul Ceglia signed two original WFH paper contracts in Boston, on April 24, 2003.

    Zuckerberg kept his original WFH, along with his original, signed, 6 page StreetFax Back-End Technical Specification contract in Exhibit C.

    Thereafter, Zuckerberg, or one of his agents, took the first page of the "Kato" StreetFax contract and created a phony 1st page with the interlineations from his original WFH contract.

    Zuckerberg photo shopped his original interlineations from the 1st page of his WFH with the verb "has".

    Zuckerberg made a fatal mistake exposing his fraud and forgery as he didn't realize that the verb "has" is not in the interlineations on Paul Ceglia's original WFH, but rather the verb "is" is.

    Zuckerberg, his lawyers, or the Government, have yet to explain by affidavit, or an expert opinion, with an ESDA test, exactly the 1st page of the WFH matches perfectly the indentations on 2nd page of the StreetFax contract or image.

    John Paul Osborn, the first expert I engaged to test the WFH contract, performed his ESDA test in January 2011,

    His report and findings were filed in June 2011, and have not been refuted by Zuckerberg, or the US Justice Dept.

    I witnessed Zuckerberg's experts, in pursuit of their 1st page forgery, run multiple ESDA tests over two days in July 2011, but failed to produce any ESDA results to the Magistrate.

    On December 17, 2013, Katherine Koppenhaver, was the last expert to examine the WFH and submitted her report dated December 31, 2013, see Exhibit L.

    Ms. Koppenhaver's forensic opinion destroys the USPIS report of Cawley, and renders it as being grossly incompetent, or the product of a corrupt process.

Cawley was unable to "find" or "determine" the indentations on the 2nd page of the WFH that were created by the 1st page of the WFH.

Ms. Koppenhaver illustrates in her report that the indentations found on the 2nd page of the WFH contract are "visible to the naked eye", see Exhibit L.

### Second Fraud on the Court by Zuckerberg and His Lawyers

The "web designer", Randy Kato, negotiated, prepared, and signed a contract with Paul Ceglia on May 5, 2003, see Exhibit D.

The Randy "Kato" contract satisfied Zuckerberg's first pre-condition of the WFH contract.

The 2nd pre-condition, "Providing web designer is finished by May, 24, 2003", were hand written, in ink, on the 1st page of the WFH, and initialed by Zuckerberg.

Our expert, Joan Winkleman, authenticates the WFH contract by analyzing and comparing the "Kato" contract with the WFH, see Exhibit M.

The "Kato" contract, Exhibit D, is the template that Zuckerberg, or one of his agents, used to photo shop and create the fraudulent page one of the "StreetFax" contract image, see Exhibit E.

The StreetFax images are of such low quality that Professor Hany Farid could not perform a reliable forensic examination of it, see Exhibit N.

Mark Zuckerberg requested a copy of the "Kato" contract from Paul Ceglia and provided it to him in Microsoft Word format.

### Similarities of the Kato and StreetFax Contracts

A. The first page of the StreetFax contract is nearly identical to the first page of the Kato contract.

   Other than changes in two paragraphs, the content is exactly the same.

B. The formatting of the paragraphs and spacing are identical.

C. The Typos are repeated from the "Kato" contract onto the fraudulent 1st page "StreetFax" contract image, as follows:

    D. "Comer" typo. Both the "Kato" contract and the StreetFax contract include the following sentence:

    " The contract between Purchaser and Comer and all provisions, specifications and drawing referenced therein."

    The word "Comer" was mistakenly included instead of "Customer".

    E. "Theses" rather than "These" was misspelled in Paragraph 2 in both contracts.

    F. Paragraph 4 spacing in both contracts.

    There is no spacing after the period between the first and second sentences of section 4(a) in both contracts.

    G. "Purchaser" typo.

    The party "Purchaser" is misspelled as "Purchase" in the first sentence of Paragraph 6 in both contracts.

    H. "Participate" typo.
    The word "participate" is misspelled as "participated" in Paragraph 6 of both contracts.

    I. "Infringement" typo.
    Infringement is spelled without the "r" and first "e" in paragraph 7 of both contracts.

    J. "Sale" typo.
    Sale is misspelled as "sake" in paragraph 7 of both contracts.

These anomalies are a few of the common repeated typos that prove that the Kato contract was the source document for the StreetFax contract forgery.

### Third Fraud on the Court by Zuckerberg and His Lawyers

Zuckerberg and Paul Ceglia had a business relationship from April 2003 through July 2004.

Zuckerberg hired the services of a Jeff Kazen, a senior at Harvard, to assist him in the writing of the StreetFax code.

The parties primarily communicated by email about their business relationship.

