# EXHIBIT A

# "WORK FOR HIRE" CONTRACT

## SECTION 1- GENERAL PROVISIONS

1. Definitions

The following terms have the meaning specified when used herein:
    PURCHASER - Paul Ceglia
    CONTRACTOR/SELLER – Mark Zuckerberg, his agents, employees,suppliers, or sub-contractors, furnishing materials equipment, or services.

    CUSTOMER – StreetFax LLC  the entity contracting for construction or other services form the Purchaser or which the goods and/or services provided hereunder are for incorporation into the work or are required to facilitate completion of Purchaser's contract with such entity.
    PRIME CONTRACT – This contract between Purchaser and Seller.

2. Entire Agreement

The contract between the Purchaser and Seller as a Purchase agreement and "work made for hire" reflects two seperate business ventures, the first being for the work to be performed directly for the StreetFax Database and the Programming language to be provided by Seller.,
Second it is for the continued development of the software, program and for the purchase and design of a suitable website for the project Seller has already initiated that is designed to offer the students of Harvard university access to a wesite similar to a live functioning yearbook with the working title of "The Face Book"

It is agreed that Purchaser will own a half interest (50%) in the software, programming language and business interests derived from the expansion of that service to a larger audience.

3. Payment Terms

No insurance or premium charges or price increases will be allowed unless authorized by Purchaser in writing.  No increase in price from that stated on the face hereof will be considered throughout the duration of the order.
The Agreed upon Cost that the Seller and the Buyer have agreed upon are as follows: Buyer agrees to pay the seller the Sum of $1000 a piece for the work to be performed for Streetfax and $1,000 for the work to be performed for "The Page Book".
Late fees are agreed to be a 5% deduction for the seller if the project is not completed by the due date and an additional 1% deduction for each day the project is delayed beyond that point.
    The agreed upon project due date for the StreetFax software *provdin wes Asgay is Fund by may 24, 2003* May 31, 2003.
The agreed upon completion for the expanded project with working title "The Face Book" shall be January 1 2004 and an additional 1% interest in the  business will be due the buyer for each day the website is delayed from that date.
Additional funds may be provided for either project on an as needed basis at the sole discretion of the Buyer.

4. Changes

a) BY PURCHASER – Purchaser agrees that no further revision shall
    be implemented until or unless approved by the seller. Those revisions
        shall be transmitted for written approval to seller.
b) BY SELLER – The Seller agrees that no further revision shall be
    implemented until or unless approved by Buyer. Those
    revisions shall be transmitted for written approval to the Street
    Fax Purchasing Department.

5. Purchaser's Property/Seller's Responsibility

For the StreetFax database Buyer agree to pay for and maintain the cost of upkeep for the servers needed for it's operation.

For "The Face Book" Seller agrees to maintain and act as the sites webmaster and to pay for all domain and hosting expenses from the funds received under this contract, and  Seller agrees that he will maintain control of these services at all times.

Data, drawings, tooling, patterns, materials, specifications, and any other items or information supplied to Seller under this order are the property of the Purchaser and must be returned upon completion of this order.  Such items or information are to be used solely in the performance of the work by the seller and shall not be used or disclosed for any other purpose whatsoever without Purchaser's prior express written consent.

6. Settlement of Controversies.

In the event that this purchase order is for materials or equipment which is excluded from this Prime Contract, and in the case of disputes between the Purchaser and the Customer or between the Purchaser and the Seller regarding materials or equipment to be furnished by the Seller, the Seller agrees to be bound to the same extent that the Purchaser is bound by the terms of the Prime Contract, and by any and all decisions and determinations made thereunder, provided that the Seller shall have the right to participate in the settlement of any dispute to the extent that the Seller will be affected thereby.
No interest shall accrue on any payment(s) otherwise due the Seller, which is withheld or delayed us a result of any such dispute, except to the extent that the Purchaser is ultimately paid interest on monies due the Seller.The Seller shall not be held liable if the Seller follows instructions of the Purchase and it is later determined that the Purchaser's instructions were not in compiance with the terms and specifications of the Prime Contract. Pending final disposition of a dispute hereunder, the Seller shall carry on the work unless otherwise agreed I writing by the purchaser.
In all instances the final authority should rest with the final Specifications.

7. Patent Indemnity

Purchaser hold seller harmless for an infringement  sellers work may constitute on patents held by third party that result from the direct request for the work made by purchaser in this "work made for hire" agreement.
The Seller hereby agrees to be responsible for all claims against the Purchaser of the Customer for alleged infringement of patents by reason of the Purchaser's or Customer's possession, use, or sake of any materials or equipment furnished hereunder by the Seller or by reason of the performance of any work hereunder by the Seller. The Seller agress to defend it's sole expense all suits against the Purchaser and/or the Customer and to save and hold harmless the Purchaser and the Customer from and against all costs, expensed, judgements, and damages of any kind which the Purchaser or the Customer may be obliged to pay or incur by reason of any such alleged or actual infringement of a patent or patents. The Purchaser and the Customer agree to render whatever assistance it reasonably can I the way of information and access to records for the defense of any such suit.
This indemnity shall not extend to alleged or actual infringements resulting from the Seller's compliance with the Purchaser's or Customers's design, instructions, processes, or formulas provided, however, that the Seller agress to be responsible if it is reasonable to assume the the Seller should have been aware of a possible alleged or actual infringement resulting from the Purchaser's or Customer's design, instructions, processes, or formulas and fails to notify the Purchasers of such possibility.

8. Assignment of Subcontracting

Neither this order nor any rights, obligations, or monies due hereunder are assignable or transferable (as security for advances or otherwise) without the Purchaser's prior written consent, and except as to purchases of raw materials or standard commercial articles or parts, the Seller shall not subcontract any major portion of the work encompassed by this order without the Purchaser's prior written approval. The Purchaser shall not be required to recognize any assignment or subcontract made without its prior written consent.

The buyer accepts that there will be two other subcontractors working on this project their work will be accepted provided a noncompete and "work made for hire agreement" are in place.

9. Proprietary Rights

It is acknowledged that this is a work made for hire agreement and that all Intellectual property rights or patent rights are that of Streetfax Inc. All code in portion or in its complete form remain the property of StreetFax Inc.If the items to be supplied hereunder have been designed in accordance with specifications or data furnished or originated by the Purchaser or its Customer, such items shall not be reproduced except with the approval of the Purchaser and, as applicable, its Customer and all drawings, photographs, data, software, and other written material or information supplied in connection therewith shall at all times remain the property of the Purchaser or its Customer and be returned promptly upon request at the completion, termination or cancellation of this order. In the event that StreetFax defaults on its payment terms rights would be granted to seller.

10.   Termination

A. DEFAULT – The Purchaser may terminate this order or any part thereof by written notice if the Seller:

a)   fails to make deliveries or to complete performance of its obligations hereunder within the time specified or in accordance with the agreed schedules unless such failure is due to acts of God, strike or other causes which are beyond the control of the Seller.

b)   Fails to comply with the terms and conditions of the purchase order and does not cure such failure within a period of ten (10) calendar days after written notice thereof.

c)   Makes an assignment for the benefit of creditors without prior written consent of the Purchaser, becomes insolvent or subject to proceedings under any law relating to bankruptcy, insolvency, or the relief of debtors.

Should the Purchaser elect to terminate for default, the Purchaser may take possession of all or any of the items to be supplied hereunder which are in the Seller's possession without regard to stage of completion and may complete or cause the work to e completed on such items or may manufacture of procure similar items. Any additional costs or expense incurred by the Purchaser over and above the original purchase price from the Seller plus freight costs shall be for the account of the Seller.

In all events, the Purchaser shall not be or become liable to the Seller or any third party claiming through or under the Seller for any portion of the price of any items that Purchaser elects not to accept following notice of termination for default.

11.   Liens

The Seller agrees to deliver the items to be supplied hereunder free and clear of all liens, encumbrances, and claims of laborers or material men and the Purchaser may withhold payment pending receipt of evidence in form and substance satisfactory to it of the absence of such items, claims and encumbrances.

12.   Governing Law

This Purchase Order and any material relating thereto shall be governed by the laws of the state in which the Purchaser's officeshant issues the order is located.

13.   Recovery of Damages

If the Seller should recover any damages as a result of antitrust violations in any manner due to price fixing on the part of another manufacturer or Seller, the Seller shall pay over to the Purchaser any ages Purchaser has suffered as a result of the same price fixing within a reasonable time after the damages are recovered by the Seller.

14.   Notice of Labor Disputes

a)   Whenever the Seller has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this order, the Seller shall immediately give notice thereof, including all relevant information with respect thereto, to the Purchaser.

b)   The Seller shall insert the substance of this clause including this paragraph (b) in any subtier supply agreement hereunder as to which a labor dispute may delay the timely performance of this order except that each such subtier supply agreement shall provide that in the event its timely performance is delayed or threatened by delay by an actual or potential labor dispute, the subtier Seller shall immediately notify its next higher tier Seller or Sellers, as the case may be, of all relevant information with respect to such dispute.

15. Indemnity Requirements for Contractors/Seller

Contractor/Vendor shall defend, indemnity and save Street Fax from any and all claims, suits, losses, damages, or expenses, whether caused or contributed to by the negligence of Street Fax, its agents, or employees, or otherwise, on account of injuries to or death of any and all persons whomsoever, including the Contractor/Vendor, subcontractors, employees of Contractor/Vendor, the subcontractor, and of Street Fax and any and all damage to property to whomsoever belonging, including property owned by, rented to, or in the care, custody, or control of the parties hereto arising or growing out of, or in any manner connected with the work performed under this contract, or caused or occasioned, in whole or in party by reason of or arising during the presence of the person or of the property of Contractor/Vendor, subcontractors, their employees, or agents upon or in proximity to the property of Street Fax Notwithstanding the foregoing, nothing herein contained is to be construed as an indemnification against the sole negligence of Street Fax.

16. Publicity

Seller shall not publish photographs or articles, give press releases or make speeches about or otherwise publicize the existence or scope of this Purchase Order, or any generalities or details about this Purchase Order without first obtaining the written consent of Buyer.

17. Seller's Disclosure

Any information relating to the Seller's designs, manufacturing processes or manufactured products which the Seller may disclose to the Buyer in connection with the performance of the contract may be used by the Buyer for any purpose relating to the contract and to its performance without liability therefor to the Seller.

18. General Notes

Seller shall reference this purchase order number on all documents and/or correspondence related to this order.

The signatures below will execute this contract.

Buyer – Paul Ceglia, StreetFax

4/28/03

Seller – Mark Zuckerberg

MZ Zubf 04.28.03

EXHIBIT B

At a Term of the Appellate Division of the Supreme
Court held in and for the First Judicial Department in
the County of New York on May 17, 2016.

PRESENT:  Hon. John W. Sweeny, Jr.,          Justice Presiding,
               Dianne T. Renwick
               Sallie Manzanet-Daniels
               Judith J. Gische,             Justices.

---------------------------------------X
Facebook, Inc., et al.,
          Plaintiffs-Respondents,

          -against-
                                            M-443
DLA Piper LLP (US), et al.,                 Index No. 653183/14
          Defendants-Appellants,

Paul Argentieri & Associates, et al.,
          Defendants.
---------------------------------------X


          Plaintiffs-respondents having moved for reargument of,
or in the alternative, for leave to appeal to the Court of
Appeals, from the decision and order of this Court, entered on
December 29, 2015 (Appeal No. 16162),

          Now, upon reading and filing the papers with respect to
the motion, and due deliberation having been had thereon,

          It is ordered that the motion is denied.


                    ENTER:



                    _____
                              CLERK

Gonzalez, P.J., Sweeny, Renwick, Manzanet-Daniels, JJ.

16162        Facebook, Inc., et al.,                    Index 653183/14
                   Plaintiffs-Respondents,

                     -against-

             DLA Piper LLP (US), et al,
                   Defendants-Appellants,

             Paul Argentieri & Associates, et al.,
                   Defendants.
             _____

Dontzin Nagy & Fleissig LLP, New York (Tibor L. Nagy, Jr. of
counsel), for DLA Piper LLP (US), Christopher P. Hall, John
Allock, Robert W. Brownlie and Gerard A. Trippitelli, appellants.

Brown Rudnick LLP, New York (Sigmund S. Wissner-Gross of
counsel), for Lippes Mathias Wexler Friedman LLP, Dennis C. Vacco
and Kevin J. Cross, appellants.

Joseph Hage Aaronson LLC, New York (Gregory P. Joseph of
counsel), for Milberg LLP, Sanford P. Dumain and Jennifer L.
Young, appellants.

Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.,
Washington, DC (Kevin B. Huff of the bar of the District of
Columbia, admitted pro hoc vice, of counsel), for respondents.
             _____

     Order, Supreme Court, New York County (Eileen A. Rakower,

J.), entered May 11, 2015, which denied the pre-answer motions of

defendants-appellants DLA Piper LLP (US), Christopher P. Hall,

John Allcock, Robert W. Brownlie, and Gerard A. Trippitelli

(collectively the DLA Piper defendants); Milberg LLP, Sanford P.

Dumain and Jennifer L. Young (collectively, the Milberg

defendants); and Lippes Mathias Wexler Friedman LLP, Dennis C. Vacco and Kevin J. Cross (collectively, the Lippes defendants) to dismiss the complaint under CPLR 3211(a)(7), unanimously reversed, on the law, without costs, the motions granted, and the complaint dismissed.   The Clerk is directed to enter judgment accordingly.

This case arises from dealings dating back over a decade between plaintiff Mark Elliot Zuckerberg and nonparty Paul Ceglia.   The underlying facts of this case are as follows:

On April 28, 2003, Ceglia hired Zuckerberg to design a website for a company called Street Fax, Inc.   Ceglia and Zuckerberg executed a two-page contract (the Street Fax Contract) and Zuckerberg performed some work under the contract, although he was not paid in full by Ceglia.

In December 2003, Zuckerberg conceived of Facebook, which he launched on February 4, 2004.

On June 30, 2010, Ceglia, through defendant attorney Paul Argentieri, filed a complaint in Allegheny County Supreme Court against Facebook and Zuckerberg (the Ceglia action), alleging that on April 28, 2003, Zuckerberg and Ceglia purportedly entered into a "Work For Hire Contract."   This purported contract allegedly reflected Ceglia's agreement to pay Zuckerberg for

developing the Street Fax website and a separate website with the working title of "The Face Book," and Ceglia's purported acquisition of a 50% interest in the software, programming language and business interests derived from any expansion of The Face Book, along with an additional 1% interest for each day the website was delayed beyond January 1, 2004.  At the time they filed the complaint, Ceglia's representatives obtained an ex parte TRO from the court restraining Facebook from transferring, selling, or assigning any assets owned by it.  The TRO was served on Facebook on July 6, 2010, and expired on or before July 23, 2010.

On July 9, 2010, the case was removed to federal court based on diversity jurisdiction.  From the outset of the litigation, Zuckerberg took the position that the Work For Hire Contract was a forgery and the Ceglia action was fraudulent.