12.

Zuckerberg has never produced his emails that are in his custody, possession and control for the following months: April, May, November, December 2003, and January, February and March, et al, 2004.

The November 2003 date is important as the Winklevosses began their business relationship with Zuckerberg.

The January – February 2004 months are critical as Zuckerberg allegedly "wrote" the Facebook code in one to two weeks, by himself.

Conversely, it took Zuckerberg, and his team, in excess of ten months, from April 2003 to February 2004, to write the StreetFax code.

Paul Ceglia pleaded in his complaint that Zuckerberg asked permission to use the StreetFax code for the Facebook project, as written on the 1st page of the WFH.

As dispositive proof of withheld emails, I personally filed into the civil record, Zuckerberg's email of February 28, 2004, received by a court ordered subpoena that was requested by Zuckerberg, and produced from the Sidley Austin (Paul Ceglia's) law firm, see Exhibit P.

As stated in my Declaration, this email is the "Rosetta Stone" that illuminates and reveals Zuckerberg's true identity, in real time, as a malicious hacker with a disregard for the legal process.

Zuckerberg has control of three repositories of his emails with Paul Ceglia, to wit:

A. Harvard's back up computer servers.

Because Zuckerberg never graduated from Harvard, he had access to his emails stored by Harvard's servers.

We were informed by Harvard that Zuckerberg, or his agent, did access his servers at Harvard in October 2010.


B. On September 8, 2004, the Winklevosses sued Zuckerberg in the Connectu, Inc. case and had Zuckerberg's original 28 computer hard drives, and devices, preserved and stored at the Mcmanis Faulkner law firm, in San Jose, CA, see Exhibit F, pages 61, 62 & 92.

C. Parmet & Associates, Inc. from the Winklevoss case, also kept a complete forensic copy of Zuckerberg's 28 computers and hard drives, see Exhibit F, page 91-92.

13.

    Attorneys Snyder, Southwell, and Benjamin, misrepresented to the Magistrate in their June 2011 hearing that only 176 "authentic" emails existed between Zuckerberg and Paul Ceglia at Harvard on its servers, see Exhibit H. Page 10, 11, 12, 16, 47, 128, 129, 130 and 131.

    Zuckerberg, and his lawyers, presented a false narrative wherein they hired Stroz Friedberg, an independent IT firm, to allegedly perform a search of his emails and submit a report to the Magistrate in order to deny discovery of Zuckerbergs' primary evidence.

    The existence of Zuckerberg's 28 computers and hard drives were never disclosed to the Magistrate in June 2011.

    We were tipped off in late November 2011 about Zuckerberg's attempt to have the computers destroyed.

    We contacted the Magistrate wherein Attorney Snyder, in a conference call, initially denied the existence of Zuckerberg's 28 computers and hard drives.

    This was a falsehood promoted by Attorney Snyder as we later learned from Michael McGowan's deposition that the Gibson Dunn law firm had produced the 28 computers to Stroz Friedberg in September, 2010.

    As a result of a second conference call, It was agreed by Gibson Dunn that these 28 computers would be preserved.

    Michael McGowan's deposition taken on July 19, 2012, confirms the methodology of a plan to deceive the court about Zuckerberg's inculpating emails, see Exhibit F.

    In September 2010, Attorney Benjamin, from the Gibson Dunn law firm, worked hand in hand with McGowan to intentionally develop a very limited, and controlled, key word search of Zuckerberg's 28 hard drives preserved from the Winklevoss case, see Exhibit F, pages 61, 64, 65, 66, & 77.

    McGowan testified he was the primary person to examine all 28 computer hard drives and devices, Exhibit F, page 62.

    The Gibson Dunn lawyers told McGowan to take no written notes, no audio notes and to only prepare a spreadsheet about the key word searches throughout this self-serving censorship, see Exhibit F, pages 63 & 64.

Exhibit F. page 77.

    Mr. Boland: The list search terms used for those devices, who created that list?

    McGowan: We created it in consultation with Gibson Dunn, we drew phrases from the contract and then worked with Gibson Dunn to develop other key words designed to get at—designed to surface what were likely to be relevant documents in this case.

14.

Exhibit F. pages 81-82

    Mr. Boland: Did you find any e-mails sent or received by Mr. Zuckerberg on those 28 devises but not involving sent or received from Mr. Ceglia, but they discussed StreetFax?

    McGowan: I'm not sure one way or another on that.

    Mr. Boland: The set of search terms you used to search the 28 devices, was it identical to the search terms used to search the Harvard e-mail account of Mr. Zuckerberg?