In early 2011, Ceglia and Argentieri offered a contingency fee arrangement to various law firms via a "Lawsuit Overview" document, which mapped out the strategy and bases of the lawsuit. Several law firms, including the DLA Piper and the Lippes defendants, as well as Kasowitz, Benson, Torres and Friedman, LLP (Kasowitz), agreed to represent Ceglia.

On March 30, 2011, a forensic e-discovery consultant

57

working with Kasowitz discovered the original Street Fax Contract on Ceglia's computer hard drive and concluded it had been altered to create the "Work For Hire Contract" by adding references to Facebook.  Kasowitz notified Argentieri of these findings several times and immediately withdrew as Ceglia's counsel.

On April 11, 2011, the DLA Piper and the Lippes defendants (DLA-Lippes) filed an amended complaint in the Ceglia action repeating Ceglia's claims against Facebook based on the Work For Hire Contract, and quoting, but not attaching, purported emails between Zuckerberg and Ceglia discussing the development of Facebook.

On April 13, 2011, Kasowitz sent a letter to the DLA-Lippes defendants, informing them that on March 30, it had seen documents on Ceglia's computer that established that the Work For Hire Contract was a forgery and that it had communicated these findings to Argentieri on March 30, April 4, and April 12.  The letter further stated that Kasowitz would agree, pending an investigation that defendant Vacco of Lippes Mathias had promised to undertake, to refrain from reporting its findings to the Federal Court.[4]  This investigation was indeed undertaken as

---

[4]The complaint in the instant action alleges, *on information and belief*, that shortly after notifying Argentieri of its

discussed infra.

On June 2, the parties moved and cross-moved for expedited discovery concerning the Work For Hire Contract, complete with affidavits and expert evidence both for and against the authenticity of the contract.  On June 29, on the eve of the hearing for expedited discovery, the DLA-Lippes defendants withdrew from the case without explanation.[5]  The Federal Magistrate ordered expedited discovery into the authenticity of the Work For Hire Contract and the purported emails.

During the expedited discovery period, Ceglia hired the Milberg defendants, which first entered an appearance on March 5, 2012.  They moved to withdraw from representing Ceglia on May 20, 2012.

On November 26, 2012, Ceglia was indicted for mail and wire fraud as a result of his scheme to defraud plaintiffs.  He subsequently fled the jurisdiction and is currently a fugitive.

On March 26, 2013, following discovery, the Federal

---

findings, and *prior* to April 11, 2011, the date the amended complaint in the Ceglia action was filed, Kasowitz advised the DLA and Lippes defendants what had been discovered concerning the Street Fax Contract.

[5]Ceglia was represented by 23 other attorneys after the DLA-Lippes defendants withdrew.

Magistrate recommended that the District Court dismiss the Ceglia action with prejudice, finding that the Work for Hire Contract and purported emails were all forgeries and that the lawsuit was a massive fraud on the court.  This recommendation was adopted by the District Court on March 25, 2014, and the complaint was dismissed.

Based on these factual allegations, plaintiffs commenced the instant action, asserting claims for malicious prosecution and attorney deceit against defendants-appellants (defendants), among others, alleging that they initiated the Ceglia lawsuit without probable cause, and thereafter continued it even as they knew, or reasonably should have known, that it was fraudulent, without merit, and based on fabricated evidence from the moment the original complaint was filed and at all times while the action was pending.

Defendants moved to dismiss the complaint, alleging, among other things, that the allegations regarding malicious prosecution failed to demonstrate that they acted with "actual malice," that they lacked "probable cause" to maintain the action, or that plaintiffs sustained a "special injury."  With respect to the claims brought under Judiciary Law § 487 for attorney deceit, defendants argued that the complaint should be

60

dismissed because it failed to allege with the requisite particularity that they intended to deceive the court or plaintiffs, that they engaged in a chronic and extreme pattern of legal delinquency, or that they were aware of the fraud and deceit during the Ceglia action.  Plaintiffs opposed those respective motions and the motion court denied all motions.  For the following reasons, we now reverse.

On a motion to dismiss pursuant to CPLR 3211, we must accept as true the facts as alleged in the complaint and accord plaintiffs the benefit of every favorable inference (*see Sokoloff v Harriman Estates Dev. Corp.*, 96 NY2d 409, 414 [2001]).  However, "[f]actual allegations presumed to be true on a motion pursuant to CPLR 3211 may properly be negated by affidavits and documentary evidence" (*Wilhelmina Models, Inc. v Fleisher*, 19 AD3d 267, 269 [1st Dept 2005], citing *Biondi v Beekman Hill House Apt. Corp.*, 257 AD2d 76, 81 [1st Dept 1999], *affd* 94 NY2d 659 [2000]; *see also Matter of Sud v Sud*, 211 AD2d 423, 424 [1st Dept 1995]).

With respect to the civil malicious prosecution claim, that cause of action should have been dismissed.  The tort of malicious prosecution requires proof of each of the following elements:  "(1) the commencement or continuation of a . . .

61

proceeding by the defendant against the plaintiff, (2) the

termination of the proceeding in favor of the [plaintiff], (3)

the absence of probable cause for the . . . proceeding and (4)

actual malice" (*Broughton v State of New York*, 37 NY2d 451, 457

[1975], *cert denied sub nom. Schanbarger v Kellogg*, 423 US 929

[1975]).  Additionally, a plaintiff must also allege and prove

"special injury" (*Engel v CBS, Inc.*, 93 NY2d 195, 201 [1999]).

With respect to the element of probable cause, a plaintiff

must allege that the underlying action was filed with "a purpose

other than the adjudication of a claim" and that there was "an

entire lack of probable cause in the prior proceeding" (*Engel*, 93

NY2d at 204).  Moreover, the lack of probable cause must be

"patent" (*Butler v Ratner*, 210 AD2d 691, 693 [3d Dept 1994], *lv

dismissed* 85 NY2d 924 [1995]).  In this context, the Court of

Appeals has stated as follows:

> "Probable cause is the knowledge of facts, actual or
> apparent, strong enough to justify a reasonable man
> in the belief that he has lawful grounds for
> prosecuting the defendant in the manner complained of.
> The want of probable cause does not mean the want of
> any cause, but the want of any reasonable cause, such
> as would persuade a man of ordinary care and prudence
> to believe in the truth of the charge" (*Burt v Smith*, 181 NY
> 1, 5-6 [1905]).

In a malicious prosecution action, the burden of proof to

establish a want of probable cause is on the plaintiffs (*id.* at

62

10).

Here, the Allegheny court's granting of a TRO at the inception of the Ceglia action, prior to any of the defendants' representation of Ceglia, created a presumption that Ceglia had probable cause to bring the case.  This presumption must be overcome by specifically pleaded facts (*see Hornstein v Wolf*, 67 NY2d 721, 723 [1986]).  Moreover, a plaintiff's factual allegations regarding lack of probable cause and malice may be disproved by the evidentiary material submitted by defendant in support of a motion to dismiss (*Shaffer v Gilberg*, 125 AD3d 632, 635 [2d Dept 2015]).

Applying these principles to this case, we find that the allegations in the instant complaint concerning defendants' lack of probable cause are entirely conclusory, and are thus inadequate to support the lack of probable cause element of the malicious prosecution claim (*see Web Mgt. v Sphere Drake Ins.*, 302 AD2d 273, 273 [1st Dept 2003]).  Despite plaintiffs' claims that the Work For Hire Contract was an obvious forgery, the Allegheny court granted a TRO after reviewing it.  Defendants produced experts who took issue with plaintiffs' experts on that score and the authenticity of the document was vigorously contested throughout the Ceglia litigation.  Moreover, the DLA-

Lippes defendants conducted a quite thorough investigation after being advised of Kasowitz's findings, going so far as subjecting Ceglia to a polygraph test, which he passed.  The Kasowitz letter alone is not sufficient to support a claim that any further representation of Ceglia was patently unsupported by probable cause.

Inasmuch as plaintiffs cannot demonstrate the existence of the element of probable cause, we need not consider the remaining elements of actual malice or special injury.  The cause of action for malicious prosecution should have been dismissed.

We turn now to the Judiciary Law claims.  Relief under a cause of action based upon Judiciary Law § 487 "is not lightly given" (*Chowaiki & Co. Fine Art Ltd. v Lacher*, 115 AD3d 600, 601 [1st Dept 2014]) and requires a showing of "egregious conduct or a chronic and extreme pattern of behavior" on the part of the defendant attorneys that caused damages (*Savitt v Greenberg Traurig, LLP*, 126 AD3d 506, 507 [1st Dept 2015]).  Allegations regarding an act of deceit or intent to deceive must be stated with particularity (see *Armstrong v Blank Rome LLP*, 126 AD3d 427, 427 [1st Dept 2015]); the claim will be dismissed if the allegations as to scienter are conclusory and factually insufficient (see *Briarpatch Ltd., L.P. v Frankfurt Garbus Klein*

64

Lippes defendants conducted a quite thorough investigation after being advised of Kasowitz's findings, going so far as subjecting Ceglia to a polygraph test, which he passed.  The Kasowitz letter alone is not sufficient to support a claim that any further representation of Ceglia was patently unsupported by probable cause.

Inasmuch as plaintiffs cannot demonstrate the existence of the element of probable cause, we need not consider the remaining elements of actual malice or special injury.  The cause of action for malicious prosecution should have been dismissed.

We turn now to the Judiciary Law claims.  Relief under a cause of action based upon Judiciary Law § 487 "is not lightly given" (*Chowaiki & Co. Fine Art Ltd. v Lacher*, 115 AD3d 600, 601 [1st Dept 2014]) and requires a showing of "egregious conduct or a chronic and extreme pattern of behavior" on the part of the defendant attorneys that caused damages (*Savitt v Greenberg Traurig, LLP*, 126 AD3d 506, 507 [1st Dept 2015]).  Allegations regarding an act of deceit or intent to deceive must be stated with particularity (*see Armstrong v Blank Rome LLP*, 126 AD3d 427, 427 [1st Dept 2015]); the claim will be dismissed if the allegations as to scienter are conclusory and factually insufficient (*see Briarpatch Ltd., L.P. v Frankfurt Garbus Klein*

64

*& Selz, P.C.*, 13 AD3d 296, 297-298 [1st Dept 2004], *lv denied* 4
NY3d 707 [2005]; *Agostini v Sobol*, 304 AD2d 395, 396 [1st Dept
2003]).

Here, the allegations that defendants knew of Ceglia's fraud
are conclusory and not supported by the record.  Although
plaintiffs allege that the DLA-Lippes defendants had been advised
by Kasowitz that the Work For Hire Contract was a forgery *prior*
to the filing of the amended complaint in the Ceglia action on
April 11, the record unequivocally shows that the Kasowitz letter
to that effect was dated April 13, two days *after* the amended
complaint was filed. There is nothing to indicate that this
information had been communicated to the defendants prior to the
issuance of that letter.  Moreover, plaintiffs offer no support
for their claim that defendants had actual knowledge of the
fraudulent nature of the claim based on statements made to them
by Ceglia.  In fact, the opposite is true.  As noted, Ceglia
consistently maintained that the Work For Hire Contract was
genuine and even passed a polygraph test covering the contract
and his other claims.  Statements made in pleadings upon
information and belief are not sufficient to establish the
necessary quantum of proof to sustain allegations of fraud (*see*
*Angel v Bank of Tokyo-Mitsubishi, Ltd.*, 39 AD3d 368, 370 [1st

*& Selz, P.C.*, 13 AD3d 296, 297-298 [1st Dept 2004], *lv denied* 4
NY3d 707 [2005]; *Agostini v Sobol*, 304 AD2d 395, 396 [1st Dept
2003]).

Here, the allegations that defendants knew of Ceglia's fraud
are conclusory and not supported by the record.  Although
plaintiffs allege that the DLA-Lippes defendants had been advised
by Kasowitz that the Work For Hire Contract was a forgery *prior*
to the filing of the amended complaint in the Ceglia action on
April 11, the record unequivocally shows that the Kasowitz letter
to that effect was dated April 13, two days *after* the amended
complaint was filed. There is nothing to indicate that this
information had been communicated to the defendants prior to the
issuance of that letter.  Moreover, plaintiffs offer no support
for their claim that defendants had actual knowledge of the
fraudulent nature of the claim based on statements made to them
by Ceglia.  In fact, the opposite is true.  As noted, Ceglia
consistently maintained that the Work For Hire Contract was
genuine and even passed a polygraph test covering the contract
and his other claims.  Statements made in pleadings upon
information and belief are not sufficient to establish the
necessary quantum of proof to sustain allegations of fraud (*see
Angel v Bank of Tokyo-Mitsubishi, Ltd.*, 39 AD3d 368, 370 [1st

65

Dept 2007]).  Even assuming that the DLA-Lippes defendants knew of Kasowitz's finding before they filed the amended complaint, and regardless of the fact that the Milberg defendants knew about the Street Fax Contract when they represented Ceglia, at any of those times, there was no conclusive proof of Ceglia's fraud that rendered their representation deceptive.  In fact, the dispute over the authenticity of the contract remained central to the Ceglia litigation throughout that action, and was the subject of expert testing and opinion, both in favor of, and against, its authenticity.  As a result, the Judiciary Law § 487 claim should have been dismissed.

THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED:  DECEMBER 29, 2015

_____
CLERK

66

EXHIBIT C

Mark Zuckerberg
2734 Harvard Yard Mail Center
Cambridge, MA 02138
914.646.8593

<u>StreetFax Back-End Technical Specification</u>

*Non-technical Explanation:*

To make the specification more readable, I will give an overview of the functionality of the system described by the set of scripts and applications below.

The first section deals with logon and security. The first script makes sure that the interface through which users log into the system is completely secure, using the latest methods of commercial cryptography. It will verify if the user has the privileges to enter the system, and if they do, it admits them. The second script protects the system from being entered through a page other than the logon page. If the only security was at the logon screen, then a person could just go to a different page and bypass the logon completely. This script will ensure that the user is logged in before it grants access to any page on the site. The third script in this section will allow the site administrators to create and edit usernames and account information. This is critical for customers who do not create their accounts through the site.

The second section deals with e-commerce. Much of the discussion here is about the different options of registration with SSL and VeriSign. The scripts we develop will use these technologies to perform secure e-commerce transactions. It will allow users to register on a subscription and individual-use basis. All actions performed by users in this section of the site will be logged in a database and can be used to generate reports later on.

The third section deals with searching the database of images. The user will enter two streets to search for their intersection, and then a script we write will search the database. If multiple intersections are found, the user will be shown a list with the towns and states to choose from. If, after reviewing the choices, there is still no an accurate match, the user will be routed to another page which will ask them to specify a state and city for a more detailed search. From their selection, the user is taken to another page with the list of intersections matching their search in the specified area. The user can choose an intersection to search for images. If only a single intersection is returned from the original search, then the images from that intersection are automatically brought up. The images will be displayed in alphabetical order with any signs at the top of the page above the photographs of the intersections. The script that retrieves the images from the database will also construct the necessary sentence describing the image from information in the database. If at any point no intersection is found, the user will be taken to a site that asks them if they want to pay to have those images acquired for them within 24 hours, this screen will appear as a half page with the nearest possible matches above it. They can search these pictures by clicking on any one of the intersections to

view it, and then by navigating back and selecting the next intersection. There will also be a script to get the number of images matching an intersection.