    McGowan: No

    Mr. Boland: And did you determine by looking at those 28 devices whether Mr. Zuckerberg used any of those devices to access his Harvard e-mail?

    McGowan: We didn't reach a conclusion on that point.

    Mr. Boland: Were you asked to look for that?

Page 20.

    McGowan: No

    Mr. Boland: Did you ever speak with Mr. Zuckerberg?

    McGowan: I have not, no.

    Mr. Boland: Did you find any references to StreetFax at all on those 28 devices?

    McGowan: I'm not sure the results on that one.

Exhibit F. page 85.

    Mr. Boland: Do you know if the StreetFax source code is on those 28 devices?

    McGowan: I don't believe so.

    Mr. Boland: And Facebook source code, did you do a search for that on those 28 devices?

    McGowan: We did not, no.

15.

Exhibit F. page 88.

> Mr. Boland: Why didn't you issue a report, then?
>
> McGowan: We weren't requested to issue a report?

Exhibit F. page 91.

> Mr. Boland: Did you search any assets that are currently being held by Parmet & Associates?
>
> McGowan: Not held by Parmet, no.

Exhibit F. pages 91-92.

> Mr. Boland: And are you aware that there's electronic assets potentially related to this case being held by Parmet & Associates?
>
> McGowan: No, I'm not

Exhibit F, page 93.

> Mr. Boland: And so just to be clear, when you analyzed these 28 devises, you had no chain of custody related to those devices, etc.
>
> McGowan: There was no chain of custody documentation.

Exhibit F. pages 65, 66.

Michael McGowan communicated his work and findings by telephone calls and emails to Attorney Benjamin.

Exhibit F. pages 76-84. McGowan testified that:

Despite his review of the 28 computers, McGowan was not sure references to the StreetFax were on Zuckerberg's 28 devices.

A. McGowan couldn't find any e-mail correspondences between Paul Ceglia and Zuckerberg.

B. The search on Zuckerberg's 28 hard drives by McGowan were NOT compared to the emails of Zuckerberg stored on the Harvard servers.

16.

### Fourth Fraud on the Court by Zuckerberg and His Lawyers

According to the record, Zuckerberg appears to have committed perjury in the civil case, and his perjury was suborned by Zuckerberg's lawyers,

On June 1, 2011, Zuckerberg filed his only sworn Declaration in the civil case, see Exhibit O.

In paragraph 7, Zuckerberg perjures himself with his sworn statement: "The contract was provided to me by Ceglia."

Attorney David Patton, the Federal Public Defender in New York, was Paul Ceglia's initial criminal defense lawyer, and received from the Federal prosecutors emails about Paul Ceglia and Zuckerberg.

These emails were originally produced pursuant to the Federal Government obtaining a search warrant to the Stroz Friedberg IT experts in New York City, based upon Investigator Douglas Veatch's affidavit, see Exhibit I, page 3.

   A. On August 18, 2003, Zuckerberg authored an email to a Jeff Kazen, previously hired by Zuckerberg to assist him in writing the StreetFax code, and stated:

   "He's (Paul Ceglia) only gotten pissed once before, and that's when I sent him the contract with all the penalty stipulations for if he didn't pay on time."

The source of recovery came from the search warrant to the Stroz Friedberg IT firm email searches that McGowan testified to in Exhibit F. when he, and Attorney Benjamin, were culling the 28 hard drives preserved from the Winklevoss lawsuit.

Zuckerberg's declaration is a material issue of fact that is in conflict with his sworn declaration and suborned by his lawyers.

   B. On February 21, 2004, Zuckerberg sent a second email to Paul Ceglia (doc. 338-8) wherein Zuckerberg references a late payment of 2.0% per month, rather than the 3.5% late late payment in the StreetFax contract in Exhibit E.

These emails were intentionally NOT produced in the civil case.

These emails are also subject to a confidential order in the criminal case.

   C. In April 2006, Zuckerberg is questioned under oath in the Winklevoss case, see Exhibit Q.

17.

Zuckerberg testified he wrote the initial Facebook code in one to two weeks, in January 2004, see Exhibit Q, pages 3, 7 & 8.

Zuckerberg denied having the idea about the Facebook in 2003, see Exhibit Q. page 7.

Zuckerberg was sued by the Winklevosses on September 8, 2004, and ordered to preserve his evidence.

Zuckerberg never disclosed his contract with Paul Ceglia, or his code writing for StreetFax in the Winklevoss case.

Zuckerberg has admitted destroying his copies of all the written contracts he had with Paul Ceglia and StreetFax.

Investigator Veatch questioned Zuckerberg in November 2011 about the idea of Facebook and his affidavit states, "It was only in or about September and October 2003 ... which was inspired by paper face books and his high school's online face book.", see Exhibit I. page 12.