The fourth section deals with saving and retrieving adjuster comments and layout settings from the database. This will allow adjusters to write comments and retrieve them later on. They will also be able to specify a layout for the screen, but we have not designed the possible layouts yet so no further explanation can be given at this point. A sample outline has been received consisting of 4 different layout types.

The fifth, sixth, and seventh sections deal with the very back-end implementation and architecture of the server and database. The database will be robust enough to be able to efficiently search the collection of images and be able to store them in a number of conventions, although the convention of "direction+street1+street2" will be accepted for now. The server will be equipped with the latest and most flexible web server, database server, and a solid hosting package. It was also have a built in interface for retrieving intersections from a given area and editing their database entries.

The eighth section deals with the client/photographer interface. Once a client requests an image, the photographer whose territory the intersection is in is notified that they need to take the picture. The dispatcher is also notified that the photograph needs to be taken by a new entry on the open requests page. This open requests page will give information on when the request was made, who made the request, and what intersection was requested. After 40 minutes, if the photographer assigned to that territory has not responded to the notification and confirmed its receipt, the specific request on the open requests page will turn a different color. When the photographer does respond to this initial request, the open requests page will display this and an email will be automatically generated and sent back to the adjuster informing them that their request has been received and accepted by the nearest photographer, and that their photos will be provided guaranteed. At selected intervals, if the photographer has not yet responded or uploaded the images, the dispatcher is again notified that the photographs still need to be taken. The system will continue to email the photographer and update the open requests page with the time remaining and status on the situation until the images are uploaded to the system. On the street, once the images have been taken, the photographer can upload them to the server, which will require the photographer to sign in to their homepage prior to upload. From here, the photographer must enter the request's claim number, which will be automatically generated with each new request. After the appropriate claim number has been entered, the server uploads the pictures to the site and updates the open requests page by graying the area. At this point, a link appears and the dispatcher has five minutes to approve or reject the photographs before the server automatically notifies the adjuster through email that their pictures are on site. There will be a link in the email that will allow the adjuster to link directly to the page which has his or her images. If the dispatcher rejects the pictures, then no notice is given to the adjuster and the process is taken over manually.

The ninth and tenth sections deal with allotting time for administrative discussions and algorithm planning.

*Database Structure and Scripting:*

1. Logon Scripts
   a. A script to validate logon information by referencing the user information table in the database. Validation includes taking the username and password and making sure they match and that the account is still valid. This script will also acquire the privileges of the user to ensure that only searches they are entitled to will be performed. It will use special security measures and encryption to maintain the integrity of users' passwords. This script will also log all user logons in a separate table in the database. Estimated Development Time: 1 day.
   b. A script to check for the logon key on all other privileged parts of the site. This script will protect against people bypassing the logon screen and accessing user-only parts of the site. EDT: ½ day.
   c. A script to add users and edit users. EDT: ½ day.

2. Financial Scripts
   a. A script to interface with the credit card validation component. This script will use security measures like secure socket layer (SSL) to ensure the integrity of the transactions. Two different scripts will need to be developed to deal with subscription and individual use transactions. All transactions will be logged in a separate table in the database. *Note:* The credit card validation component and SSL certificate will carry additional costs. There are several options for e-commerce, and these can be discussed later. EDT: 4 days.

3. Search Scripts
   a. A script to interface with the database of images, which is given two street names. If no such intersection exists, then the names of intersections which are similar to the one entered are returned and the search can be repeated. If multiple intersections match the street names entered, then a new page comes up which asks the user to specify a state or city. From the selection, if there are still multiple matches, another page comes up that lets the user choose which intersection they want to retrieve images of. All searches will be logged, along with which user performed them, in a separate table in the database. EDT: 3 days.
   b. A script to retrieve images from the database, given a unique intersection in some state. The script will display all images found in the database along with a sentence describing the image, its orientation, and the street it was taken from. If no images are found, it will ask the user if they would like those images to be acquired. If so, a notice will be sent to an email address or list of email addresses. Either way, the fact that no results came up will be recorded in a separate table in the database along with the user's response to acquiring the images. EDT: 3 days.
   c. A subscript to reference the main script and return how many intersections and/or images match a given set of intersections. EDT: ¼ day.

    d.    A subscript to include speed limits in the capacity of the search engine. This script will return images of the speed limits in the queried regions using the keywords described. A full explanation of all keywords will be needed to write this script. EDT: 2 days.

4.    Adjuster Preference Scripts
    a.    A script to store adjusters' comments about images from their queries in the database. This script will take the comments that adjusters enter about the images and it will save the comments in the database for later retrieval when the same images are viewed. EDT: ½ day.
    b.    A script to query adjusters' comments about images from the database. This script will return and display the current adjuster's saved comments about the currently viewed images in the allotted area for marking notes. EDT: ½ day.
    c.    A script to store adjusters' viewing preferences about the layout of the screen. Several different layout options will be available (they are not specified here but they will be in the final specification), and this script will save each adjuster's settings in the database. EDT: ½ day.
    d.    A script to query adjusters' viewing preferences from the database and incorporate these settings into the display. The script will apply the given display settings into the screen format. As mentioned in 4.c, the different settings available to the adjusters will be specified in the final version of the spec. EDT: 1½ days. *e. A script that allows Back End Administrators to view & edit all intersections within a given city through a drop down menu bar.*

5.    Database Architecture
    a.    An application to build the appropriate table structure from the image files in the system. This program will make an entry in the main table in the database for each image file in the database. This is the conversion necessary to get from the raw image collection to the organized database we will use in the site. The program will be robust enough to handle images within different directory structures as long as the same naming convention is used throughout the file system. This will allow images of a given intersection to be stored in a separate folder, or in a conglomerate folder with images from other intersections, as long as each image follows the same naming convention. For this version of the specification, the file naming convention in use unilaterally will be "directional+street1+street2". EDT: 3½ days.
    b.    Configuration of an efficient table structure in the database. This construction will provide the framework for the database so that it can be populated with all of the necessary data fields. EDT: 2 days.

*Server Specification and Applications:*
1.    Package Research
    a.    As we have not yet decided how to host the final application, some research must be done to figure out the best option in this area. It seems doubtful that we will be able to find a non-specific contract agreement with some well-known hosting company that will meet our specifications for access requirements and applications that need to be run. Therefore, it might seem

best to purchase a server and take care of hosting ourselves. We will look into all of these options. EDT: 1½ days.

2.   Server Configuration
   a.   Stable Internet configuration. EDT: 1 day.
   b.   Apache web server configuration. EDT: ¾ day.
   c.   PHP pre-processor configuration. EDT: ¾ day.
   d.   MySQL configuration and phpMyAdmin interface installation. EDT: ¾ day.
   e.   Photographer access configuration. EDT: ¾ day.

3.   Photographer Application
   a.   A web interface between the photographers and the dispatcher. A script that that will automate sending emails to client, photographer, and dispatcher. The client will be emailed upon receipt of their request and again once the request has been completed to tell them that their images are ready. The correct photographer will be contacted to take the images, and then will be warned on regular intervals if the photographs have not been taken and uploaded to the server. An email will be sent to the photographer to confirm the upload of the images when the job is done. An email will be sent to the dispatcher to notify him of the request, and warning emails will be sent on regular intervals to tell the dispatcher if the request has not yet been filled. A confirmation email will be sent to the dispatcher to confirm that the request has been filled. *Note:* This is a major change from the original specification. The original photographer application was discarded and this one replaced it for the initial development. EDT: 4 days.

*Internal and External Administravia:*
1.   Communication
   a.   Correspondence through emails and phone with you about progress, questions, and other general information exchange. EDT: 1 day.
   b.   Correspondence and meetings with my team about progress, development, and other general information exchange. EDT: 1 day.
   c.   Quality Assurance of all work done by my team. EDT: 3 days.

*Algorithm Design:*
1.   Planning and Design
   a.   Architecting the main algorithms in the search engine, database population, file naming, and general site security. EDT: 2 days.

*Enhancements (Not Included):*
1.   Police Reports and Building Inspection
   a.   These will essentially require new sections of the database and new database population algorithms. It seems to make sense to save these aspects of the project until later unless they are absolutely necessary in the first version of StreetFax.

2.  Highlighted Maps
    a.  This feature will be difficult to implement since it will require someone to go
        through the database and add information to all of the old entries.  At this
        point, that does not seem like an economical use of resources.  We can try to
        implement this enhancement later on, perhaps using a different algorithm.

3.  Automated Database Applications
    a.  It was a little unclear to me what sort of automated database cleanup you
        wanted, but I definitely see room for redundant entry filtering, data linking,
        and priority sorting to help increase the efficiency of the system.  This can
        come after the basic development.
    b.  Scripts that query the database to find results from a specific photographer and
        that email photographers when photographs have not been submitted on time.
        This functionality also seems less important in getting the system up and
        running.

4.  Robust Photographer Interface
    a.  This feature will take the form of a powerful custom server application that
        photographers can log into to use dynamic functionality within the assignment
        and request systems.  It will also provide the photographers with extra tools
        for batch uploading and perhaps editing of their images.

5.  Anti-Hacker System
    a.  An additional system to ensure the security of the server and maintain the
        integrity of the information inside.  Since some of the data, namely credit card
        numbers and passwords, is sensitive, this extra functionality is highly
        recommended in the long term.

This specification will be approved with appropriate signatures below.

Paul Ceglia, Street Fax

Mark Zuckerberg

# EXHIBIT D

General Conditions of Purchase

# STREET FAX

## SECTION 1- GENERAL PROVISIONS

### 1. Definitions

The following terms have the meaning specified when used herein:
  PURCHASER – Street Fax Inc.
  CONTRACTOR/SELLER – The entity, its agents, employees, suppliers, or sub-contractors, furnishing materials equipment, or services hereunder, as identified on Purchase Order.
  CUSTOMER – the entity contracting for construction or other services from Purchaser or which the goods and/or services provided hereunder are for incorporation into the work or are required to facilitate completion of Purchaser's contract with such entity.
  PRIME CONTRACT - The contract between Purchaser and Comer and all provisions, specifications and drawing referenced therein.

### 2. Entire Agreement

The contract between the Purchaser and Seller shall consist of and be contingent upon the Seller's acceptance of the Purchase Order, the provisions written on the face thereof, all provisions, specifications, and drawings referred to therein and these printed terms and conditions with appendixes. In the event of conflict between the provisions written on the face of this Purchase Order and those contained in these printed terms and conditions, the provisions written on the face of the Purchase Order shall prevail. This Purchase Order shall not be modified either orally or by failure of either party to enforce their rights hereunder. It is a condition of this Purchase Order that provisions printed on or otherwise contained in any quotations, order acknowledgment, shipping document, or other instrument of the seller shall be of no force or effect.

### 3. Payment Terms

  No insurance or premium charges or price increases will be allowed unless authorized by Purchaser in writing. No increase in price from that stated on the face hereof will be considered throughout the duration of the contract.
  The Agreed upon Cost that the Seller and the Buyer have agreed upon are as follows: Buyer agrees to pay seller the Sum of five hundred dollars($500) at the onset of this contract. Upon completion Buyer agrees to pay seller an additional one thousand dollars ($1,000.00 )US dollars within Thirty days of delivery of the Final approved work. Late fees are agreed to be a 5 % deduction for the seller  if project is not completed by due date and an additional 1% deduction for each day the project is late thereafter. Buyer agrees to pay a 2% late fee per month on  the balance owed the seller and further agrees to pay a minimum of $500 per month to seller or acknowledges that failure to comply  will result in the seller having the right to offline the site Streetfax.com and remove his work until it is paid in full.

### 4. Changes

a) BY PURCHASER – Purchaser agrees that no further revision shall be implemented until or unless approved by seller.Those revisions shall be transmitted for wrtitten approval to seller.
b) BY SELLER – The Seller agrees that no further revision shall be implemented until or unless approved by Street Fax. Those revisions shall be transmitted for written approval to the Street Fax Purchasing Department.

### 5. Purchaser's Property

Does not include the price of renting the server, and registering VeriSign and SSL.

Data, drawings, tooling, patterns, materials, specifications, and any other items or information supplied to Seller under this order are the property of the Purchaser and must be returned upon completion of this order. Such items or information are to be used solely in the performance of the work by the seller and shall not be used or disclosed for any other purpose whatsoever without Purchaser's prior express written consent.

### 6. Settlement of Controversies

In the event that this purchase order is for materials or equipment which will be incorporated in the Customer's work under the Prime Contract, and in the case of disputes between the Purchase and the Customer or between the Purchaser and the Seller regarding materials or equipment to be furnished by the seller, the Seller agrees to be bound to the same extent that the Purchaser is bound by the terms of the Prime Contract, and by any and all decisions and determinations made thereunder, provided that the Seller shall have the right to participated in the settlement of any dispute with the customer to the extent that the Seller will be affected thereby.
No interest shall accrue on any payment(s) otherwise due the Seller, which is withheld or delayed as a result of any such dispute except to the extent that the Purchaser is ultimately paid interest on monies due the Seller. The Seller shall not be held liable if the Seller follows instructions of the Purchase and it is later determined that the Purchaser's instructions were not in compliance with the terms and specifications of the Prime Contract. Pending final disposition of a . dispute hereunder, the Seller shall carry on the work unless otherwise agreed in writing by the Purchaser.
  In all instances the final authority should rest with the final Specifications.

### 7. Patent Indemnity

Purchaser hold seller harmless for any infingment sellers work may constitute on patents held by any third party that result from the direct request for work made by purchaser in this "work made for hire" agreement.
  The Seller hereby agrees to be responsible for all claims against the Purchaser of the Customer for alleged infringement of patents by reason of the Purchaser's or Customer's possession, use, or sake of any materials or equipment furnished hereunder by the Seller or by reason of the performance of any work hereunder by the Seller. The Seller agrees to defend at its sole expense all suits against the Purchaser and/or the Customer and to save and hold harmless the Purchaser and the Customer from and against all costs, expensed, judgments, and damages of any kind which the Purchaser or the Customer may be obliged to pay or incur by reason of any such alleged or actual infringement of a patent or patents. The Purchaser and the Customer agree to render whatever assistance is reasonably can in the way of information and access to records for the defense of any such suit. This indemnity shall not extend to alleged or actual infringements resulting from the Seller's compliance with the Purchaser's or Customer's design, instructions, processes, or formulas provided, however, that the Seller agrees to be responsible if it is reasonable to assume that the Seller should have been aware of a possible alleged or actual infringement resulting from the Purchaser's or Customer's design, instructions, processes, or formulas and fails to notify the Purchasers of such possibility.

### 8. Assignment of Subcontracting

Neither this order nor any rights, obligations, or monies due hereunder are assignable or transferable (as security for advances or otherwise) without the Purchaser's prior written consent, and except as to

purchases of raw materials or standard commercial articles or parts, the Seller shall not subcontract any major portion of the work encompassed by this order without the Purchaser's prior written approval. The Purchaser shall not be required to recognize any assignment or subcontract made without its prior written consent.

Subcontractors must have a "work made for hire agreement" in place with StreetFax.com before commencing their work.