Zuckerberg has admitted to all the elements of Paul Ceglia's breach of contract case, under New York law.

### Paul Ceglia vs. Zuckerberg is Tantamount to a Small Claims Case

This is not a complex case, but a complex fraud by Zuckerberg.

Paul Ceglia and Mark Zuckerberg's contract dispute were between two young entrepreneurs, who didn't hire any lawyers, about their unsophisticated, but legal, WFH contract.

Zuckerberg admitted to signing a 2 page paper contract with Paul Ceglia to write the StreetFax code in Boston, MA, on April 28, 2003.

Zuckerberg's contract called for him to be finished with his code for StreetFax by May, 31st, 2003, or in about a month after their meeting.

Zuckerberg admitted being paid $9,000 in several checks from Paul Ceglia.

Zuckerberg commingled those monies into his personal checking account at the Fleet bank in Boston, along with the other monies he was paid for the Facebook and the Winlevoss projects, see Exhibit R.

Zuckerberg, Jeff Kazen, and others, worked approximately 10 months, from April 2003, through February 2004, to write the StreetFax code.

Zuckerberg, in his February 28, 2004 email to Paul Ceglia, threatened to take down the StreetFax site in a payment dispute, see Exhibit P.

This email, and many others, disclose a different narrative were never produced by Zuckerberg in the civil case.

Zuckerberg testified he wrote the Facebook code, by himself, in 2 weeks in January 2004.

Paul Ceglia produced an email permitting Zuckerberg to use the StreetFax code into the Facebook code.

Zuckerberg produced 176 Harvard emails, in paper form, from Harvard.

Zuckerberg produced no emails from April – May 2003, and November 2003 through January, February, March, et al in 2004.

### One Page Forgery vs. Two Page Forgery

The Government is in agreement the WFH contract is not a recently created 2 page fabrication, because Zuckerberg admitted his signature was genuine on the 2nd page of the WFH contract.

The Government's failure to produce experts to refute Paul Ceglia's experts, authenticates the WFH, as our reports are unchallenged.

Zuckerberg's lawyers, and Michael McGowan, have admitted the WFH contract was a one page forgery, as the 2nd page of the WFH is the same 2nd page of the StreetFax contract.

Zuckerberg admitted signing the 2nd page of StreetFax, which is identical to the 2nd page of the WFH.

### Zuckerberg's Emails Confirms His Perjuries and Frauds on the Court

Other than the WFH contract, the best evidence of Zuckerberg's contractural relationship with Paul Ceglia are his emails stored on the Harvard servers, and on the 28 computer devices preserved from the Winklevoss lawsuit.

Zuckerberg should be compelled to produce the StreetFax code stored on his 28 computers and from his Harvard account. After all, it's Paul Ceglia's property.

Paul Ceglia's expert reports have removed all questions in authenticating the WFH.

The probability of locating a copy of the contracts to be found by examining all Zuckerberg's electronic media and computers at Harvard and from his lawsuits is high and should be ordered.

19.

### New York Appellate Division Decision Rejects Zuckerberg

The New York Appellate Division has established enough facts to reject any claim that the WFH is a recently created two page fabrication, by clear and convincing evidence, following a plain reading of our record, including, but limited to, our expert reports, see Exhibit B.

In point of fact, there's more evidence than this letter documents, or what the Appellate Division could review, before dismissing Zuckerberg's complaint.

The same lawyers from Gibson Dunn, Attorneys Snyder, Southwell and Benjamin, have appeared in your court, to repeat the same extrinsic frauds and falsehoods that misled the Magistrate, invokes this type of review as decided by the Supreme Court and outlined in their Hazel Atlas Decision.

Zuckerberg's after-discovered extrinsic frauds, knowingly perpetrated by, and participated in, by his lawyers, in promoting a false "victimhood" status, empowers this court, in equity, for correcting injustices, by permitting a formal hearing.

This application is not about Paul Ceglia's Indictment, it's about the abuse when the Gibson Dunn lawyers, having appeared before you, and took advantage of your trust that as officers of the court, they wouldn't deceive you.

Zuckerberg, and his lawyers, are subversives to our administration of justice.

On a professional note, after law school, I was accepted into the FBI as a special agent. When that position was put on hold by the election of Jimmy Carter, I eventually became a practicing trial lawyer.

For the past 39 years, I've tried cases all over western New York, and my reputation is one of integrity, by never deceiving the court or opposing counsel.

This application is not my opinion, but what I can prove.

Wherefore, I'm asking the court for permission to proceed according to your protocol.

Respectfully Submitted,

Paul A. Argentieri