**9. Proprietary Rights**
It is acknowledged that this is a work made for hire agreement and that all Intellectual property rights or patent rights are that of Streetfax Inc. All code in portion or in its complete form remain the property of StreetFax Inc.If the items to be supplied hereunder have been designed in accordance with specifications or data furnished or originated by the Purchaser or its Customer, such items shall not be reproduced except with the approval of the Purchaser and, as applicable, its Customer and all drawings, photographs, data, software, and other written material or information supplied in connection therewith shall at all times remain the property of the Purchaser or its Customer and be returned promptly upon request at the completion, termination or cancellation of this order. In the event that StreetFax defaults on it payment terms rights would be granted to seller.

**10. Termination**
A. DEFAULT – The Purchaser may terminate this order or any part thereof by written notice if the Seller:
  a) fails to make deliveries or to complete performance of its obligations hereunder within the time specified or in accordance with the agreed schedules unless such failure is due to acts of God, strike or other causes which are beyond the control of the Seller.
  b) Fails to comply with the terms and conditions of the purchase order and does not cure such failure within a period of ten (10) calendar days after written notice thereof.
  c) Makes an assignment for the benefit of creditors without prior written consent of the Purchaser, becomes insolvent or subject to proceedings under any law relating to bankruptcy, insolvency, or the relief of debtors.
Should the Purchaser elect to terminate for default, the Purchaser may take possession of all or any of the items to be supplied hereunder which are in the Seller's possession without regard to stage of completion and may complete or cause the work to o completed on such items or may manufacture of procure similar items. Any additional costs or expense incurred by the Purchaser over and above the original purchase price from the Seller plus freight costs shall be for the account of the Seller.
In all events, the Purchaser shall not be or become liable to the Seller or any third party claiming through or under the Seller for any portion of the price of any items that Purchaser elects not to accept following notice of termination for default.

**11. Liens**
The Seller agrees to deliver the items to be supplied hereunder free and clear of all liens, encumbrances, and claims of laborers or material men and the Purchaser may withhold payment pending receipt of evidence in form and substance satisfactory to it of the absence of such items, claims and encumbrances.

**12. Governing Law**
This Purchase Order and any material relating thereto shall be governed by the laws of the state in which the Purchaser's office that issues the order is located.

**13. Recovery of Damages**
If the Seller should recover any damages as a result of antitrust violations in any manner due to price fixing on the part of another manufacturer or Seller, the Seller shall pay over to the Purchaser any ages Purchaser has suffered as a result of the same price fixing within a reasonable time after the damages are recovered by the Seller.

**14. Notice of Labor Disputes**
  a) Whenever the Seller has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this order, the Seller shall immediately give notice thereof, including all relevant information with respect thereto, to the Purchaser.

  b) The Seller shall insert the substance of this clause including this paragraph (b) in any subtier supply agreement hereunder as to which a labor dispute may delay the timely performance of this order except that each such subtier supply agreement shall provide that in the event its timely performance is delayed or threatened by delay by an actual or potential labor dispute, the subtier Seller shall immediately notify its next higher tier Seller or Sellers, as the case may be, of all relevant information with respect to such dispute.

Work agreement. The scope of this contract is based on the following agreement for work to be performed:

CONSULTING (10 hours)
- review of business concept, site services and goals, target audience
- determining user interface design with respect to site functionality
- clarifying roles of designer/developer and programmer

DESIGN (10 hours)
- incorporating existing concepts/logo into a professional, easy-to-use graphical interface
- laying out a flexible template that can be used throughout the site to present various dynamically generated textual and graphical content

DEVELOPMENT (10 hours)
- converting designs to working HTML
- optimizing imagery and code for optimum efficiency and browser compatibility
- setting up style sheets and template code for easy plug-and-play implementation of dynamic content

TOTAL PROJECT BID: $1500.00

PROVISIONS
- work to begin/proceed upon signing of contract and receipt of pre-payment (previously determined to be $500)
- design limited to one round of revisions
- design limited to one homepage design and one universal subpage design
- development to include delivery of all static pages and a single template to serve for all dynamic pages
- development limited to pages included on the site map sent 4/12/2003
- development to begin upon delivery of complete and finalized content for all static pages (1-6, 8-10, 11, 12, 22, 25 and 26)
- any additional work (further design/content revisions, additional templates, additional pages, etc.) to be billed on top of the total project bid

24. Indemnity Requirements for Contractors/Seller
Contractor/Vendor shall defend, indemnity and save Street Fax from any and all claims, suits, losses, damages, or expenses, whether caused or contributed to by the negligence of Street Fax, its agents, or employees, or otherwise, on account of injuries to or death of any and all persons whomsoever, including the Contractor/Vendor, subcontractors, employees of Contractor/Vendor, the subcontractor, and of Street Fax and any and all damage to property to whomsoever belonging, including property owned by, rented to, or in the care, custody, or control of the parties hereto arising or growing out of, or in any manner connected with the work performed under this contract, or caused or occasioned, in whole or in party by reason of or arising during the presence of the person or of the property of Contractor/Vendor, subcontractors, their employees, or agents upon or in proximity to the property of Street Fax Notwithstanding the foregoing, nothing herein contained is to be construed as an indemnification against the sole negligence of Street Fax.

25. Publicity
Seller shall not publish photographs or articles, give press releases or make speeches about or otherwise publicize the existence or scope of this Purchase Order, or any generalities or details about this Purchase Order without first obtaining the written consent of Buyer.

26. Seller's Disclosure
Any information relating to the Seller's designs, manufacturing processes or manufactured products which the Seller may disclose to the Buyer in connection with the performance of the contract may be used by the Buyer for any purpose relating to the contract and to its performance without liability therefor to the Seller.

27. General Notes
Seller shall reference this purchase order number on all documents and/or correspondence related to this order.

CONTRACTOR/SELLER:

Randy Kato
527 Gates Avenue #4
Brooklyn, NY 11216

Signed:
Dated: May 5, 2003

EXHIBIT E

General Conditions of Purchase

# STREET FAX

SECTION 1- GENERAL PROVISIONS

**1. Definition**

The following terms have the meaning specified when used herein:

PURCHASER – Street Fax, Inc.

CONTRACTOR/SELLER – The entity, its agents, employees, suppliers, or sub-contractors, furnishing materials equipment, or services hereunder, as identified on Purchase Order.

CUSTOMER – the entity contracting for construction or other services from Purchaser for which the goods and/or services provided hereunder are for incorporation into the work or are required to facilitate completion of Purchaser's contract with such entity.

PRIME CONTRACT – The contract between Purchaser and Customer and all provisions, specifications and drawings referenced therein.

**2. Entire Agreement**

The contract between the Purchaser and Seller shall consist of, and be contingent upon the Seller's acceptance of the Purchase Order, the provisions written on the face thereof, all provisions, specifications, and drawings referred to thereon and these printed terms and conditions and appendices. In the event of conflict between the provisions written on the face of this Purchase Order and those contained in these printed terms and conditions, the provisions written on the face of this Purchase Order shall prevail. This Purchase Order shall not be modified either orally or by failure of either party to enforce their rights hereunder. It is a condition of this Purchase Order that provisions printed on or otherwise contained in any quotation, order acknowledgment, shipping document, or other instrument of the seller shall be of no force or effect.

**3. Payment Terms**

No insurance or premium charge or price increases will be allowed unless authorized by Purchaser in writing. No increase in price, from that stated on the face hereof will be considered through out the duration of the order.

The Agreed upon Cost that the Seller and the Buyer have agreed upon are as follows: Buyer agrees to pay seller the Sum of $1,000 at the onset of the contract. The Buyer agrees to pay seller $2,000 on the first day of the project, and upon completion Buyer agrees to pay seller an additional $13,000 US dollars within Thirty days of delivery of the Final approved program. Late fees are agreed to be a 5% deduction for the seller if project is not completed by due date and an additional 1% deduction for each day the project is late thereafter. Buyer agrees to pay a 5% late fee per month on the balance owed the seller and further agrees to pay a maximum of $2,000 per month to seller or acknowledges that failure to comply will result in the seller losing the right to offline the site Streetfax.com and remove his program.

The Agreed upon project due date is May 31, 2003.

*[handwritten signature]*

**4. Charges**

a) BY PURCHASER – Purchaser agrees that no further revision shall be implemented until or unless approved by a Seller. These revisions shall be transmitted for written approval on seller.

b) BY SELLER – The Seller agrees that no further revision shall be implemented until or unless approved by Street Fax. These revisions shall be transmitted for written approval on the street Fax Purchasing Department.

**5. Purchaser's Property**

Does not include the price of renting the server, and registering VeriSign and SSL. The Buyer agrees to lease these expenses in addition to the price of the contract, and will maintain control of these services at all times.

Data, drawings, tooling, patterns, manuals, specifications, and any other items or information supplied to Seller under this order are the property of the Purchaser and must be returned upon completion of the order. Such items or information are to be used solely in the performance of the work under this order by the seller shall not be used or disclosed for any other purpose whatsoever without Purchaser's prior express written consent.

**6. Settlement of Controversies**

In the event that the purchase order is for materials or equipment which will be incorporated in the Customer's work under the Prime Contract and in the case of dispute between the Purchaser and the Customer or between the Purchaser and the Seller regarding materials or equipment to be furnished by the seller, the Seller agrees to be bound to the same extent that the Purchaser is bound by the terms of the Prime Contract, and by any and all decisions and determinations made thereunder, provided that the Seller shall have the right to participate in the settlement of any dispute with the customer to the extent that the Seller will be affected thereby.

No interest shall accrue on any payment(s) otherwise due the Seller, which is withheld or delayed as a result of any such dispute except to the event that the Purchaser is thereby paid interest on reasons that the Seller. The Seller shall not be held liable if the Seller follows instructions of the Purchaser and it is later determined that the Purchaser's instructions were not in compliance with the terms and specifications of the Prime Contract. Pending final disposition of a dispute hereunder, the Seller shall carry on the work unless otherwise agreed in writing by the Purchaser.

In all instances the final authority should rest with the client Specification.

**7. Patent Indemnity**

Purchaser hold seller harmless for any infringement where work may constitute on patents held by any third party that could harm the client request for work made by purchaser in the "work made for hire" agreement.

The Seller hereby agrees to be responsible for all claims against the Purchaser or the Customer for alleged infringement of patents by reason of the Purchaser's or Customer's possession, use, or sale of any materials or equipment furnished hereunder by the Seller or by reason of the performance of any work hereunder by the Seller. The Seller agrees to defend at its own expense all suits against the Purchaser and/or the Customer and to save and hold harmless the Purchaser and the Customer from and against all costs, expenses, judgments, and damages of any kind which the Purchaser or the Customer may be obliged to pay by reason of any such alleged or actual infringement of a patent or patents. The Purchaser and the Customer agree to render without assistance as reasonably can in the way of information and access to records for the defense of any such suit. This indemnity shall not extend to infringement resulting from the Seller's compliance with the Purchaser's or Customer's design, instructions, processes, or formulae provided, however, that the Seller agrees to the responsible if it is reasonable to assume that the Seller should have been aware of a possible alleged or actual infringement or resulting from the Purchaser's or Customer's design, instructions, processes, or formulae and fails to notify the Purchaser of such possibility.

8. Assignment of Subcontracting

Neither this order nor any rights, obligations, or monies due hereunder are assignable or transferable (as security for advances or otherwise) without the Purchaser's prior written consent, and except as to purchases of raw materials or standard commercial articles or parts, the Seller shall not subcontract any major portion of the work encompassed by this order without the Purchaser's prior written approval. The Purchaser shall not be required to recognize any assignment or subcontract made without its prior written consent.

The parties recognize that there will be non-direct subcontractors working on this project their work will be accepted provided a noncompete and "work made for hire agreement" are in place.

9. Proprietary Rights

It is acknowledged that this is a work made for hire agreement and that all intellectual property rights or patent rights are that of Street Fax Inc. All tools or portion of its complete form remain the property of StreetFax Itself, if the items to be supplied hereunder have been designed in accordance with specifications or data furnished or originated by the Purchaser or its Customer, such items shall not be reproduced except with the approval of the Purchaser and, as applicable, its Customer and all drawings, photographs, data, software, and other written material or information supplied in connection therewith shall at all times remain the property of the Purchaser or its Customer and be returned promptly upon request at the completion, termination or cancellation of this order. In the event the StreetFax defaults on a payment terms rights would be granted to seller.

10. Termination

A. DEFAULT - The Purchaser may terminate this order or any part thereof by written notice if the Seller:

   a)  fails to make deliveries or to complete performance of its obligations hereunder within the time specified or in accordance with the agreed schedule unless such failure is due to acts of God, strike or other causes which are beyond the control of the Seller.

   b)  Fails to comply with the terms and conditions of the purchase order and does not cure such failure within a period of ten (10) calendar days after written notice thereof.

   c)  Makes an assignment for the benefit of creditors without prior written consent of the Purchaser, becomes insolvent or subject to proceedings under any law relating to bankruptcy, insolvency, or the relief of debtors.

Should the Purchaser elect to terminate for default, the Purchaser may take possession of all or any of the items to be supplied hereunder which are in the Seller's possession without regard to stage of completion and may complete or cause the work to completed on such items or may manufacture or procure similar items. Any additional costs or expense incurred by the Purchaser over and above the original purchase price from the Seller plus freight costs shall be for the account of the Seller.

In all events, the Purchaser shall not be or become liable to the Seller or any third party claiming through or under the Seller for any portion of the price of any items that Purchaser elects not to accept following notice of termination for default.

11. Liens

The Seller agrees to deliver the items to be supplied hereunder free and clear of all liens, encumbrances, and claims of laborers or material men and the Purchaser may withhold payment pending receipt of evidence in form and substance satisfactory to it of the absence of such liens, claims and encumbrances.

12. Governing Law

This Purchase Order and any material relating thereto shall be governed by the laws of the state in which the Purchaser's office that issues the order is located.

13. Recovery of Damages

If the Seller should recover any damages as a result of antitrust violations in any manner due to price fixing on the part of another manufacturer or Seller, the Seller shall pay over to the Purchaser any sum Purchaser has suffered as a result of the same price fixing within a reasonable time after the damages are recovered by the Seller.

14. a)  Whenever the Seller has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this order, the Seller shall immediately give notice thereof, including all relevant information with respect thereto, to the Purchaser.

    b)  The Seller shall insert the substance of this clause including the paragraph (b) in any lower supply agreement hereunder as to which a labor dispute may delay the timely performance of this order except that each such subtier supply agreement shall provide that in the event its timely performance is delayed or threatened by delay by an actual or potential labor dispute, the subtier Seller shall immediately notify its next higher tier Seller or Sellers, as the case may be, of all relevant information with respect to such dispute.

15. Indemnity Requirements for Contractors/Seller

Contractor/Vendor shall defend, indemnify and save Street Fax from any and all claims, suits, liens, damages, or expenses, whether caused or contributed to by the negligence of Street Fax, its agents, or employees, or otherwise, on account of injuries to or death of any and all persons whomsoever, including the Contractor/Vendor, subcontractors, employees of Contractor/Vendor, the subcontractors, and of Street Fax and any and all damage to property to whatsoever belonging, including property owned by, rented to, or in the care, custody, or control of the parties hereto arising or growing out of, or in any manner connected with the work performed under this contract, or caused or occasioned, in whole or in part by reason of or arising during the presence of the person or of the property of Contractor/Vendor, subcontractors, their employees, or agents upon or in proximity to the property of Street Fax. Notwithstanding the foregoing, nothing herein contained is to be construed as an indemnification against the sole negligence of Street Fax.

16. Publicity

Seller shall not publish photographs or articles, give press releases or make speeches about or others the publicize the existence or scope of this Purchase Order, or any general information about or in this Purchase Order without first obtaining the written consent of Buyer.

17. Seller's Disclosure

Any information relating to the Seller's designs, manufacturing processes or manufactured products which the Seller may disclose to the Buyer in connection with the performance of this contract may be used by the Buyer for any purpose relating to the contract and in its performance without liability therefor to the Seller.

18. General Notes

Seller shall reference this purchase order number on all documents and/or correspondence related to this order.

The signatures below will execute this contract.

Buyer – Paul Ceglia    _____



Seller – Mark Zuckerberg    _____

# EXHIBIT F

Page 1

```
 1
 2     UNITED STATES DISTRICT COURT
 3     WESTERN DISTRICT OF NEW YORK
 4     No. 1:10-cv-00569-RJA
 5     -----------------------------x
       PAUL D. CEGLIA,
 6
                        Plaintiff,
 7
                   vs.
 8
       MARK ELLIOT ZUCKERBERG,
 9     Individually, and
       FACEBOOK, INC.,
10
                        Defendants.
11     -----------------------------x
12
13
14                   July 19, 2012
15                   10:11 a.m.
16
17          Videotaped deposition of MICHAEL
18     F. McGOWAN, held at the offices of Gibson,
19     Dunn & Crutcher LLP, 200 Park Avenue, New
20     York, New York, pursuant to notice, before
21     Cary N. Bigelow, Court Reporter, a Notary
22     Public of the State of New York.
23
24
25
```

Page 61

1                   M. McGowan

2           MR. SOUTHWELL:  I'm going to object to

3       this line as beyond the scope of the

4       court-authorized discovery at this point.

5           I think you can proceed with that

6       question, I am not sure how much more you

7       intended to ask on it.

8           MR. BOLAND:  Well, your objections are

9       noted, but unless there's a privilege issue

10      here, we're driving on.

11      Q.    What other assets do you -- please

12  describe the assets belonging to Mr. Zuckerberg

13  as you just referred to it in your answer to my

14  previous question.

15      A.    There were approximately --

16  approximately 28 devices belonging to

17  Mr. Zuckerberg that were presented to us for

18  examination.

19      Q.    What were those devices?

20      A.    The devices included original hard

21  drives as well as forensic images of devices that

22  I understand were created during the course of

23  prior litigations.

24      Q.    When you say forensic images of devices,

25  what type of devices are you referring to?

Page 62

M. McGowan

1
2    A.     Primarily computer hard drives.

3    Q.     What else?

4    A.     In addition, there was -- and I don't

5    recall if these were forensic images or if these

6    were devices, were they originals, but external

7    media such as Iomega Clik devices, it's a form of

8    storage.

9    Q.     Were you the person who evaluated all

10   those, analyzed all those devices?

11   A.     I analyzed -- yes, I analyzed them, I

12   had a system at work, but I was the -- I did

13   examine all of them, I was the primary person

14   conducting that examination.

15   Q.     And where was that conducted?

16   A.     It was conducted in San Jose,

17   California, at the offices of the McManis

18   Faulkner law firm.

19   Q.     And who else was present during that

20   examination?

21   A.     Also present was one of my -- a

22   colleague of mine at Stroz Friedberg.

23   Q.     Who?

24   A.     He has since left the firm, but his

25   name is Michael Kunkel, K-u-n-k-e-l.

Page 63

M. McGowan

1
2      Q.    Is he a qualified computer forensics
3   expert?
4      A.    What do you mean by that term?
5      Q.    Does he have an EnCase certification?
6      A.    I haven't reviewed his CV in some time.
7   I consider him to be a qualified computer
8   forensics examiner.
9      Q.    And where does he work now, if you
10  know?
11     A.    I don't know.  He moved -- for family
12  reasons he moved to Texas.  I don't recall where
13  he's employed.
14     Q.    Do you know if he's still in computer
15  forensics?
16     A.    I believe so.
17     Q.    Why did he leave Stroz Friedberg?
18     A.    As I mentioned, he wanted to get back
19  to Texas for personal reasons.
20     Q.    Did you take notes during your analysis
21  of these 28 devices?
22     A.    We did not take written notes.
23     Q.    Did you take audio notes?
24     A.    No.
25     Q.    Did you take any notes?

Page 64

1                           M. McGowan

2          A.     We prepared spreadsheets identifying

3    what it was we were examining, we noted our --

4    noted our results electronically.

5          Q.     How electronically?  What does that

6    mean?

7          A.     Part of our work included keyword

8    searches, so we would document what we searched,

9    what was the search criteria that was used and to

10   the extent that data was identified relevant to

11   the searches we made a copy, we made a copy of

12   that information.

13         Q.     Do you still have the list of keyword

14   searches that you did on that media saved

15   somewhere in your files or someone else's files

16   at Stroz Friedberg?

17         A.     We do, yes.

18         Q.     When did this examination occur of

19   these 28 devices belonging to Mr. Zuckerberg?

20         A.     In around September of 2010.

21         Q.     How long did that work take in

22   California?

23         A.     It was more than several days, I don't

24   recall the full length, the exact length of how

25   long it took.

Page 65

1                          M. McGowan

2        Q.    And who paid you to do the work?

3        A.    We were paid -- we conducted this work

4   for Gibson, Dunn on behalf of Facebook, I believe

5   it's Facebook that's paying our bills.

6        Q.    Well, who does the check come from that

7   goes to Stroz Friedberg, from Gibson, Dunn or

8   Facebook?

9        A.    I don't see the checks, but my

10  understanding is the engagement letters calls for

11  Facebook to pay our bills.

12       Q.    And did you provide any reports or any

13  written results to anyone of your analysis of

14  those 28 devices belonging to Mr. Zuckerberg?

15       A.    We did not prepare a written report.

16       Q.    Did you communicate with anyone from

17  defense counsel after evaluating those 28 devices?

18       A.    Yes.

19       Q.    Can you describe how that occurred?

20  Was that a conference call or phone call on your

21  own?  How did that happen?

22       A.    I think it was several phone calls that

23  I had with Mr. Benjamin, counsel of Gibson, Dunn,

24  as we conducted our -- as we conducted our work,

25  so there were several of those.

Page 66

M. McGowan

1
2          There may have been e-mail
3   correspondence, I don't recall which form it
4   took, but I recall that Mr. Benjamin was the
5   primary person at Gibson, Dunn with whom we were
6   in communication at that time.
7          Q.    What categories of electronic evidence
8   did you find on those 28 devices?
9          A.    What categories --
10         Q.    Of electronic evidence did you find on
11  those 28 devices.
12         A.    I guess I'm not sure --
13         Q.    Was there a Web history on some of
14  them?
15         A.    I'm not sure specifically about that.
16         Q.    Was there instant messaging records?
17         A.    Yes.
18         Q.    Were there e-mails?
19         A.    Yes, I believe so.
20         Q.    Were there e-mails authored -- were
21  there e-mails sent by Mr. Zuckerberg?
22         A.    I don't recall.
23         Q.    Were there e-mails received by
24  Mr. Zuckerberg?
25         A.    I don't recall.

Page 67

M. McGowan

1
2          I remember that I -- primarily we
3     conducted searches using keywords designed to
4     identify copies of the contract, communications
5     with Mr. Ceglia, other issues related to this
6     case.  We did not -- we didn't find any copies of
7     the contract, didn't find any correspondence with
8     Mr. Ceglia.
9              Those were our primary findings from
10    our examination of the Zuckerberg assets.
11       Q.    Do you know if you found e-mails
12    between Mr. Zuckerberg and Mr. Ceglia from the
13    time period of March 2003 to June 2003?
14       A.    I just said we didn't find any
15    correspondence with Mr. Ceglia.
16       Q.    Were there e-mails on any of those
17    devices, stored on those devices from
18    Mr. Zuckerberg's Harvard e-mail account?
19       A.    I don't recall.
20       Q.    Would you have records?  Would Stroz
21    Friedberg have records of what you found in your
22    analysis?
23       A.    Yes.
24       Q.    And who would have those?
25       A.    Primarily we have the messages that we

Page 68

M. McGowan

1
2    had identified or the data that we had identified
3    pursuant to the search, the search criteria,
4    that's the primary body of information that we
5    have from that, from that work.
6         Q.    I'm talking about the 28 devices.
7         A.    Yes.
8         Q.    Were there any communications you found
9    on those 28 devices about StreetFax?
10        A.    I don't recall specifically.
11        Q.    Any e-mails you found on those 28
12   devices regarding Karin Peterson?
13        A.    I don't recall.
14        Q.    Did you find any source code related to
15   the StreetFax project that Mr. Zuckerberg worked
16   on for Mr. Ceglia on any of those 28 devices?
17        A.    I don't believe so.
18        Q.    Was this part of the work that you did
19   in arriving at the conclusions that are in your
20   report?
21        A.    I know that the report, our report
22   was -- it was submitted -- discussing our report
23   we conducted, our examination we conducted
24   pursuant to the expedited discovery order of the
25   Ceglia media, so our report does provide a

```
                                        Page 69
 1                      M. McGowan
 2   summary of the opinions we reached and the
 3   materials we considered there.
 4        Q.    Let's throw a hypothetical at you here.
 5              If you would have found e-mails
 6   relevant to expedited discovery --
 7              MR. BOLAND:  Scratch that.  Not
 8        e-mails.
 9        Q.    Had you found any data on those 28
10   devices relevant, in your opinion, to the Court's
11   expedited discovery order would you have provided
12   that in your report, Exhibit 1 that's in front of
13   you?
14        A.    What's Exhibit 1?
15        Q.    It's your report.
16        A.    Oh, okay, Rose Exhibit 1.
17              MR. SOUTHWELL:  Objection to the form.
18        Q.    Do you need the question again?
19        A.    No, I'm all set there.
20              The Court's expedited discovery order,
21   as I understand it, called for us to report our
22   finding on the Ceglia media, that was the
23   specific purpose of it, and that's what we did
24   here.
25        Q.    That's not my question.
```

Page 70

1                         M. McGowan

2              My question is if in your analysis of

3      the 28 devices had you found any information that

4      in your opinion was contemplated by the Court's

5      expedited discovery order, would you have put it

6      in that report?

7                   MR. SOUTHWELL:  Objection, asked and

8          answered.

9          Q.    Just yes or no, would you have put it

10     in the report?

11         A.    I went over what my opinion of the

12     Court's expedited discovery order calls for and

13     in my opinion it doesn't call for -- it doesn't

14     call for anything related to the Zuckerberg

15     assets.

16         Q.    So your answer is no, you would not

17     have put it in the report, even if you thought it

18     was contemplated by the Court's expedited

19     discovery order you wouldn't have put it in the

20     report?

21                   MR. SOUTHWELL:  Objection, he just said

22         it wasn't.

23         Q.    Let me break it down for you.

24              Let's say -- hypothetical time -- you

25     found an e-mail on the 28 devices, assets that

Page 71

1                          M. McGowan

2     you analyzed that was from Paul Ceglia to Mark

3     Zuckerberg discussing the StreetFax business,

4     let's hypothetically say you found that e-mail on

5     one of those 28 devices, would you have put that

6     in your report?

7         A.    On that alone, I'm not sure that is

8     enough of a basis in terms of -- without further

9     context for knowing what the e-mail said.

10             In this case, what we do is quite

11    clear, we're -- on the one hand we did conduct a

12    search of the Zuckerberg assets, didn't find

13    anything related to, related here, and focused on

14    the Ceglia media as properly -- as I feel

15    properly responsive to the Court's expedited

16    discovery order.

17             So I'm not sure in just an e-mail from

18    Paul Ceglia to Mark Zuckerberg, I'm not sure that

19    would give me enough basis to know whether or not

20    what it said and whether or not it's relevant,

21    but as I went over earlier, as I understand the

22    Court's expedited discovery order was for us to

23    report our examination of the Ceglia media and

24    our findings.

25        Q.    So this is not my question, you are

Page 72

1                           M. McGowan
2    rephrasing it not how I asked it.
3              If you found an e-mail on one of those
4    28 devices between Mr. Zuckerberg and Paul
5    Ceglia -- and here's the key thing you're
6    missing -- discussing the StreetFax agreement,
7    would you have produced, would you have
8    referenced that and talked about that e-mail in
9    your report?
10              MR. SOUTHWELL:  Objection.  You are
11         starting to badger and harass the witness.
12              MR. BOLAND:  I am not badgering.
13              MR. SOUTHWELL:  He is answering your
14         questions.  You may not like the answer, you
15         may not like the answer, but he is answering
16         your questions.
17              MR. BOLAND:  The question he answered,
18         he answered a question of whether there was
19         an e-mail between Paul Ceglia and Mr.
20         Zuckerberg, is that enough.  That's not my
21         question.
22    A.    That was the earlier question.
23    Q.    An e-mail between Paul Ceglia and Mark
24    Zuckerberg discussing the StreetFax business, if
25    you'd have found an e-mail like that on one of

Page 73

M. McGowan

1
2  those 28 devices would you put it in the report?
3      A.    Sorry, which one?  Is it the contract,
4  the business?  What's the e-mail discussing?
5      Q.    Let's break it down.
6          An e-mail between Paul Ceglia and Mark
7  Zuckerberg discussing the StreetFax business, if
8  you had found an e-mail that discusses that,
9  would you have put it in the report?
10     A.    This is an e-mail that also was located
11 elsewhere in the Harvard account?
12     Q.    Just all by itself, never saw it
13 before, no other e-mail like it in the world, it
14 discusses the StreetFax business between
15 Mr. Zuckerberg, Mr. Ceglia, it's on the 28
16 devices, would you have put it in the report?
17     A.    I think it's hard for me to answer in
18 the abstract.
19          What we did is as we found evidence we
20 considered whether -- our charge was is it
21 reasonably related to the authenticity of the
22 StreetFax contract and the purported e-mails,
23 so --
24     Q.    My question is not what your charge is,
25 it's a hypothetical question.

```
                                            Page 74
                            M. McGowan
1
2        A.     Well, I guess I --
3        Q.     You are not answering the question,
4   sir, and please listen to the question.
5               I'm not saying what was your charge,
6   what do you think your charge was, charge was not
7   even in my question.
8               Hypothetical.  If you found an e-mail
9   from Ceglia and Zuckerberg discussing the
10  StreetFax business, would you have put that
11  information that you found that e-mail discussing
12  the StreetFax business in your report?
13              That's the question.
14              MR. SOUTHWELL:  Objection.  This is --
15         you are just badgering him.  He's already
16         clearly stated what he put in the report --
17              MR. BOLAND:  You can't coach him by --
18         you can object to the form, Alex, but no
19         coaching.
20              MR. SOUTHWELL:  I'm not coaching.  I'm
21         try go make it clear.  You seem to keep
22         asking the same thing over and over again.
23              MR. BOLAND:  Because he's not
24         answering the question.
25              MR. SOUTHWELL:  He is answering.
```

Page 75

M. McGowan

1

2          MR. BOLAND:  I'll ask it for the next

3     hour because it's a very clear question he

4     is refusing to answer, and I suspect I know

5     why.

6     Q.     Please answer the question.

7          It's not a difficult question.  The

8     hypothetical you have to assume is an e-mail --

9     we all know what that is -- between Mr. Ceglia

10    and Mr. Zuckerberg -- so far we know what that

11    is -- and it discusses the StreetFax business.

12         Assuming that existed on one of these

13    28 devices and existed nowhere else on any Ceglia

14    media, would you have reported that fact in your

15    report?

16         That's it, that's all I want to know.

17    A.     And it would depend -- I think one of

18    the facts it would depend on is the content of

19    that e-mail.

20         Is it -- does it discuss -- does it

21    bear on the -- does it bear on the contract?  Is

22    there information in it that either points in

23    favor or cuts against either of the contract,

24    either the version that was produced by

25    Mr. Ceglia or the version that we found on the

Page 76

                          M. McGowan

1

2    Seagate hard drive?  Is there information in that

3    e-mail that's consistent with or inconsistent

4    with any of the purported e-mails?

5            So those would be factors that I think

6    I'd need -- I think would shape -- would shape my

7    evaluation of that e-mail.

8            MR. BOLAND:  All right.  We'll take

9        about a 10-minute break.

10           (Recess taken.)

11           THE VIDEOGRAPHER:  The tape is rolling.

12   BY MR. BOLAND:

13       Q.    So we are back on the record,

14   Mr. McGowan.

15           Do you know who David Cressy is,

16   spelled C-r-e-s-s-y?

17       A.    David Cressy?  Without more context I'm

18   not sure I can place that name.

19       Q.    Okay.

20           The 28 devices that we were talking

21   about before we broke, was there anything on

22   those 28 devices related to Paul Ceglia at all?

23       A.    I don't believe so.  I recall we had

24   run searches for his name, for his e-mail

25   address.  I don't believe we had identified

1                          M. McGowan

2    materials related to Paul Ceglia.

3        Q.    That list of search terms you provided

4    for those 28 devices -- not provided.

5             The list of search terms used for those

6    28 devices, who created that list?

7        A.    We created it in consultation with

8    Gibson, Dunn, we drew phrases from the contract

9    and then worked with Gibson, Dunn to develop

10   other keywords designed to get at -- designed to

11   surface what were likely to be relevant documents

12   in this case.

13       Q.    And who at Gibson, Dunn worked with you

14   on creating that list of search terms?

15       A.    As I mentioned, we were primarily

16   dealing with Mr. Benjamin for this portion of

17   the work.

18       Q.    And did you communicate with him by

19   e-mail about -- prior to the analysis of those 28

20   devices, about the analysis of those 28 devices?

21       A.    Yes.

22       Q.    And if you recall, how many of those 28

23   devices were used by Mr. Zuckerberg in 2003 and

24   2004, the time frame where he had a business

25   relationship with Mr. Ceglia?

Page 78

M. McGowan

1

2      A.      I don't recall.

3      Q.      Do you know if any of them were used by

4      him during that time frame?

5      A.      Yes.

6      Q.      And you just don't know the number of

7      how many?

8      A.      I don't know the number.

9      Q.      Were any of those computers used by him

10     much later in time or anytime after 2004, if you

11     recall?

12     A.      I know one of them that sticks in my

13     mind, one of the devices had last been used in

14     2005, but I don't recall how much later devices

15     were used.

16     Q.      And were some of those devices you

17     analyzed involved in the Winklevoss ConnectU

18     case, if you know?

19     A.      In the ConnectU case?

20     Q.      Yes.

21     A.      I believe so.

22     Q.      Were some of those devices involved in

23     a case between Mr. Zuckerberg and Eduardo

24     Saverin, if you know?

25     A.      Do you know what the cite of that is?

Page 79

                    M. McGowan

1       I think I have seen it mostly by captions.

2           Q.    No, I don't know the cite off the top

3       of my head.

4               If you don't recall based on just

5       Eduardo Saverin being one of the parties, then

6       that's fine if you don't recall.

7           A.    That's right, I don't recall.

8           Q.    Do you realize, do you know now that

9       Paul Ceglia and Mark Zuckerberg in fact had a

10      business relationship in 2003-2004 related to

11      StreetFax that Mr. Zuckerberg is not disputing?

12              Are you aware of that?

13          A.    I am aware of that.

14          Q.    And do you think it's odd that you

15      didn't find any e-mail correspondence between

16      Mr. Ceglia and Mr. Zuckerberg on any of those 28

17      devices, given that they had a business

18      relationship?

19          A.    I don't know if it's odd or not.  I

20      don't know -- the devices were presented to me

21      for inspection.  I don't know, without knowing

22      more about how they were used, when they were

23      used, I'm not sure I could -- I'm not sure I have

24      an opinion one way or another in terms of the


Page 80

1                          M. McGowan

2    absence of communication between the two on these

3    devices.

4         Q.    You've seen the Harvard e-mails from

5    Mr. Zuckerberg's Harvard e-mail account that were

6    produced related to the expedited discovery order?

7         A.    I have seen the Harvard e-mails that

8    were produced pertaining to the expedited

9    discovery order.

10        Q.    Were any of those e-mails, copies of

11   them, present on those 28 devices, if you know?

12        A.    I don't believe so.

13        Q.    And what's the basis for your belief

14   that none of them, copies of those e-mails do not

15   appear on those 28 devices?

16        A.    I know that we've conducted searches

17   for Mr. Ceglia's name and e-mail addresses, the

18   several e-mail addresses, those were in the

19   Harvard e-mails, those were the Harvard e-mails

20   that Mr. Zuckerberg and Mr. Ceglia exchanged and

21   so based on the fact that we didn't identify any

22   communications between the two of them on the

23   Zuckerberg assets, the approximately 28 devices,

24   that's my basis for -- that's my basis period.

25        Q.    Did you search for e-mails in which

Page 81

M. McGowan

1       Mr. Zuckerberg communicated with other people,

2       not Mr. Ceglia, about StreetFax?

3            A.    StreetFax would have been included as

4       one of the search criteria.  I don't recall the

5       full list of search criteria, sitting here, but

6       that would have been one of the terms used.

7            Q.    So is your answer -- what's your answer

8       to my question?

9            Did you find any e-mails between

10      Mr. Zuckerberg and someone who is not Paul Ceglia

11      discussing StreetFax?

12           MR. SOUTHWELL:  Objection.

13           A.    I'm sorry, I thought your question was

14      did we search for.

15           Q.    No.  Did you find?

16           If it was search for, I will correct

17      myself.

18           Did you find any e-mails sent or

19      received by Mr. Zuckerberg on those 28 devices

20      but not involving sent or received from

21      Mr. Ceglia, but they discussed StreetFax?

22           A.    I'm not sure one way or another on

23      that.

24           Q.    The set of search terms you used to

Page 82

1                         M. McGowan

2    search the 28 devices, was it identical to the

3    search terms used to search the Harvard e-mail

4    account of Mr. Zuckerberg?

5         A.    No.

6         Q.    And did you determine by looking at

7    those 28 devices whether Mr. Zuckerberg used any

8    of those devices to access his Harvard e-mail?

9         A.    We didn't reach a conclusion on that

10   point.

11        Q.    Were you asked to look for that?

12        A.    No.

13        Q.    Did you ever speak with Mr. Zuckerberg?

14        A.    I have not, no.

15        Q.    Did you find any references to

16   StreetFax at all on those 28 devices?

17        A.    I'm not sure the results on that one.

18        Q.    So it's possible there are references

19   to StreetFax on those 28 devices?

20        A.    I'm not sure on that one, one way or

21   another on that.

22        Q.    I'm just asking if it's possible, since

23   you don't know.

24              Is that possible that there's

25   references to StreetFax on those 28 devices?

Page 83

M. McGowan

1

2      A.     It's possible.  I don't -- I don't

3   recall the results of that search.

4      Q.     Were any of your results of your

5   searches documented in any way or do those

6   results solely rely on your memory?

7      A.     As part of the search process we

8   applied the search criteria and then obtained

9   high-level search results in terms of just how

10  many documents or how many hits per keyword, so

11  it's documented at that phase and then we

12  exported the search results and so we have a set,

13  we have the set of materials that match the

14  search criteria as well, so with the original

15  keyword list, the what I would call the keyword

16  breakdowns, keyword hit breakdowns and the

17  results themselves.

18     Q.     Did you provide those to defense

19  counsel?

20     A.     We did, yes.

21     Q.     Do you know if Mr. Zuckerberg reviewed

22  that information?

23     A.     I don't have any basis to know one way

24  or another whether he reviewed it.

25     Q.     Can you name everyone that has had

Page 84

1                          M. McGowan

2      access to those results, everyone at Stroz

3      Friedberg that has had access to those results?

4          A.    The results being the search statistics

5      or the documents that resulted?

6          Q.    The entire analysis of those 28

7      devices, whatever documentation arose or was

8      generated from that analysis, who at Stroz

9      Friedberg has had access to that information that

10     you know of?

11         A.    That I'm aware, that I know of, it's

12     the individuals who had been working on this

13     portion of the analysis:  myself, Mr. Kunkel,

14     Mr. Rose.

15              The results themselves were made

16     available, the documents that matched the search

17     criteria were made available for review in our

18     electronic discovery search platform.  I don't

19     know the names of the individuals, but there

20     would be additional individuals who would have

21     been involved in making the documents available

22     for review by Gibson, Dunn.

23         Q.    And do you know who at Gibson, Dunn

24     accessed those materials?

25         A.    I know that Mr. Benjamin, I believe

Page 85

1                        M. McGowan

2    that Mr. Benjamin did, but beyond that, I'm not

3    certain.

4         Q.    Do you know if the StreetFax source

5    code is on those 28 devices?

6         A.    I think you asked me that.  I don't

7    believe so.

8         Q.    And what's the basis for your belief

9    that it's not there?

10        A.    I don't recall -- in the materials I

11   reviewed I don't recall seeing any source code,

12   any StreetFax source code.

13        Q.    Did you conduct a search for StreetFax

14   source code as part of your search?

15        A.    We conducted search -- the keywords

16   would have included terms such as StreetFax.  We

17   did not specifically conduct a search -- I myself

18   have not seen the StreetFax -- it's not as if we

19   received it, drew search terms from it and

20   applied a search, but I believe in the searches

21   that we did conduct I'm not aware of having

22   identified it.

23        Q.    And Facebook source code, did you do a

24   search for that on those 28 devices?

25        A.    We did not, no.

Page 86

1                    M. McGowan

2      Q.    Now, if the word "StreetFax" doesn't

3  appear in the StreetFax source code, then it's

4  logical you wouldn't have found the StreetFax

5  source code; true?

6      A.    If the word "Street" -- it would depend

7  on whether any of the other keywords we had

8  run -- if any of the other keywords appeared then

9  it would have been surfaced through our searches.

10  If none of the word searches, none of the terms

11  appeared in the source code then it would not

12  have been returned as part of the searches.

13     Q.    And so Mr. Benjamin reviewed the

14  results of this, the searches you ran on the 28

15  devices; true?

16     A.    Mr. Benjamin was provided access to the

17  results.

18     Q.    And would you consider that a report,

19  providing a report to him or not?

20     A.    Would I consider what providing a

21  report?

22     Q.    Providing him access to the results of

23  your search of the 28 devices, is that

24  equivalent, in your mind, to providing him a

25  report of your results?

Page 87

1                          M. McGowan

2       A.     Not as I'm thinking of a report, no.

3       Q.     Were you told not to take notes of your

4    analysis, handwritten notes?

5       A.     No.

6       Q.     Do you typically not take notes when

7    you're doing analysis?

8       A.     Oftentimes I document it electronically

9    as we're conducting it just so that it's

10   available and not on a scrap of paper I'm going

11   to lose, so oftentimes it's just the electronic

12   documentation.

13      Q.     And did you take electronic

14   documentation searching these 28 devices?

15      A.     Yes, we went over the materials that we

16   prepared there in response to your earlier

17   questions, yes.

18      Q.     Did anyone tell you to take -- make

19   that electronic documentation, using your point,

20   did anyone tell you to do that or did you just do

21   it as a matter of standard practice?

22      A.     I do it as a matter of standard practice.

23      Q.     Do you sometimes issue reports

24   following your analysis of electronic assets?

25      A.     Yes, sometimes we issue a written

Page 88

1                        M. McGowan

2    report documenting our analysis.

3        Q.    And were you told not to issue a report

4    relating to your analysis of the 28 devices?

5        A.    No, we weren't told, we weren't told

6    not to issue a report.

7        Q.    Why didn't you issue a report, then?

8        A.    We weren't requested to issue a report.

9        Q.    So can you just describe for me, just

10   give me a summary of exactly how you analyzed

11   these 28 devices?  What process did you go

12   through?

13       A.    So as I mentioned, we first identified,

14   first identified the unique assets.  By that I

15   mean that the 28 devices in some cases were

16   forensic images of other devices that were

17   already included in the set.  In some cases it

18   was forensic images of forensic images, like a

19   Russian nest, Russian doll through the various --

20   I understand there were various past efforts, so

21   the first step of our process was just

22   identifying among the materials that we had been

23   presented with what are the -- what are the

24   original sources or what are the unique devices

25   that we have in front of ourselves.

Page 89

M. McGowan

2    If a forensic image had already been
3  created we verified it and to the extent we had
4  an existing forensic image that already existed,
5  we relied on that, made a copy of that as opposed
6  to contributing to sort of the proliferation of
7  duplicate copies.

8    To the extent that a device, it was an
9  original device for which a forensic image had
10  not already been created we attempted to create a
11  forensic image of it and where successful
12  verified that and included that in the results or
13  in the set to search.

14    The searches themselves, we conducted
15  searches using the EnCase forensic software and a
16  search product called DT Search of both the
17  active contents, the information, the active and
18  recoverable data on the computer as well as an
19  allocated space search, an allocated space
20  component of the hard drives where fragments of
21  deleted data, text fragments may exist, so that
22  was the search process, review of the search
23  results and making -- and then making those data
24  available for review by Gibson, Dunn.

25    Q.    Did you do this in the offices, the

Page 90

1                         M. McGowan
2     conference room or whatever of that law firm you
3     mentioned before?
4          A.    Yes.  That last -- all except for that
5     last stage where the results themselves were
6     taken out at our data center, they were processed
7     in a format that could be made available for
8     review, but up until that point in time the
9     identification, preservation and searching, that
10    was done at McManis Faulkner's offices.
11         Q.    If you know, were these 28 devices
12    being stored at that law firm prior to you
13    analyzing them or were they brought to that law
14    firm from some other location for you to analyze?
15         A.    I believe that most if not all of the
16    devices had been -- were being stored, stored at
17    that law firm had been brought out for our
18    inspection.
19         Q.    Do you know how they were stored?
20         A.    I do not know.
21         Q.    Can you take a look at Rose Exhibit 1,
22    page 90, please.
23         A.    Okay.
24         Q.    And hold that page for a second.
25               Are you aware that there are electronic

```
                                              Page 91
 1                        M. McGowan
 2   assets being held by a company called Parmet &
 3   Associates related to this case?
 4        A.    Being held by them?
 5        Q.    Yes.
 6        A.    No, I'm not aware of that.
 7        Q.    Did you search any assets provided by a
 8   company called Parmet & Associates?
 9        A.    Provided by them?
10        Q.    Or being held by them, let's put it
11   that way.
12              Did you search any assets that are
13   currently being held by Parmet & Associates?
14        A.    Not held by Parmet, no.
15        Q.    Have you ever been to the offices of
16   Parmet & Associates?
17        A.    No.
18        Q.    Did you see a chain of custody document
19   for the 28 devices that you were given to analyze
20   at the law firm that we just mentioned?
21        A.    There was forensic documentation on the
22   hard drive itself about the imaging, but not a
23   written chain of custody form.
24        Q.    And are you aware that there's
25   electronic assets potentially related to this
```

Page 92

1                         M. McGowan

2      case being held by Parmet & Associates?

3          A.      I think you asked me that.

4                  No, I'm not.

5          Q.      Has anyone from Stroz Friedberg, to

6      your knowledge, gained access to those assets to

7      analyze them, the ones at Parmet & Associates?

8          A.      Among the devices that we had been

9      presented, presented to us, I believe there was

10     references to Parmet, but we have not been

11     provided -- those would have been at McManis'

12     offices, we haven't -- to my knowledge, no one

13     has been provided access to assets directly held

14     by Parmet & Associates.

15         Q.      What are the references to Parmet &

16     Associates you just mentioned, what does that

17     mean?

18         A.      That among the 28 devices were some

19     that, according to the documentation, had been

20     preserved by Parmet & Associates in the past and

21     were presently being held by McManis Faulkner.

22         Q.      Documentation, was it paper

23     documentation you are talking about or

24     documentation on the drives themselves?

25         A.      I was thinking of the drives

Page 93

                        M. McGowan

1

2   themselves, yes.

3        Q.     And so just to be clear, when you

4   analyzed these 28 devices, you had no chain of

5   custody related to those devices, they just

6   landed on that table and you analyzed them, you

7   don't know where they came from before that time

8   as far as in a written documentation form?

9        A.     There was no chain of custody

10  documentation.   There was -- I had reviewed

11  declarations that had been filed in a prior case

12  that described, that described the media of where

13  they had come from, so there is some written

14  documentation, but in that format.

15       Q.     Did those declarations have hash values

16  for all of those 28 devices so you could confirm

17  you were looking at the same thing?

18       A.     I am not sure the declarations did.

19  The hash values would have been among the

20  electronic media, the materials that I referred

21  to on the drives.

22       Q.     And isn't it a better practice if you

23  can have it, is to have chain of custody for

24  assets that you're going to analyze in a computer

25  forensics analysis?

```
                                        Page 94
 1                      M. McGowan
 2       A.      A better practice than --
 3       Q.      When you got EnCase certified, wasn't
 4   it -- weren't you taught that you would ask, you
 5   would ask for a chain of custody for any evidence
 6   you were analyzing, if you can get it?
 7       A.      I think having a chain of custody is
 8   good practice.
 9       Q.      All right.
10              On page -- what page did I tell you to
11   go to?  90?  I think I told you page 90.
12       A.      Page 90, yes.
13       Q.      That is, if I am correct, page 2 -- no,
14   I'm sorry, page 1 of the StreetFax contract as
15   you identify it in your report; true?
16              MR. SOUTHWELL:  I'm going to object to
17          the document that's before the witness,
18          which is, as we stated yesterday, is
19          different than what was actually filed in
20          the Stroz report, so I just want to make
21          that clear.
22              MR. BOLAND:  Very well.
23       Q.      So it's a smaller than 8-1/2-by-11 size
24   print of the TIFF image that is page 1 of the
25   StreetFax contract, as you identify in your
```

Page 95

1                          M. McGowan

2    report; is that true on that page?

3        A.    On this page, yes, what you have handed

4    me is a smaller version of it.

5        Q.    And page 2, I think, is another exhibit

6    in your attachments there, I think it's Exhibit

7    F, I thought it was.

8        A.    Okay.

9        Q.    Perhaps I'm wrong.

10             Let's look at Exhibit F, see if that's

11   page 2.

12       A.    Right, Exhibit F, yes.

13       Q.    You would agree with me that that TIFF

14   image is an image of a paper document, that's the

15   contention that's being made in your report,

16   that's an image of a paper document?

17       A.    It appears to be yes.  This is -- I'm

18   pausing because the version that you are showing

19   me is much smaller than the version of the

20   StreetFax contract that I am accustomed to seeing

21   in print.

22       Q.    But you don't dispute -- we already got

23   your testimony earlier -- that's the actual size,

24   physical size of that file, the measurements are

25   in Mr. Broom's report and you conceded those

Page 96

1                    M. McGowan

2   measurements were accurate.

3            MR. SOUTHWELL:  Objection,

4       mischaracterizes.

5       Q.    Do you disagree with me that that's the

6   actual size, physical size of that file as you

7   found it?

8       A.    I think to be clear here we're talking

9   about -- there's a couple of different things,

10  there's the size of the original, there's the

11  size of the TIFF image and then there would be

12  the size when printed out, so the measurements

13  pertain to the dimensions of the TIFF image, the

14  TIFF image as it's displayed, as it's displayed

15  electronically.

16      Q.    Right.  I'm talking about do you

17  disagree that the size of this TIFF image is 2.4

18  by 3.2 inches?

19            Is there some other measurement for

20  this TIFF that you think, a different size that

21  you determined it was?

22      A.    I think it's -- so the measurements,

23  they are going to depend on -- the size is

24  measured in pixels and how that appears, for

25  example, the size that appears on your laptop

Page 97

M. McGowan

1

2  monitor versus a big screen versus a CRT, all of

3  that is going to depend on the dots-per-inch that

4  your monitor is set for.

5      Q.   No, sir, we're going to go back --

6           MR. SOUTHWELL:  He was not finished

7      with his answer.

8      Q.   Go right ahead, but -- we'll clear this

9  up.

10          Go ahead.

11     A.   So that size, the physical size is

12  going to be dependent both upon -- I mean, the

13  size of a TIFF image is measured in pixels.  If

14  you want to translate into dimensions it's going

15  to depend on what the pixels are and also the

16  dots per inch that it's presently being displayed

17  at.

18     Q.   Do you disagree with me, sir, that the

19  metadata associated with these two TIFF images

20  indicates that they were 480 by 646 pixels at 200

21  DPI?  Do you disagree with that?

22     A.   I think one of them was smaller than

23  the other, I don't think they were both the same

24  size.

25     Q.   Okay.

Page 98

M. McGowan

1
2        What's your basis for that?

3        A.    I think just that area that you're

4    speaking of right there, I've been -- the place

5    we have it most handy is the Broom report on page

6    21 where Scan0001 was 480 by 646 and Scan0002 was

7    480 by 657, so they are slightly different size.

8        Q.    Do you disagree with those numbers that

9    Mr. Broom put in his report?

10       A.    I do not disagree with those numbers.

11       Q.    And the 200 DPI, do you disagree with

12   that, as embedded in the metadata?

13       A.    No.  The 200 DPI is the resolution of

14   the TIFF image.

15       Q.    Of the TIFF image, right.

16            So I don't care what a monitor

17   resolution is for this question.

18            The resolution of the TIFF image is 200

19   DPI; correct?

20       A.    Of the TIFF image, yes.

21       Q.    And you previously testified you do not

22   disagree with Mr. Broom's conversion from pixels

23   to inches; correct?

24       A.    From that measurement, no, I do not

25   disagree.

Page 99

1                        M. McGowan

2       Q.    Right.   These are the pixels, we just

3   acknowledged, we agreed these are the pixels, the

4   measurements of those two TIFF images and he

5   converted them to 2.4 by 3.2 inches, which is the

6   physical size of that file, you would agree with

7   that?

8       A.    It's an electronic file.

9       Q.    Right.

10      A.    That would be the size at the -- that

11  would be the size of the image without any --

12  that would be the size of the image --

13      Q.    At a hundred percent resolution?

14      A.    -- at a hundred percent resolution at

15  200 DPI.

16      Q.    Right.

17            So anything else, if that image is

18  printed out in any other size other than 2.4 by

19  3.2 inches, that's not a hundred percent

20  resolution, is it?

21      A.    Well, printing is something -- is

22  something different.

23      Q.    Listen to my question.

24            If you printed it at exactly a hundred

25  percent resolution, so I don't care what printer

1                         M. McGowan

2    you use, what monitor, it's irrelevant.  If you

3    print this image at a hundred percent resolution,

4    when you measure it with a ruler on that printed

5    page, that image is going to be 2.4 by 3.2 inches

6    in dimension; is it not, sir?

7         A.    I'm not sure it is because it's the

8    pixels, pixels is defined, it's the smallest

9    addressable unit.

10        Q.    But it's already been converted to

11   inches and you've agreed to the conversion to

12   inches, so if you print the image at a hundred

13   percent resolution, that image measured with a

14   ruler on the printed page is going to be 2.4 for

15   scan 1, 2.4 by 3.2 inches, is it not?

16            And sir, if you don't know, it's an

17   acceptable answer.  If you don't know, you don't

18   know.

19        A.    So if you print -- if you print the

20   image --

21        Q.    At a hundred percent resolution.

22        A.    And leaving aside differences between

23   printer size pixels and the images of the digital

24   pixels and then add a hundred percent resolution,

25   it would be -- if you were using a program and

Page 101

                    M. McGowan

1

2    were able to -- and printed it at that it would

3    be those, it would be those measurements.

4        Q.    All right.

5            So for scan 1 the measurement of the

6    printed image of scan 1 TIFF printed at a hundred

7    percent resolution would be 2.4 by 3.2 inches;

8    true?

9            And I'm reading right from page 21 of

10   Broom's report, I'm not trying to trick you with

11   the numbers.

12           Is that correct, sir, that's what you

13   just said?

14       A.    No, I -- that's if you print it at a

15   hundred percent resolution --

16       Q.    Yes.

17       A.    -- which there's, by default wouldn't

18   be how an image would be printed.  Windows

19   provides the ability, when you print, the options

20   you get are to expand it, so the TIFF images

21   would generally be -- printed TIFF images would

22   generally be expanded to fit the size of a page.

23       Q.    Right.

24           But I'm not talking about that, I'm

25   talking about a hundred percent resolution.

Page 102

1                          M. McGowan

2              So you'd agree with me the hundred

3     percent resolution, the first Scan0001.tif, if

4     printed, would be 2.4 inches by 3.2 inches as you

5     measure it on the page?

6          A.    If printed at 100 percent resolution.

7          Q.    And then Scan0002.tif, if printed at a

8     hundred percent resolution, would measure 3.23

9     inches by 2.4 inches?

10              MR. SOUTHWELL:  Where are you getting

11         that from?

12              MR. BOLAND:  I'm just asking him the

13         question.

14         Q.    It would measure 2.4 inches by 3.23

15     inches?

16              MR. BOLAND:  Actually, let me withdraw

17         that question.

18         Q.    Since the Scan002.tif is slightly

19     larger --

20         A.    Right.

21         Q.    -- by it looks like 11 pixels, you

22     would expect the printed size of that image at a

23     hundred percent resolution to be fairly close to

24     2.4 times 3.2 inches; wouldn't you agree?  11

25     pixels isn't that much.

Page 103

                    M. McGowan

1

2      A.    Yes, if printed at a hundred percent

3   resolution.

4      Q.    Right.

5            You can print TIFF images at larger

6   resolution:  200 percent, 300 percent and so

7   forth; correct?  You can set your printer to

8   print it at a larger resolution?

9      A.    Either your printer or the software,

10   for example, but generally it's oftentimes not

11   just by percentages, but if you used the default

12   program in Microsoft Windows, you'd hit Print,

13   your first two options, the options presented to

14   you will be to scale to fit the size of the page.

15      Q.    Okay.

16            The two printed versions of the TIFF

17   images, Exhibit F, I think, and then the one on

18   page 90, whatever that was, Exhibit --

19      A.    Exhibit H is the one that's on.

20      Q.    Right.

21            Do those appear to be approximately 2.4

22   by 3.2 inches?

23            I'm not asking you to say exactly, but

24   do they appear to be about 2-1/2 inches and a

25   little over three inches tall, as printed?

Page 104

M. McGowan

2      A.     Not having a ruler here, but it appears
3  to be approximately those dimensions to me.
4      Q.     Fair enough.  And I'll note, of course,
5  you don't have a ruler and I'm not asking you to
6  say exactly.
7             So this is an image of a paper
8  document.
9             You are not a paper document expert;
10  correct?
11      A.     I am not, yes.
12      Q.     So you have nothing to say about the
13  authenticity of any paper documents in this case;
14  correct?
15      A.     I haven't examined any paper documents
16  in this case.
17             The only thing that, as we discussed
18  earlier, it's only to the extent that it's -- the
19  only inferences I have are to the extent that
20  it's a paper document of -- it's a paper copy of
21  a document which I examined electronically and
22  reached opinions about it that way.
23      Q.     I'm asking about the paper document of
24  which this is an image of a paper document.
25             You don't have any evidence to offer,

Page 105

M. McGowan

1

2  you don't have any qualifications to testify

3  about the authenticity of the paper document from

4  which this image was made; correct, sir?

5      A.    Does that paper image, does that paper

6  document exist?

7            I am not aware of --

8      Q.    Please just answer the question.

9            You have nothing, no testimony to offer

10  about the paper document from which this image

11  was created because you are not a paper document

12  expert; correct?

13      A.    I don't have any -- I don't have any

14  opinions to offer.  I don't believe that

15  document, I am not aware of that document

16  existing, but I don't have any opinions to offer

17  about it.

18      Q.    Very good.

19            And likewise, if I gave you a picture

20  of the Brooklyn Bridge --

21            Are you familiar with the Brooklyn

22  Bridge?

23      A.    Yes.

24      Q.    If I gave you a picture of the Brooklyn

25  Bridge, I think you would agree with me you are

Page 106

1                         M. McGowan

2    not qualified to talk about, based on that

3    picture, the structural integrity of the Brooklyn

4    Bridge?

5        A.    That's correct, I am not qualified to

6    talk about the structural integrity of the

7    Brooklyn Bridge.

8        Q.    And have you ever seen the paper

9    document -- you've never seen the paper document

10   from which that image was made?

11       A.    Yes.  It's my understanding that it

12   doesn't exist.

13       Q.    You've never seen it?

14       A.    I have never seen it.

15       Q.    So your testimony, your conclusions in

16   your report are solely about the TIFF image

17   that's contained in your report, not about the

18   underlying paper document from which the TIFF

19   image was created; right?

20       A.    Could I clarify one thing?

21             We were speaking -- I mentioned I am

22   not aware of it existing.  We were actually

23   speaking about the second page.  I believe the

24   second page of the Work For Hire, the Work For

25   Hire document and the StreetFax contract are the

Page 107

1                        M. McGowan

2     same.

3              When I was speaking about I'm not aware

4     of it having existed I was talking specifically

5     about the first page of the StreetFax contract

6     which I'm not aware of, I'm not aware of it

7     existing in print format.

8         Q.    So it's your opinion, based on your

9     analysis, that the second page of the StreetFax

10    contract is the same as the second page of the

11    paper contract which the paper experts have

12    evaluated in this case; is that true?

13        A.    I haven't conducted a paper -- I

14    haven't conducted a paper document analysis of

15    it.  From my review of the text I believe that

16    the content is the same on the second page.

17        Q.    Did you review the signatures that

18    appear on the second page of the TIFF, the

19    StreetFax contract, and the second page of the

20    paper contract, at least if you have seen a scan

21    of it, did you review those signatures?  Do you

22    think those look the same to you?

23        A.    I -- earlier on, I think when it was

24    first identified in August of 2011 I recall

25    looking at the two of them together.  I don't

Page 108

                        M. McGowan
1
2    recall, but it's been a while, so I don't recall
3    details, the details of how the two appear.
4         Q.    Is it your belief, your opinion, your
5    expert opinion, that page 2 of the StreetFax
6    contract is a TIFF image created from page 2 of
7    the paper contract that was evaluated by the
8    paper experts?
9         A.    I don't have an expert opinion on that.
10        Q.    And we already went through earlier you
11   don't know how -- you can't conclude with any
12   certainty how that TIFF image was actually
13   created; correct?
14        A.    Correct, I cannot conclude how the TIFF
15   image had been created and whether, for example,
16   it was scanned directly onto the Seagate hard
17   drive or whether it had been introduced from
18   another media.
19        Q.    And do you know -- and you don't know
20   if that TIFF image from the moment of its
21   creation to the time it was placed onto the media
22   where you found it was altered at any point
23   during that time, before it got onto the location
24   where you found it, you can't say whether it was
25   altered at all?

Page 144

1

2                  C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                            : ss.

5    COUNTY OF NEW YORK     )

6

7         I, CARY N. BIGELOW, Court Reporter,

8    a Notary Public within and for the State of

9    New York, do hereby certify:

10        That MICHAEL F. McGOWAN, the witness

11   whose testimony is hereinbefore set forth,

12   was duly sworn by me and that such

13   testimony given by the witness was taken

14   down stenographically by me and then

15   transcribed.

16        I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, and that I am

19   in no way interested in the outcome of this

20   matter.

21        IN WITNESS WHEREOF, I have hereunto

22   set my hand this 23rd day of July, 2012.

23

24        _____

25                  CARY N. BIGELOW

# EXHIBIT G

## CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss (Doc. No. 318), should be GRANTED because clear and convincing evidence establishes the StreetFax Document is the authentic contract and the Work for Hire Document is a recently created fabrication; alternatively, the Defendants' Motion to Dismiss (Doc. No. 318), should be GRANTED based on Plaintiff's spoliation of evidence, but DENIED based on litigation misconduct.  Defendants' Motion for Judgment on the Pleadings (Doc. No. 320), should be DISMISSED as moot.  The Clerk of the Court should be directed to close the file.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      March 26, 2013
            Buffalo, New York

# EXHIBIT H

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
————————————————————————————————————

PAUL D. CEGLIA,

                    Plaintiff,

          -vs-                              10-CV-569A

MARK ELLIOTT ZUCKERBERG and
FACEBOOK, INC.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -


            Proceedings held before the

       Honorable Leslie G. Foschio,   U.S.

       Courthouse, 68 Court Street, Buffalo,

       New York on June 30, 2011.


       APPEARANCES:

       JEFFREY ALAN LAKE, ESQ.,
       Appearing for Plaintiff.

       ORIN S. SNYDER, ESQ.,
       MATTHEW BENJAMIN, ESQ.,
       TERRANCE P. FLYNN, ESQ.,
       Appearing for Defendants.


       AUDIO RECORDER:  Sandra Wilson

       TRANSCRIBER:     Michelle L. McLaughlin, RPR,
                        Official Reporter,
                        U.S.D.C. W.D.N.Y.
                        716/332-3560



       (Proceedings recorded by electronic sound
       recording, transcript produced by computer.)

1          THE CLERK:  On the record.  Ceglia versus

2     Zuckerberg and Facebook.  Appearing for the

3     plaintiff is Jeffrey Lake and appearing for the

4     defendants are Orin Snyder, Matthew Benjamin and

5     Terrence Flynn.  We're here for oral argument on

6     the parties' motions for expedited discovery and

7     also a scheduling conference.

8          THE COURT:  Good afternoon.  You are

9     Mr. Lake?

10          MR. LAKE:  Yes, your Honor.  Good

11     afternoon.

12          THE COURT:  Welcome to our court.

13          MR. LAKE:  Thank you very much.

14          THE COURT:  Mr. Snyder.

15          MR. SNYDER:  Good afternoon, your Honor.

16          THE COURT:  That's first chair,

17     Mr. Benjamin and what's your name again?  By the

18     way, with all these changes of counsel, we can only

19     hope and assume that there won't be anything

20     affecting Mr. Flynn, because we are always

21     interested in making sure that our former U.S.

22     attorneys are gainfully employed.

23          MR. FLYNN:  Thank you, your Honor.

24          THE COURT:  All right.  We've got the

25     motions.  We know what they say.  We've read them.

1  Very intriguing to say the least.

2      And we're ready to hear from Mr. Snyder, and

3  then we'll hear from Mr. Lake, and we'll ask

4  questions along the way.

5      I guess I would want to emphasize that any

6  questions I may ask are not intended to indicate

7  the Court's views on the merits.  Obviously this is

8  a very significant case, subject to the defendant's

9  views about the authenticity of the underlying

10 agreement.  Rather, the questions are intended to

11 assist me in understanding, if I can use the term,

12 the big picture, so that I can make an informed and

13 reasonable decision on, first of all, the question

14 of whether these motions should be granted at all,

15 or need to be granted, and if so, in what form, and

16 to then inform the Court about how to handle the

17 case as we go forward to the extent that we need to

18 go forward.

19     Then, of course, I fully understand the two

20 questions are totally intermixed, especially in the

21 defendant's view.  So just bear with me with my

22 questions and understand that I'm not trying to in

23 any way second guess any of your theories or

24 arguments, but I'm just trying to understand better

25 what we're trying to accomplish.

4

1      So, Mr. Snyder, you have the floor for the

2  moment.

3           MR. SNYDER:  Thank you, your Honor.  May I

4  approach, your Honor?

5           THE COURT:  Oh, that's the other thing.

6  If you prefer to be seated and at counsel table for

7  whatever reason, you're welcome to do it.  If you

8  prefer to stand and deliver, use the podium.

9           MR. SNYDER:  Thank you.  Good afternoon,

10  your Honor.

11           THE COURT:  Good afternoon.

12           MR. SNYDER:  Your Honor, our motion

13  presents overwhelming evidence that this plaintiff

14  is committing what we believe is an unmitigated

15  fraud on this court which strikes at the heart of

16  the integrity of the judicial process and this

17  court's processes.  We seek expedited discovery to

18  fully expose the nature and magnitude of the fraud,

19  although we believe our papers have gone way beyond

20  the requisite showing of prima facie evidence of

21  fraud to establish an overwhelming case of fraud.

22      I think the case begins, your Honor, to give

23  the Court background, this plaintiff waited seven

24  years to file a lawsuit claiming a multi-billion

25  dollar interest in one of the most well-known

5

1    companies in the world.  There are statute of

2    limitation and laches problems which affect the

3    case, but we believe the case can and should end

4    before those issues even need to be resolved.

5         This case is based on a fraudulent contract and

6    fabricated emails.  The case --

7              THE COURT:  Fraudulent in the sense that

8    it's nonexistent?

9              MR. SNYDER:  The contract attached to the

10   complaint and the amended complaint is a doctored,

11   fraudulent document which this plaintiff, perhaps

12   in concert with others, manufactured for the

13   purpose of bringing this lawsuit.

14             THE COURT:  That's one thing I'm not quite

15   clear on, and I may have missed something in the

16   papers.  Is it Mr. Zuckerberg's position that he

17   never signed anything?

18             MR. SNYDER:  No, your Honor.

19   Mr. Zuckerberg did sign --

20             THE COURT:  Could I finish the question?

21             MR. SNYDER:  I'm sorry.  Yes, your Honor,

22   of course.

23             THE COURT:  Anything in any written

24   instrument that carried both his signature and

25   Mr. Ceglia's, the plaintiff?

1            MR. SNYDER:  As Mr. Zuckerberg attested to

2     in his declaration, your Honor, he did sign a

3     contract with this plaintiff in 2003 before

4     Facebook was even a figment of his imagination,

5     much less a concept or a company, concerning an

6     entity known as StreetFax.  StreetFax was a failing

7     and ultimately failed company that this plaintiff

8     tried to get off the ground.  Mr. Zuckerberg, who

9     was a freshman at Harvard looking for extra income,

10    answered an ad on Craigslist and performed limited

11    computer services.

12            THE COURT:  Such as?

13            MR. SNYDER:  Such as coding, programming

14    work.  Mostly coding, creating software for this

15    system, StreetFax, which had to do with taking

16    pictures of street intersections and --

17            THE COURT:  What did Mr. Ceglia contribute

18    to that project?

19            MR. SNYDER:  The StreetFax project?

20            THE COURT:  Yes.

21            MR. SNYDER:  It was ironically, your

22    Honor, and I say this not to -- to cast aspersions,

23    but Mr. Ceglia ironically started StreetFax --

24            THE COURT:  But you wouldn't mind if it

25    did consistent with your --

```
 1                    MR.  SNYDER:  Well, it's the record, your
 2        Honor.
 3                    THE COURT:   -- published position.
 4                    MR.  SNYDER:  Well, the facts compel this
 5        comment, your Honor.  StreetFax ironically was
 6        borne out of Mr. Ceglia's theft of that company
 7        from people for whom he worked.
 8                    THE COURT:  Is that in the record
 9        anywhere?
10                    MR.  SNYDER:  It's in the public record.
11                    THE COURT:  I mean, in the papers that are
12        before me?  I don't remember reading that.
13                    MR.  SNYDER:  I don't believe so, your
14        Honor.
15                    THE COURT:  So this is new information to
16        me?
17                    MR.  SNYDER:  New information, but there
18        was a litigated --
19                    THE COURT:  He somehow stole StreetFax?
20                    MR.  SNYDER:  Yes, and there was a
21        litigation in Boston federal court where the
22        founders of a predecessor entity sued him, and
23        there ultimately was a settlement out of which
24        Mr. Ceglia obtained the right to use the StreetFax
25        name.  It was his -- so it wasn't even his idea.
```

1    It was a company that he used to work for that had

2    the exact same identical idea and concept.  So

3    Mr. Zuckerberg did, in fact --

4         THE COURT:  Same identical idea and

5    concept as?

6         MR. SNYDER:  Taking photographs of street

7    intersections and uploading them on the Internet.

8         THE COURT:  That's the project that he

9    engaged with Mr. Zuckerberg about?

10         MR. SNYDER:  Yes, your Honor.  So

11    Mr. Zuckerberg for a period of months performed

12    limited services --

13         THE COURT:  So what was Mr. Ceglia's role

14    in this project, this coding programming software?

15         MR. SNYDER:  As best as we can understand

16    from the limited information we have, he was

17    running the company.  He was looking for customers,

18    trying to find financing, and the kind of things

19    that one does trying to get a fledgling startup

20    company --

21         THE COURT:  Did he give Mr. Zuckerberg the

22    specifications for the software that he was

23    attempting to write or build for this street

24    intersection identification program?

25         MR. SNYDER:  Yes, your Honor.  They had

1    conversations about the project, and

2    Mr. Zuckerberg, who, even at that time, was a

3    proficient software developer and coder, was able

4    to develop software code to enable that system to

5    operate.  Ironically, Mr. Ceglia did not pay

6    Mr. Zuckerberg for the work performed.

7            THE COURT:  I see all of that -- those

8    allegations in there.

9            MR. SNYDER:  Sure.

10           THE COURT:  But he did receive some money?

11           MR. SNYDER:  A modest sum of money but --

12           THE COURT:  How much?

13           MR. SNYDER:  I believe he was paid in

14   total about in $9,000 and was owed --

15           THE COURT:  9,000?

16           MR. SNYDER:  -- more than that, and --

17           THE COURT:  Not exactly modest to a

18   college student.

19           MR. SNYDER:  It wasn't, but he did a

20   considerable amount of work.

21           THE COURT:  I'm sure.

22           MR. SNYDER:  So he --

23           THE COURT:  He was a proficient coder too.

24           MR. SNYDER:  At the time he was, even at

25   the time he was.

1              THE COURT:  Received no training,

2    self-taught?

3              MR. SNYDER:  Self-taught, but also took

4    computer courses in high school and in college.

5              THE COURT:  Okay.  Which Mr. Ceglia, he

6    had no competence in that regard, that technical

7    way?

8              MR. SNYDER:  To the extent we're

9    knowledgeable of his technical skills, they were

10   limited, and he certainly needed to engage an

11   independent contractor to perform those services

12   for him.  But what's clear is that that project had

13   absolutely nothing to do with anything related to

14   Facebook, a social media network, or any related

15   concepts.

16       And -- and, your Honor, the emails which we've

17   told your Honor about which exist today on the

18   Harvard University server, 176 of them actually,

19   all tell a narrative of a relationship between

20   Mr. Zuckerberg on the one hand and StreetFax and

21   Mr. Ceglia on the other that relates only entirely

22   exclusively to StreetFax.

23             THE COURT:  And they in no way corroborate

24   or are consistent with those emails that are

25   purportedly genuine emails between the plaintiff

1   and Mr. Zuckerberg that are attached to the

2   complaint?

3          MR. SNYDER:  Correct, your Honor.  In

4   fact, they tell a narrative that, when read

5   side-by-side with the fictional narrative told in

6   the amended complaint, make the narrative in the

7   amended complaint not only fantastical, but almost

8   impossible as a matter of logic and reason, because

9   at the same time that the authentic emails that

10  reside today on the Harvard server and date

11  from 2004 indicate a deadbeat Mr. Ceglia unable to

12  pay Mr. Zuckerberg, begging for forbearance,

13  begging for forgiveness --

14          THE COURT:  That's in the --

15          MR. SNYDER:  Right.

16          THE COURT:  I see those.

17          MR. SNYDER:  The Court --

18          THE COURT:  Are your -- do the emails that

19  are in your papers, are those all the emails?

20          MR. SNYDER:  Those are three, your Honor.

21          THE COURT:  Those are the three.

22          MR. SNYDER:  The reason we only attached

23  three is interesting, your Honor.  We believe that

24  if we attached all of them, it would just provide

25  this plaintiff with a roadmap for how to even