

Buyer – Paul

Seller – Mark

...om the Seller plus freight...

...shall not be or become liable to the Seller or
...ugh or under the Seller for any portion of
...urchaser elects not to accept following
fault.

...he items to be supplied hereunder free and
...es, and claims of laborers or material men
...old payment pending receipt of evidence
...ctory to it of the absence of such items,

...ing. No do not be governed

# EXHIBIT C

 Designation: E1658 – 08

## Standard Terminology for
## Expressing Conclusions of Forensic Document Examiners[1]

This standard is issued under the fixed designation E1658; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

### 1. Scope

1.1 This terminology is intended to assist forensic document examiners in expressing conclusions or opinions based on their examinations.

1.2 The terms in this terminology are based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science that was adopted as the recommended guidelines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners.[2]

### 2. Referenced Documents

2.1 *ASTM Standards:*[3]
E444 Guide for Scope of Work of Forensic Document Examiners

### 3. Significance and Use

3.1 Document examiners begin examinations from a point of neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.

3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. The expressions used to differentiate the gradations of opinions should not be considered as strongly defined "categories". These expressions should be guidelines without sharply defined boundaries.

3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the guidelines in this standard, the appropriate definition(s) could be quoted in or appended to reports.

3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, that is, to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any guidelines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no guidelines can cover exactly.

3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in Guide E444, and it may be used by forensic examiners in other areas, as appropriate.

3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

### 4. Terminology

4.1 *Recommended Terms:*

**identification (definite conclusion of identity)**—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.
*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion [or conclusion] that John Doe of the known material wrote the questioned material.

**strong probability (highly probable, very probable)**—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order;

[1] This terminology is under the jurisdiction of ASTM Committee E30 on Forensic Sciences and is the direct responsibility of Subcommittee E30.02 on Questioned Documents.

Current edition approved Aug. 15, 2008. Published October 2008. Originally approved in 1995. Last previous edition approved in 2004 as E1658 – 04. DOI: 10.1520/E1658-08.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

[3] Mc Alexander T. V., Beck, J., and Dick, R., "The Standardization of Handwriting Opinion Terminology," *Journal of Forensic Science*, Vol. 36, No. 2, March 1991, pp. 311–319.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

E1658 − 08

however, the examiner is virtually certain that the questioned and known writings were written by the same individual.

*Examples*—There is *strong probability* that the John Doe of the known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.

> Discussion—Some examiners doubt the desirability of differentiating between strong probability and probable, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

probable—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; however, it falls short of the" virtually certain" degree of confidence.

*Examples*—It has been concluded that the John Doe of the known material probably wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

indications (evidence to suggest)—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.

*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion.

> Discussion—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

no conclusion (totally inconclusive, indeterminable)—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another.

*Examples*—*No conclusion* could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

indications did not—this carries the same weight as the indications term that is, it is a very weak opinion.

*Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence *suggests* that the John Doe of the known material did not write the questioned material, or I

found *indications* that the John Doe of the known material did *not* write the questioned material but the evidence is far from conclusive.

See Discussion after indications.

probably did not—the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.

*Examples*—It has been concluded that the John Doe of the known material probably did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material probably did not write the questioned material.

> Discussion—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

strong probability did not—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.

*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.

> Discussion—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

elimination—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.

*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.

> Discussion— This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1 When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.

 E1658 – 08

### 4.2 Deprecated and Discouraged Expressions:

4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

**possible/could have**—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a handwriting sample is by a specific person. If the evidence is so limited or unclear that no definite or qualified opinion can be expressed, then the proper answer is *no conclusion*. To say that the suspect "could have written the material in question" says nothing about probability and is therefore meaningless to the reader or to the court. The examiner should be clear on the different meanings of "possible" and "probable," although they are often used interchangeably in everyday speech.

**consistent with**—there are times when this expression is perfectly appropriate, such as when "evidence consistent with disguise is present" or "evidence consistent with a simulation or tracing is present, but "the known writing is consistent with the questioned writing" has no intelligible meaning.

**could not be identified/cannot identify**—these terms are objectionable not only because they are ambiguous but also because they are biased; they imply that the examiner's task is only to identify the suspect, not to decide whether or not the suspect is the writer. If one of these terms is used, it should always be followed by "or eliminate[d]".

similarities were noted/differences as well as similarities—these expressions are meaningless without an explanation as to the extent and significance of the similarities or differences between the known and questioned material. These terms should never be substituted for gradations of opinions.

**cannot be associated/cannot be connected**—these terms are too vague and may be interpreted as reflecting bias as they have no counterpart suggesting that the writer cannot be eliminated either.

**no identification**—this expression could be understood to mean anything from a strong probability that the suspect wrote the questioned writing to a complete elimination. It is not only confusing but also grammatically incorrect when used informally in sentences such as," I no identified the writer" or "I made a no ident in this case."

**inconclusive**—this is commonly used synonymously with no conclusion when the examiner is at the zero point on the scale of confidence. A potential problem is that some people understand this term to mean something short of definite (or conclusive), that is, any degree of probability, and the examiner should be aware of this ambiguity.

**positive identification**—This phrase is inappropriate because it seems to suggest that some identifications are more positive than others.

**[strong] reason to believe**—there are too many definitions of *believe* and *belief* that lack certitude. It is more appropriate to testify to our conclusion (or determination or expert opinion) than to our belief, so why use that term in a report?

**qualified identification**—An *identification* is not qualified. However, opinions may be qualified when the evidence falls short of an *identification* or *elimination*.

ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.

This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the ASTM website (www.astm.org/ COPYRIGHT/).

# EXHIBIT M

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

PAUL D. CEGLIA,

                          Plaintiff,

        vs.

ERIC HIMPTON HOLDER, JR.,
as Attorney General of the United States,
PREETINDER S. BHARARA,
as US Attorney for the Southern District
of New York, JANIS M. ECHENBERG
and CHRISTOPHER D. FRYE,
in their capacity as representatives of the U.S.
Attorney's Office for the Southern District of New
York,

                        Defendants.

Civil Action No.: 1:13-cv-00256-RJA

---

## DECLARATION OF JOAN M. WINKELMAN

I, Joan M. Winkelman, do hereby declare, under the pains and penalties of perjury of the United States, as follows:

1.      I am a board certified forensic document examiner. A true and complete copy of my statement of qualifications is annexed hereto as Exhibit A. I have personal knowledge of the facts stated herein.

2.      Included therein is a list of court proceedings and other hearings in which I have testified as an expert forensic document examiner (independent of my former role as an employee of the Erie County Department of Social Services). In each instance where the word "qualified" appears, I was permitted to testify as an expert and, to the best of my knowledge, my testimony was admitted into evidence.

3.     The majority of my work as a forensic document examiner involves determining the authenticity of handwriting including, but not limited to, signatures. My training and experience include determining the authenticity of the various components of questioned documents, including, but not limited to, attributes such as fonts or type and formatting used.

4.     The assignment in this matter was to determine indicators, if any, of authenticity in the "Work For Hire agreement," through the comparison of that document with the Street Fax document which is also described as the "Kato-Street Fax document."

5.     I received images of the two documents in .pdf, jpeg, and .tif formats:

- The "Work for Hire agreement" consists of two pages, hand-dated on page 2, in the signature area, "4/28/03," received as .tif file image on October 29, 2013, and examined using Irfanview program for zoom of image capability. Printout of the .tif images are attached as Exhibit B.

- The "Kato-Street Fax document" consists of three pages, type-dated on page 3 in the signature area, "5/5/2003," received as .tif image on November 11, 2013 and examined using Irfanview program for zoom of image capability. As represented by counsel, this document is presumed to be authentic. Printout of the .tif images are attached as Exhibit C.

6.     In addition, I received a two page USPS Lab Report.pdf of John W. Cawley, III, dated September 27, 2013, regarding examination of the original two-page "Work for Hire agreement," for empirical review. A printout of the report is attached as Exhibit D.

7.     My examination of the Work for Hire agreement identified two different fonts which I have determined to be Times New Roman and Garamond. My examination of the Kato-Street Fax document identified two different fonts which I have determined to be Times New Roman and Garamond.

2

8.    My examination and comparison of the Work for Hire agreement and the Kato-Street Fax document disclosed that both instruments contain the same two fonts, limited formatting differences, and typographical errors supporting the conclusion that the Work for Hire agreement is authentic.

9.    Based upon my examination and comparison of the two page Work for Hire agreement and the three page Kato-Street Fax document, both available in image form, it is my opinion, given to a reasonable degree of professional certainty, that the similarities and differences identified in the two documents support the conclusion that the Work For Hire agreement is authentic.  This opinion is stated at the highly probable level of certainty due to the fact that the documents were available to me only in image form.

10.    Annexed hereto as Exhibit E is a listing of my observations of the similarities and differences between the two documents that form the basis of my opinion.

11.    ASTM International's Designation E 1658-08 – Standard Terminology for Expressing Conclusions of Forensic Document Examiners is the recognized standard for the terminology used by forensic document examiners to express their conclusions.  A copy of the ASTM standard is annexed hereto as Exhibit F.  (That standard has also been adopted verbatim by The Scientific Working Group for Forensic Document Examination (see http://www.swgdoc.org/)).  My opinion is stated at the "highly probable" level (described by ASTM as "very persuasive") and not a higher level due to the fact that I had to examine document images rather than originals.  On the other hand, I have seen the Postal Service's Forensic Document Examiner's report of September 27, 2013, and although he did examine

original documents, his opinion is rendered at the "indications" level which, as the ASTM discussion notes state, is "a very weak opinion," which does not rise even to the level of "probable."

I swear that the foregoing is true and correct under the pains of perjury of the United States.

Dated: December 30, 2013

*Joan M. Winkelman*
Joan M. Winkelman

EXHIBIT A

# JOAN M. WINKELMAN

## STATEMENT OF QUALIFICATIONS

**BOARD CERTIFIED FORENSIC DOCUMENT EXAMINER** status awarded 9/04 following written and oral testing and presentation before Certification Review Board – Independent Association of Questioned Document Examiners
    **RECERTIFIED** 6/20/09 following review of professional activity

**BOARD CERTIFIED FORENSIC DOCUMENT EXAMINER** status awarded 7/93 as Certified Document Examiner following oral presentation and response to questions before Certification Review Board – World Association of Document Examiners. Status renamed 1999 as Board Certified Forensic Document Examiner

**REGISTERED PROFESSIONAL DOCUMENT EXAMINER** status awarded 7/86 following graded written testing – World Association of Document Examiners

**COURT QUALIFIED** designated within World Association of Document Examiners 1993

**MEMBER:** National Association of Document Examiners (NADE) 1986 --
    Independent Association of Questioned Document Examiners (IAQDE) 2002 to 10/31/10
    World Association of Document Examiners (WADE) 1986 to 1/16/03
    ASTM International (formerly American Soc for Testing and Materials) 2008 –

**OFFICES HELD:** Appointed Librarian and serving as member of Board of Directors, NADE 10/88 --
    Elected Secretary and served as member of the Executive Board, IAQDE 8/05, re-elected 6/07 – re-elected 6/09
    Appointed Newsletter Editor, IAQDE 6/07 – 8/08
    Appointed Publication Editor, IAQDE 8/08 – 10/10
    Joined Journal Editorial Board, NADE 7/10 --
    Appointed Chief Editor Newsletter, NADE 4/11 --

**ACTIVITIES:** Member Certification Board and Testing Proctor, IAQDE 2006 – 2010

**PAPERS PUBLISHED:** NADE 11/89 Journal "Signatures In Succeeding Series"
    NADE 8/92 Journal "Envelopes: Gum Strip Differences"
    WADE 7/94 Exchange "'Electron' Microscope for Lee-Tekees"
    WADE 4/98 Exchange "A New Method to Detect Erasures"
    WADE 10/98 Exchange "Watermarks Are Trademarks"
    IAQDE 2-3/09 Under the Scope "Signatures In A Series – A Test"

    As Editor IAQDE articles re: Document examiner website set-up, search engine placement, office computer security and maintenance 6/07 – articles re: locating references on various handwriting case topics 1/09 – 10/10

**PAPERS PRESENTED:** WADE Spring Seminar, Warwick, Rhode Island 2/90
    "Determining Ball Point Pen Direction"
    WADE Annual Seminar, Oak Brook, Illinois 7/01
    "Seeing Is Believing – Convincing Demonstrative Exhibits"
    IAQDE Annual Seminar, St. Louis, MO 9/03
    "Social Security Cards -- from the beginning"
    IAQDE Annual Seminar, Arlington, VA 8/06
    "All About the Date – Metal Date Stamp Impressions"
    IAQDE Annual Seminar, Albuquerque, NM 6/07
    "I Need Information, Where Do I Find It, Where Do I Begin (Nourishing Professional Library)"

Statement of Qualifications          JOAN M. WINKELMAN          Page 2 of 2

**PAPERS PRESENTED** -cont'd
          IAQDE Annual Seminar, Sarasota, Florida 6/09
          "Promoting Your Business"
          IAQDE Annual Seminar, Boston, MA 6/10
          "How Can Those Resting Dots Help You?"

**COURT AND HEARING TESTIMONY:**    as an independent document examiner I have
testified in Supreme Court in Cattaraugus, Erie and Monroe County, Erie County Court,
Livingston County Court, Surrogates Court in Erie Co., Buffalo City Court, Niagara Falls City
Court, Town Courts of Amherst, Clarence, Newstead, Tonawanda. (List available on request.)

**DOCUMENT EXAMINATION RELATED TRAINING GIVEN:**
2/96   Marine Midland Item Processing and Security staff, approximately 40 staff
          members, 2 sessions  4 hours each
3/99   Marine Midland/HSBC Item Processing staff, approximately 30 staff members,
          1 session  2 hours
11/02 HSBC Item Processing and Security staff, approximately 25 staff members,
          1 session  1 ½ hours

**BUSINESS:**  in 1984 filed business certificate establishing business as handwriting
          consultant.  In 1986 added service as independent document examiner.

**EMPLOYMENT:**  Erie Co. Dept. of Social Services 4/26/61-3/15/05; assigned to
          Resource Section, Special Investigations Division.
          Duties included __document examination__  work in fraud investigation cases
          involving signature and form comparison, anonymous letter authorship - 1993 to 2005

**EDUCATION  - INTENSIVE DOCUMENT EXAMINATION TRAINING:**
.40  hours   **NADE Apprentice Course**, Philadelphia, Pa.,  Phyllis Cook, CDE  7/86
70+ hours   **Department of the Treasury, U. S. Secret Service**  Questioned Document
          Course, Glynco, Ga.  3/92
26  hours   **Rochester Institute of Technology and U. S. Secret Service**  Printing
          Process Identification and Image Analysis for Forensic Document
          Examiners, 6/03
32+ hours   **Foray Technologies** and Town of Hamburg Police Depart  Introduction
          to Forensic Digital Imaging, Hilbert College, Hamburg, NY  8/04
35  hours   including digital imaging, microscopy, measurement
823 1/2 hours  attendance at **training seminars, annual seminars, additional training**
          7/86 to current sponsored by World Association of Document Examiners, National
          Association of Document Examiners, Independent Association of Questioned
          Document Examiners
( 7 months)  Andrew Bradley Training Course in Forensic Document Examination  20 lessons
          20 testings and final exam     8/87 -- 3/88
219 1/2 hours   other school courses and training          (List available on request.)

Independent study and empirical research as needed (List of professional library available on request.)

**PROFICIENCY TESTING:** as an independent document examiner I participate in proficiency testing
through Collaborative Testing Services Inc. (providing worldwide interlaboratory testing programs
www.collaborativetesting.com)

4/30/13

Please do not designate me as your expert until fee contract agreement has been signed and retainer fee has
been received by me.

Joan M. Winkelman    1905 Maple Road, Amherst, NY -- 14221-2754    716-634-4348    bp995@netzero.net
                                                                                                                    jwink995@gmail.com

## JOAN M. WINKELMAN

**COURT AND HEARING TESTIMONY:**   as an independent document examiner

5/23/91   Joan Able v Able   John A. Michalek, attorney   Index 832/90
Judge Joseph Sedita   Court – Supreme   Bench   Qualified

7/25/91   James J. Michalek v People,   James J. Michalek, attorney   Index 90-0911-001
Judge Rose LaMendola   Court – Erie County   Jury   Qualified

5/21/92   People v Michael Marano   Philip Thielman, attorney   Complaint #102526
Judge John Gruber   Court – Tn. of Tonawanda   Bench   Qualified

11/16/92   Estate Harold Schrutt   L. Mattar & T. D'Agostino, attorneys   File #89-5096
Judge Joseph S. Matlina   Court – Surrogate   Jury   Qualified

6/25/93   Estate of Janet M. Ward,   ShaRee Meadows, attorney   File #92-2952
Judge Joseph S. Matlina   Court – Surrogate   Bench   Qualified

7/13/94   K. Kozlowski v Victor Lorenzo   Jerry Ader, attorney   Case 93-070001
Judge Dennis R. Freeman   Court - Tn of Newstead   Jury   Qualified

9/28/94   K. Kozlowski v Taurus Automotive/Todd Lorenzo   Robert Gurbacki, attorney
Judge Richard L. Campbell   Court – Tn. of Newstead   Small Claims
Bench   Qualified

10/14/94   Sears Roebuck v Larnell Evans   William Urban, attorney
Judge William Waible   Court – Tn. of Clarence   Bench   Qualified

6/3/96   Hearing – National Assoc. Security Dealers   Dr. Joseph S. Calabrese, attorney
Hyatt Hotel Executive Room   Qualified

1/14 & 15/97   C.A.Curtze Co. v Frank Cipriani/Garcia's Irish Pub   Robert DiTusa, attorney
Judge Christopher J. Burns   Court – Supreme   Part 29   Bench   Qualified
Index 1996-2932

5/21/98   John M. Hariaczyi v Leo Piotrowski   Daniel Sperrazza, attorney   Index H58546
Judge Nelson H. Cosgrove   Court – Supreme   Part 7   Jury   Qualified

2/11/99   Hearing – Barker School System   Jerome D. Schad, attorney
Somerset Town Hall   Qualified

2/16/99   Coley v Fibich   Robert DiTusa, attorney   Index 97-3647
Judge John H. Doerr   Court – Supreme   Part 13   Bench   Qualified

9/7/00   Bottini v Holiday Olds   Christopher A. Cardillo, attorney   Index 3877 – 98
Judge John F. O'Donnell   Court – Supreme   Part 11   Bench   Qualified

7/24/02   84 Lumber Co. v McGuire Contracting   James F. Allen, attorney   Index 2282/1998
Judge Joseph G. Makowski   Court – Supreme   Part 25   Bench   Qualified

1/16/03   Re: James Kavanaugh   John M. Garrity, attorney   Case No. 01-05136-5
Judge Mark G. Farrell   Court – Tn. of Amherst   Bench   Qualified

6/2/03   Re: Terrance Gidney   Michael J. Rooth, attorney   Index 2002-2256001
Judge Sheila A. DiTullio   Court – Erie Co   Part 3   Bench   Qualified

7/10/03   Hearing: Lewis v Lewis   Robert K. Duerr, attorney   Index 901982-2002
Judge Salvatore R. Martoche   Court – Supreme   Part 2   Qualified

JOAN M. WINKELMAN
COURT TESTIMONY

Page 2 of 2

11/10/03   Sharon Galbraith v Gary Buchanan
   Judge John Gruber   Tn of Tonawanda Small Claims Court   Bench   Qualified

11/19/03   People v Dwayne Ivery   Daniel Medved, attorney   Index 177-03
   Judge David D. Eagan   Court - Monroe Co.   Supreme/Criminal  Rm. 444
            Jury   Qualified

12/2 & 3/03   Linda L Sikorski, Boleslus F Sikorski v Henry Boron, Christopher Boron, Security
   Mutual Life Insurance Co of NY,  Hartford Accident & Indemnity Co.
   Howard Kleiman, attorney   Index 2001-6059
   Judge John P. Lane   Court – Supreme   Part 13   Jury   Qualified

8/5/04   Ring v Koch   Robert H. Gurbacki, attorney   Index 67062
   Judge Larry M. Himelein   Court – Cattaraugus Co. Supreme   Bench   Qualified

10/20/04   People v Shondell Edwards   Carl H. Dobozin, attorney   Docket 03F16571
   Judge Thomas P. Franczyk   Court – Buffalo City Court   Bench   Qualified

10/4/05   People v Stephen J. Hicks   John M. Ange, attorney   Indictment 01775-04
   Judge Joseph S. Forma   Court – Supreme Part 22   Bench   Qualified

3/19/07   Creative Collections of New York, Inc. v James DiBlasi, Jr., Denise DiBlasi, Jason Knobloch
   and Innovative Recovery Group, Inc.   James I. Myers, attorney   Index  I 2006/12455
   Judge John M. Curran   Court – Supreme   Part 4   Bench   Qualified

1/31/08   People v Corey R. Moss   James R. Boehler, attorney   Indictment 2007-093
   Judge Robert Wiggins   Court – Livingston County   Jury   Qualified

3/28/08   Hearing – Anthony C. Otto vs Daniel Buttery   P. Andrew Vona, attorney   File 07-9479
   Judge Mark A. Volante   Court – Niagara Falls City Court   Qualified

5/6/08   Hearing – Andree S. Bogaerts as Executrix of the Estate of Winoc Bogaerts v Elaine
   Thompson   Michael E. Ferdman, attorney   Index 2006-012432
   Judge Joseph E. Makowski   Court – Supreme   Part 33   Qualified

11/19/09   People v Abdo Alkhulaqi   Frank L. Bybel, attorney   File 08-02476
   Judge M. William Boller   Court – Supreme Part 13   Bench   Qualified

7/19/11   American Legal & Commercial Printers, Inc. and Douglas J. Russo v John L. Russo
   E. Robert Fussell, attorney   Case No. 1-10-11576  AP(adversary proceeding) #1-10-01110
   Judge Michael J. Kaplan   Court ~ US Bankruptcy Court Western Dist of NY
           Bench   Qualified

10/4/12   Hearing - NYS Trooper Disciplinary   David Killion   Jon Wilson, attorney
   NYS Trooper Troup A Headquarters
          Qualified

As an employee, Erie Co. Dept. of Social Services, I testified as a document examiner at more than fifty NYS Fair Hearings.

12/18/13

# EXHIBIT B

# "WORK FOR HIRE" CONTRACT

## SECTION 1- GENERAL PROVISIONS

### 1. Definitions

The following terms have the meaning specified when used herein:
PURCHASER – Paul Ceglia
CONTRACTOR/SELLER – Mark Zuckerberg, his agents, employees, suppliers, or sub-contractors, furnishing materials equipment, or services.

CUSTOMER – StreetFax LLC the entity contracting for construction or other services for which the goods and/or services provided hereunder are for incorporation into the work or are required to facilitate completion of Purchaser's contract with such entity.
PRIME CONTRACT – This contract between Purchaser and Seller.

### 2. Entire Agreement

The contract between the Purchaser and Seller as a Purchase agreement and "work made for hire" reflects two seperate business ventures, the first being for the work to be performed directly for the StreetFax Database and the Programming language to be provided by Seller.
Second it is for the continued development of the software, program and for the purchase and design of a suitable website for the project Seller has already initiated that is designed to offer the students of Harvard university access to a wesite similar to a live functioning yearbook with the working title of "The Face Book"

It is agreed that Purchaser will own a half interest (50%) in the software, programming language and business interests derived from the expansion of that service to a larger audience.

### 3. Payment Terms

No insurance or premium charges or price increases will be allowed unless authorized by Purchaser in writing. No increase in price from that stated on the face hereof will be considered throughout the duration of the order.
The Agreed upon Cost that the Seller and the Buyer have agreed upon are as follows: Buyer agrees to pay the seller the Sum of $1000 a piece for the work to be performed for Streetfax and $1,000 for the work to be performed for "The Page Book".
Late fees are agreed to be a 5% deduction for the seller if the project is not completed by the due date and an additional 1% deduction for each day the project is delayed beyond that point.
The agreed upon project due date for the StreetFax software *by* May 31, 2003. *Penalties will require a Fund by May 3 yates* ML
The agreed upon completion for the expanded project with working title "The Face Book" shall be January 1 2004 and an additional 1% interest in the business will be due the buyer for each day the website is delayed from that date.
Additional funds may be provided for either project on an as needed basis at the sole discretion of the Buyer.

### 4. Changes

a) BY PURCHASER – Purchaser agrees that no further revision shall be implemented until or unless approved by the seller. Those revisons shall be transmitted for written approval to seller.
b) BY SELLER – The Seller agrees that no further revision shall be implemented until or unless approved by Buyer. Those revisions shall be transmitted for written approval to the Street Fax Purchasing Department.

### 5. Purchaser's Property/Seller's Responsibility

For the StreetFax database Buyer agrees to pay for and maintain the cost of upkeep for the servers needed for it's operation.

For "The Face Book" Seller agrees to maintain and act as the sites webmaster and to pay for all domain and hosting expenses from the funds received under this contract, and  Seller agrees that he will maintain control of these services at all times.

Data, drawings, tooling, patterns, materials, specifications, and any other items or information supplied to Seller under this order are the property of the Purchaser and must be returned upon completion of this order.  Such items or information are to be used solely in the performance of the work by the seller and shall not be used or disclosed for any other purpose whatsoever without Purchaser's prior express written consent.

### 6. Settlement of Controversies

In the event that this purchase order is for materials or equipment which  is excluded from this  Prime Contract, and in the case of disputes between the Purchaser and the Customer or between the Purchaser and the Seller regarding materials or equipment to be furnished by the Seller, the Seller agrees to be bound to the same extent that the Purchaser is bound by the terms of the Prime Contract, and by any and all decisions and determinations made thereunder, provided that the Seller shall have the right to participate in the settlement of any dispute to the extent that the Seller will be affected thereby.
No interest shall accrue on any payment(s) otherwise due the Seller, which is withheld or delayed as a result of any such dispute, except to the extent that the Purchaser is ultimately paid interest on monies due the Seller. The Seller shall not be held liable if the Seller follows instructions of the Purchaser and it is later determined that the Purchaser's instructions were not in compiance with the terms and specifications of the Prime Contract. Pending final disposition of a dispute hereunder, the Seller shall carry on the work unless otherwise agreed I writing by the purchaser.
In all instances the final authority should rest with the final Specifications

### 7. Patent Indemnity

Purchaser hold seller harmless for an infringement  sellers work may constuitute on patents held by and third party that result from the direct request for the work made by purchaser in this "work made for hire" agreement.
The Seller hereby agrees to be responsible for all claims against the Purchaser of the Customer for alleged infringement of patents by reason of the Purchaser's or Customer's possession, use, or sake of any materials or equipment furnished hereunder by the Seller or by reason of the performance of any work hereunder by the Seller. The Seller agrees to defend in it's sole expense all suits against the Purchaser and/or the Customer and to save and hold harmless the Purchaser and the Customer from and against all costs, expensed, judgements, and damages of any kind which the Purchaser or the Customer may be obliged to pay or incur by reason of any such alleged or actual infringement of a patent or patents. The Purchaser and the Customer agree to render whatever assistance it reasonably can I the way of information and access to records for the defense of any such suit.
This indemnity shall not extend to alleged or actual infringements resulting from the Seller's complience with the Purchaser's or Customers's design, instructions, processes, or formulas provided, however, that the Seller agrees to be responsible if it is reasonable to assume the Seller should have been aware of a possible alleged or actual infringement resulting from the Purchaser's or Customer's design, instructions, processes, or formulas and fails to notify the Purchasers of such possibility.

8  Assignment of Subcontracting
Neither this order nor any rights, obligations, or monies due hereunder are assignable or transferable (as security for advances or otherwise) without the Purchaser's prior written consent, and except as to purchases of raw materials or standard commercial articles or parts, the Seller shall not subcontract any major portion of the work encompassed by this order without the Purchaser's prior written approval. The Purchaser shall not be required to recognize any assignment or subcontract made without its prior written consent.

The buyer accepts that there will be two other subcontractors working on this project that work will be accepted provided a noncompete and "work made for hire agreement" are in place.

9  Proprietary Rights
It is acknowledged that this is a work made for hire agreement and that all intellectual property rights or patent rights are that of Streetfax Inc. All code in portion or in its complete form remain the property of StreetFax Inc. If the items to be supplied hereunder have been designed in accordance with specifications or data furnished or imparted by the Purchaser or its Customer, such items shall not be reproduced except with the approval of the Purchaser and, as applicable, its Customer and all drawings, photographs, data, software, and other written material or information supplied in connection therewith shall at all times remain the property of the Purchaser or its Customer and be returned promptly upon request at the completion, termination or cancellation of this order. In the event that StreetFax defaults on it payment terms rights would be granted to seller.

10.  Termination
A. DEFAULT – The Purchaser may terminate this order or any part thereof by written notice if the Seller
   a)  fails to make deliveries or to complete performance of its obligations hereunder within the time specified or in accordance with the agreed schedules unless such failure is due to acts of God, strike or other causes which are beyond the control of the Seller.
   b)  Fails to comply with the terms and conditions of the purchase order and does not cure such failure within a period of ten (10) calendar days after written notice thereof.
   c)  Makes an assignment for the benefit of creditors without prior written consent of the Purchaser, becomes insolvent or subject to proceedings under any law relating to bankruptcy, insolvency, or the relief of debtors.

Should the Purchaser elect to terminate for default, the Purchaser may take possession of all or any of the items to be supplied hereunder which are in the Seller's possession without regard to stage of completion and may complete or cause the work to e completed on such items or may manufacture of procure similar items. Any additional costs or expense incurred by the Purchaser over and above the original purchase price from the Seller plus freight costs shall be for the account of the Seller.

In all events, the Purchaser shall not be or become liable to the Seller or any third party claiming through or under the Seller for any portion of the price of any items that Purchaser elects not to accept following notice of termination for default.

11.  Liens
The Seller agrees to deliver the items to be supplied hereunder free and clear of all liens, encumbrances, and claims of laborers or material men and the Purchaser may withhold payment pending receipt of evidence in form and substance satisfactory to it of the absence of such liens, claims and encumbrances.

12.  Governing Law
This Purchase Order and any material relating thereto shall be governed by the laws of the state in which the Purchaser's office that issues the order is located.

13.  Recovery of Damages
If the Seller should recover any damages as a result of antitrust violations in any manner due to price fixing on the part of another manufacturer or Seller, the Seller shall pay over to the Purchaser any ages Purchaser has suffered as a result of the same price fixing within a reasonable time after the damages are recovered by the Seller.

14  Notice of Labor Disputes

a)  Whenever the Seller has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this order, the Seller shall immediately give notice thereof, including all relevant information with respect thereto, to the Purchaser.
b)  The Seller shall assert the substance of this clause including this paragraph (b) in any subtier supply agreement hereunder as to which a labor dispute may delay the timely performance of this order except that each such subtier supply agreement shall provide that in the event its timely performance is delayed or threatened by delay by an actual or potential labor dispute, the subtier Seller shall immediately notify its next higher tier Seller or Sellers, as the case may be, of all relevant information with respect to such dispute.

15.  Indemnity Requirements for Contractors/Seller
Contractor/Vendor shall defend, indemnify and save Street Fax from any and all claims, suits, losses, damages, or expenses, whether caused or contributed to by the negligence of Street Fax, its agents, or employees, or otherwise, on account of injuries to or death of any and all persons whomsoever, including the Contractor/Vendor, subcontractor, employees of Contractor/Vendor, the subcontractor, and of Street Fax, and upon all damage to property to whomsoever belonging, including property owned by, rented to, or in the care, custody, or control of the parties hereto arising or growing out of, or in any manner connected with the work performed under this contract, or caused or occasioned, in whole or in party by reason of or arising during the presence of the person or of the property of Contractor/Vendor, subcontractors, their employees, or agents upon or in proximity to the property of Street Fax Notwithstanding the foregoing, nothing herein contained is to be construed as an indemnification against the sole negligence of Street Fax

16  Publicity
Seller shall not publish photographs or articles, give press releases or make speeches about or otherwise publicize the existence or scope of this Purchase Order, or any generalities or details about this Purchase Order without first obtaining the written consent of Buyer.

17  Seller's Disclosure
Any information relating to the Seller's designs, manufacturing processes or manufactured products which the Seller may disclose to the Buyer in connection with the performance of the contract may be used by the Buyer for any purpose relating to the contract and to its performance without liability therefor to the Seller.

18  General Notes
Seller shall reference this purchase order number on all documents and/or correspondence related to this order.

The signatures below will execute this contract.

Buyer – Paul Ceglia, Streetfax

_____  1/28/03

Seller – Mark Zuckerberg

_____  01.28.03

# EXHIBIT C

General Conditions of Purchase

# STREET FAX

## SECTION 1- GENERAL PROVISIONS

### 1. Definitions

The following terms have the meaning specified when used herein:

PURCHASER – Street Fax Inc.

CONTRACTOR/SELLER – The entity, its agents, employees, suppliers, or sub-contractors, furnishing materials equipment, or services hereunder, as identified on Purchase Order.

CUSTOMER – the entity contracting for construction or other services from Purchaser or which the goods and/or services provided hereunder are for incorporation into the work or are required to facilitate completion of Purchaser's contract with such entity.

PRIME CONTRACT - The contract between Purchaser and Customer and all provisions, specifications and drawing referenced therein.

### 2. Entire Agreement

The contract between the Purchaser and Seller shall consist of and be contingent upon the Seller's acceptance of the Purchase Order, the provisions written on the face thereof, all provisions, specifications, and drawings referred to therein and these printed terms and conditions with appendixes. In the event of conflict between the provisions written on the face of this Purchase Order and those contained in these printed terms and conditions, the provisions written on the face of the Purchase Order shall prevail. This Purchase Order shall not be modified either orally or by failure of either party to enforce their rights hereunder. It is a condition of this Purchase Order that provisions printed on or otherwise contained in any quotations, order acknowledgement, shipping document, or other instrument of the seller shall be of no force or effect.

### 3. Payment Terms

No insurance or premium charges or price increases will be allowed unless authorized by Purchaser in writing. No increase in price from that stated on the face hereof will be considered throughout the duration of the order.

The Agreed upon Cost that the Seller and the Buyer have agreed upon are as follows: Buyer agrees to pay seller the Sum of five hundred dollars($500) at the onset of this contract. Upon completion Buyer agrees to pay seller an additional one thousand dollars ($1,000.00 )US dollars within Thirty days of delivery of the Final approved work. Late fees are agreed to be a 5 % deduction for the seller if project is not completed by due date and an additional 1% deduction for each day the project is late thereafter. Buyer agrees to pay a 2% late fee per month on the balance owed the seller and further agrees to pay a minimum of $500 per month to seller or acknowledges that failure to comply will result in the seller having the right to offline the site Streetfax.com and remove his work until it is paid in full.

### 4. Changes

a) BY PURCHASER – Purchaser agrees that no further revision shall be implemented until or unless approved by seller. Those revisions shall be transmitted for written approval to seller.

b) BY SELLER – The Seller agrees that no further revision shall be implemented until or unless approved by Street Fax. Those revisions shall be transmitted for written approval to the Street Fax Purchasing Department.

### 5. Purchaser's Property

Does not include the price of renting the server, and registering VeriSign and SSL.

Data, drawings, tooling, patterns, materials, specifications, and any other items or information supplied to Seller under this order are the property of the Purchaser and must be returned upon completion of this order. Such items or information are to be used solely in the performance of the work by the seller and shall not be used or disclosed for any other purpose whatsoever without Purchaser's prior express written consent.

### 6. Settlement of Controversies

In the event that this purchase order is for materials or equipment which will be incorporated in the Customer's work under the Prime Contract, and in the case of disputes between the Purchase and the Customer or between the Purchaser and the Seller regarding materials or equipment to be furnished by the seller, the Seller agrees to be bound to the same extent that the Purchaser is bound by the terms of the Prime Contract, and by any and all decisions and determinations made thereunder, provided that the Seller shall have the right to participated in the settlement of any dispute with the customer to the extent that the Seller will be affected thereby.

No interest shall accrue on any payment(s) otherwise due the Seller, which is withheld or delayed as a result of any such dispute except to the extent that the Purchaser is ultimately paid interest on monies due the Seller. The Seller shall not be held liable if the Seller follows instructions of the Purchase and it is later determined that the Purchaser's instructions were not in compliance with the terms and specifications of the Prime Contract. Pending final disposition of a dispute hereunder, the Seller shall carry on the work unless otherwise agreed in writing by the Purchaser.

In all instances the final authority should rest with the final Specifications.

### 7. Patent Indemnity

Purchaser hold seller harmless for any infringement sellers work may constitute on patents held by any third party that result from the direct request for work made by purchaser in this "work made for hire" agreement.

The Seller hereby agrees to be responsible for all claims against the Purchaser of the Customer for alleged infringement of patents by reason of the Purchaser's or Customer's possession, use, or sake of any materials or equipment furnished hereunder by the Seller or by reason of the performance of any work hereunder by the Seller. The Seller agrees to defend at its sole expense all suits against the Purchaser and/or the Customer and to save and hold harmless the Purchaser and the Customer from and against all costs, expensed, judgments, and damages of any kind which the Purchaser or the Customer may be obliged to pay or incur by reason of any such alleged or actual infringement of a patent or patents. The Purchaser and the Customer agree to render whatever assistance is reasonably can in the way of information and access to records for the defense of any such suit. This indemnity shall not extend to alleged or actual infringements resulting from the Seller's compliance with the Purchaser's or Customer's design, instructions, processes, or formulas provided, however, that the Seller agrees to be responsible if it is reasonable to assume that the Seller should have been aware of a possible alleged or actual infringement resulting from the Purchaser's or Customer's design, instructions, processes, or formulas and fails to notify the Purchasers of such possibility.

### 8. Assignment of Subcontracting

Neither this order nor any rights, obligations, or monies due hereunder are assignable or transferable (as security for advances or otherwise) without the Purchaser's prior written consent, and except as to

purchases of raw materials or standard commercial articles or parts, the Seller shall not subcontract any major portion of the work encompassed by this order without the Purchaser's prior written approval. The Purchaser shall not be required to recognize any assignment or subcontract made without its prior written consent.

Subcontractors must have a "work made for hire agreement" in place with StreetFax.com before commencing their work.

**9.  Proprietary Rights**
It is acknowledged that this is a work made for hire agreement and that all Intellectual property rights or patent rights are that of StreetFax Inc. All code in portion or in its complete form remain the property of StreetFax Inc. If the items to be supplied hereunder have been designed in accordance with specifications or data furnished or originated by the Purchaser or its Customer, such items shall not be reproduced except with the approval of the Purchaser and, as applicable, its Customer and all drawings, photographs, data, software, and other written material or information supplied in connection therewith shall at all times remain the property of the Purchaser or its Customer and be returned promptly upon request at the completion, termination or cancellation of this order. In the event the StreetFax defaults on it payment terms rights would be granted to seller.

**10.  Termination**
A. DEFAULT – The Purchaser may terminate this order or any part thereof by written notice if the Seller

  a)  fails to make deliveries or to complete performance of its obligations hereunder within the time specified or in accordance with the agreed schedules unless such failure is due to acts of God, strike or other causes which are beyond the control of the Seller.

  b)  Fails to comply with the terms and conditions of the purchase order and does not cure such failure within a period of ten (10) calendar days after written notice thereof.

  c)  Makes an assignment for the benefit of creditors without prior written consent of the Purchaser, becomes insolvent or subject to proceedings under any law relating to bankruptcy, insolvency, or the relief of debtors.

Should the Purchaser elect to terminate for default, the Purchaser may take possession of all or any of the items to be supplied hereunder which are in the Seller's possession without regard to stage of completion and may complete or cause the work to e completed on such items or may manufacture or procure similar items. Any additional costs or expense incurred by the Purchaser over and above the original purchase price from the Seller plus freight costs shall be for the account of the Seller.
In all events, the Purchaser shall not be or become liable to the Seller or any third party claiming through or under the Seller for any portion of the price of any items that Purchaser elects not to accept following notice of termination for default.

**11.  Liens**
The Seller agrees to deliver the items to be supplied hereunder free and clear of all liens, encumbrances, and claims of laborers or material men and the Purchaser may withhold payment pending receipt of evidence in form and substance satisfactory to it of the absence of such liens, claims and encumbrances.

**12.  Governing Law**
This Purchase Order and any material relating thereto shall be governed by the laws of the state in which the Purchaser's office that issues the order is located.

**13.  Recovery of Damages**
If the Seller should recover any damages as a result of antitrust violations in any manner due to price fixing on the part of another manufacturer or Seller, the Seller shall pay over to the Purchaser any ages Purchaser has suffered as a result of the same price fixing within a reasonable time after the damages are recovered by the Seller.

**14.  Notice of Labor Disputes**
a)  Whenever the Seller has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this order, the Seller shall immediately give notice thereof, including all relevant information with respect thereto, to the Purchaser.

b)  The Seller shall insert the substance of this clause including this paragraph (b) in any subtier supply agreement hereunder as to which a labor dispute may delay the timely performance of this order except that each such subtier supply agreement shall provide that in the event its timely performance is delayed or threatened by delay by an actual or potential labor dispute, the subtier Seller shall immediately notify its next higher tier Seller or Sellers, as the case may be, of all relevant information with respect to such dispute.


Work agreement. The scope of this contract is based on the following agreement for work to be performed:

CONSULTING (10 hours)
- review of business concept, site services and goals, target audience
- determining user interface design with respect to site functionality
- clarifying roles of designer/developer and programmer

DESIGN (10 hours)
- incorporating existing concepts/logo into a professional, easy-to-use graphical interface
- laying out a flexible template that can be used throughout the site to present various dynamically generated textual and graphical content

DEVELOPMENT (10 hours)
- converting designs to working HTML
- optimizing imagery and code for optimum efficiency and browser compatibility
- setting up style sheets and template code for easy plug-and-play implementation of dynamic content

TOTAL PROJECT BID: $1500.00

PROVISIONS
- work to begin/proceed upon signing of contract and receipt of pre-payment (previously determined to be $500)
- design limited to one round of revisions
- design limited to one homepage design and one universal subpage design
- development to include delivery of all static pages and a single template to serve for all dynamic pages
- development limited to pages included on the site map sent 4/12/2003
- development to begin upon delivery of complete and finalized content for all static pages (1-6, 8-10, 11, 12, 22, 25 and 26)
- any additional work (further design/content revisions, additional templates, additional pages, etc.) to be billed on top of the total project bid

24. Indemnity Requirements for Contractors/Seller
Contractor/Vendor shall defend, indemnity and save Street Fax from any and all claims, suits, losses, damages, or expenses, whether caused or contributed to by the negligence of Street Fax, its agents, or employees, or otherwise, on account of injuries to or death of any and all persons whomsoever, including the Contractor/Vendor, subcontractors, employees of Contractor/Vendor, the subcontractor, and of Street Fax and any and all damage to property to whomsoever belonging, including property owned by, rented to, or in the care, custody, or control of the parties hereto arising or growing out of, or in any manner connected with the work performed under this contract, or caused or occasioned, in whole or in party by reason of or arising during the presence of the person or of the property of Contractor/Vendor, subcontractors, their employees, or agents upon or in proximity to the property of Street Fax Notwithstanding the foregoing, nothing herein contained is to be construed as an indemnification against the sole negligence of Street Fax.

25. Publicity
Seller shall not publish photographs or articles, give press releases or make speeches about or otherwise publicize the existence or scope of this Purchase Order, or any generalities or details about this Purchase Order without first obtaining the written consent of Buyer.

26. Seller's Disclosure
Any information relating to the Seller's designs, manufacturing processes or manufactured products which the Seller may disclose to the Buyer in connection with the performance of the contract may be used by the Buyer for any purpose relating to the contract and to its performance without liability therefor to the Seller.

27. General Notes
Seller shall reference this purchase order number on all documents and/or correspondence related to this order.

CONTRACTOR/SELLER:

Randy Kata
527 Gates Avenue #4
Brooklyn, NY 11216

Signed:
Dated: May 5, 2003

EXHIBIT D

Reques or: USPISJWCawley



UNITED STATES
POSTAL SERVICE

Forensic Laboratory Examination Report
Forensic Laboratory Services
22433 Randolph Drive
Dulles, VA 20104-1000

September 27, 2013

Case No.1910925-MF - Lab File No. 9-109-009384(1)
Type of Examination: Questioned Documents
Request Date(s): 07-30-2013

C. P. Cizin .
Postal Inspector
P. O. Box 191
New York, NY 10008-0191

EXAMINATIONS:
Determine the printing process(es) utilized to produce the machine printed entries on Exhibits
Q-1-1 ("WORK FOR HIRE" CONTRACT, Page One, Barcode IS0000739359) and Q-1-; (Page
Two of "WORK FOR HIRE" CONTRACT, Barcode IS0000739359).

Determine whether indented impressions are discernible on Exhibits Q-1-1 and Q-1-2.

Determine whether the paper in Exhibit Q-1-1 and Exhibit Q-1-2 can be associated.

Determine whether Exhibits Q-1-1 and Q-1-2 were altered.

FINDINGS:
Based on visual and instrumental examinations, it was determined the machine printing on
Exhibits Q-1-1 and Q-1-2 was produced using toner technology (e.g., photocopier, laser printer).

Based on visual and instrumental examinations, it was determined no indented impress ons
were observed on Exhibits Q-1-1 and Q-1-2.

Based on the examination and inter-comparison of the paper in Exhibits Q-1-1 and Q-1-2, no
associations were effected due to the absence of any identifying characteristics (e.g.,
watermarks and/or encoding information).

Based on visual, instrumental and inter-comparison examinations of Exhibits Q-1-1 and Q-1-2,
the following was determined:
- The design of the font on page one (Q-1-1) of the contract is not
  the same design as the font on page two (Q-1-2);
- Arrangement differences were observed between the margins,
  spacing and column widths of Exhibits Q-1-1 and Q-1-2;
- The face of the paper in Exhibit Q-1-2 reacts differently than the
  face of the paper in Exhibit Q-1-1 when exposed to ultraviolet
  light;

4431

Case No.1910925-MF - Lab File No. 9-109-009384(1)                                    Page 2

- Tonal differences are present between the front and back of
  each page of Exhibits Q-1-1 and Q-1-2;
- Typographical errors were observed on Exhibits Q-1-1 and Q-1-2.

Due to the noted discrepancies, there are indications these pages may have come from multiple sources.

No other associations or examinations were possible with Exhibits Q-1-1 and Q-1-2 due to the condition of the documents.

REMARKS:
If testimony is required the undersigned should be notified at least three weeks prior to the scheduled trial or hearing date.

EXHIBITS:
Exhibits Q-1-1 and Q-1-2 received in this laboratory on July 30, 2013 are being returned with this report via hand carry.

John W. Cawley, III
Forensic Document Examiner, Sr.
Telephone: 703-406-7121
Fax: 703-406-7115

This is an official FLS examination report only if it contains an original signature of the forensic analyst.

AN ASCLD/LAB ACCREDITED LABORATORY SINCE JANUARY 28, 2010

# EXHIBIT E

Prepared by Joan M. Winkelman: my listing of observations of similarities and differences that form the basis of my opinion --

Documents:
Work For Hire Contract, 2-pages
Kato---STREET FAX document, 3 pages   This document herein after referred to as KATO--Street Fax or Kato document, as represented to me by counsel, is presumed to be authentic.

dates:
Work For Hire page two in signature area hand dates the document  4/28/03
KATO--STREET FAX document page three in signature area typed date 5/5/03
    --- close proximity in time supports the conclusion that the Work For Hire document is authentic

the fonts in the documents:
Work For Hire page one is Times New Roman
Work For Hire page two is Garamond
Work For Hire page one font size is 8
Work For Hire page two font size is 7

KATO page one is Garamond
KATO page two is Garamond with exception of portion Column 2 between
        CONSULTING and Point 24 which is Times New Roman font
KATO page three is Garamond
KATO page one, two, and three are font size 7
    --- repeating same two fonts supports the conclusion that the Work For Hire document is
        authentic

appearance of fonts:
Work For Hire page one darker
Work For Hire page two slightly lighter - function of Garamond font style shading
        and smaller size

KATO page one, page two, except portion Column 2 between CONSULTING
        and Point 24, and page three slightly lighter - function of Garamond
        font style shading and smaller size
KATO page 2 portion Column 2 darker - Times New Roman font

ABCDEFGHIJKLMNOPQRSTUVWXYZ  Garamond 16
ABCDEFGHIJKLMNOPQRSTUVWXYZ  Times New Roman
abcdefghijklmnopqrstuvwxyz  1234567890 '' "" ""  Times  16
abcdefghijklmnopqrstuvwxyz  1234567890 '' "" ""  Garamond 16

format:  paragraph indents -
KATO page 1 Point 3 Line 1  1 space
                        Line 5  2 spaces
                Point 6 Line 20  3 spaces
                Point 7 Line 5  5 spaces
KATO page 2 Point 8 Line 9  1 space

Work For Hire page 1 Point 3 Line 12  11 spaces
Work For Hire page 2 Point 8 Line 9  1 space
    --- various indents including the same indent in both documents in Page 2 Point
        8 Line 9 supports the conclusion that the Work For Hire document is authentic

format:  paragraph line spacing - within a Point
Work For Hire page 1  between Point 1 heading and wording  1 space
KATO page 1  between Point 1 heading and wording  1 space
   --- this similarity of line spacing within page 1 Point 1 of both documents supports the
      conclusion that the Work For Hire document is authentic

format:  paragraph line spacing - between Points
Work For Hire page 1 between Point 3 and Point 4  2 spaces

Work For Hire page 1 between Point 5 and Point 6  3 spaces
KATO page 1  between Point 5 and Point 6  2 spaces

Work For Hire page 1 between Point 6 and Point 7  3 spaces
   --- the similarity of increased paragraph line spacing between Points 5 and
      Point 6 in both documents, and additional spacings in Work For Hire
      document, supports the conclusion that the Work For Hire document is authentic

total number of characters in columns and spaces:
Work For Hire  page 1 Column 1 longest Point 2 paragraph 2 line 2
      73 characters 9 spaces = 82
Work For Hire  page 1 Column 2 longest Point 6 paragraph 1 line 7
      70 char 12 spaces = 82
Work For Hire  page 1  distance between columns approx 2 characters

Work For Hire page 2 Column 1 longest Point 9 line 1
      58 characters 13 spaces = 71
Work For Hire page 2 Column 2 longest Point 15 line 13
      62 characters 7 spaces = 69
Work For Hire  page 2  distance between columns approx 11 characters

KATO page 1 Column 1 longest Point 2 line 3  66 characters 9 spaces = 75
KATO page 1 Column 2 longest Point 7 1st indented paragraph
      indent 5 characters,  58 characters 11 spaces = 74
KATO page 1  distance between columns approx 13 characters

KATO page 2 Column 1 longest (Point 8) line 2  60 characters 10 spaces = 70
KATO page 2 Column 2 longest Point 24 line 9  61 characters 13 spaces = 74
KATO page 2  distance between columns approx 11 characters

KATO page 3 Column 1 longest Point 26 line 3  56 characters 11 spaces = 67
   --- similarity of characters total in various columns and pages in both
      documents and difference in the inner margin between columns of two
      spaces in Work For Hire page 1 and 11 to 13 spaces in Work For Hire page
      2 and KATO pages 1, 2 supports the conclusion that the Work For Hire document is
      authentic

format:  document heading - centered
WORK For Hire page 1 Heading  font size 18
KATO page 1 Heading font size  22
      KATO also has a pre-sub heading above and to left of the centered heading
   --- difference in font size of heading in each document supports the conclusion that the Work
      For Hire document is authentic

--- basic typing errors needing correction, in my opinion, that follow in this chart supports the
   conclusion that the Work For Hire document is authentic

   --- some errors occur in both documents in same location, others occur in only
      one of the documents

P = point   L = line   ok = wording similar but no error

/jwinkelman

| ITEM | WORK FOR HIRE Page 1 | WORK FOR HIRE Page 2 | KATO Page 1 | KATO Page 2 | KATO Page 3 |
|---|---|---|---|---|---|
| Street Fax LLC or Inc  or nothing, no sp or 1 sp betw | needs to be standardized | | needs to be standardized | | |
| no page number such as page 2 of 2 or date each page | should have page number | should have page number | should have page number | should have page number | should have page number |
| space betw heading & first line | P1 standardize | | P1 standardize | | |
| employees,suppliers, or | P1 needs sp betw comma and s | | ok | | |
| Comer | -- | | P1 L11 does it need changing - phrase not familiar | | |
| Second it is for | P2 L5 may need comma after Second -- needs clarity | | --- | | |
| university | P2 L7 needs cap | | -- | | |
| wesite | P2  L8 needs a b | | -- | | |
| of"The Face | P2 L9 needs space betw f & " | | -- | | |
| "The Page Book" | P3  para2 L4 - P2 para 2 L5 "The Face Book" - same thing? | | -- | | |
| line beg The agreed upon project-- para indents | P3 para4 indented - other para not | | different wording - paras indent 2 sp  not needed | | |
| sole diiscretion | P3 para 6 remove an 'i' | | -- | | |
| seller.Those revisions | -- | | P4 a) needs 1 or 2 spaces | | |
| Does not include... | -- | | P5 L1&2 not a complete sentence | | |
| Buyer agree | P5 L1 needs s | | -- | | |
| as the sites webmaster | P5 para 2 L1 needs ' | | -- | | |
| | | | | page 3 | of 5 |

| | | | | |
|---|---|---|---|---|
| between the Purchase and the | ok | | P6 L3 needs r | |
| participated in | ok | | P6 L9 loose d | |
| due the Seller.The Seller | P6 para2 L3 needs a space | | -- | |
| instructions of the Purchase and it is | P6 para2 L4 add r | | P6 para2 L5 add r | |
| compiance | P6 para2 L5 needs l | | -- | |
| agreed I writing | P6 para2 L8 change I to lower case & add n | | -- | |
| In all instances | P6 para3 switch s & n | | -- | |
| Purchaser hold seller harmless | P7 L1 needs s | | P7 L1 needs s | |
| infringement sellers work | P7 L1 needs ' | | P7 L1 needs ' | |
| held by and third party | P7 L2 change and to any | | -- | |
| Purchaser of the Customer | P7 L5 change f to r | | P7 para 2 L2 change f to r | |
| agress | P7 L8 change to agrees | | -- | |
| it's | P7 L8 change to its | | -- | |
| all costs, expensed | P7 L11 change  d to s | | P7 para 2 L8 change d to s | |
| is reasonably can | ok  but should change be to they | | P7 para 2 L12 needs change to it or they | |
| can I the way of | P7 L14 change I to i add n | | -- | |
| the the | P7 L19 loose one the | | -- | |
| Purchasers | P7 L22  all others are singular | | P7 L21  all others are singular | |
| on this project their work will be | | P8 para2 L2 needs comma, semi-colon, or new sentence | -- | |
| Streetfax Inc | | P9 L2 cap F and space | | P9 L2 cap F and space |
| | | | | page 4  of 5 |

| StreetFax Inc.If the | | P9 L4 needs a space | | P9 L4 needs a space | |
| on it payment terms rights | | P9 L12 needs an s needs comma | | P9 L12 needs an s needs comma | |
| notice if the seller | | P10 L2 change i to o | | P10 L2 change i to o | |
| work to e completed | | P10 para2 L4 needs b | | P10 para2 L4 needs b | |
| manufacture of procure | | P10 para2 L5 change f to r | | P10 para2 L5 change f to r | |
| ages Purchaser | | P13 L4 change to damages | | P13 L4 change to damages | |
| shall defend, indemnity and save | | P15 L1 change t to f | | P24 L1 change t to f | |
| in whole or in party by reason | | P15 L11 loose y | | P24 L11 loose y | |
| of Street Fax Notwithstanding the | | P15 L14 needs period | | P24 L14 needs period | |
| of Buyer | | P16 L4 insert the | | P25 L4 insert the | |
| | | | | | |

# EXHIBIT F



**Designation: E1658 – 08**

## Standard Terminology for Expressing Conclusions of Forensic Document Examiners[1]

This standard is issued under the fixed designation E1658; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

### 1. Scope

1.1 This terminology is intended to assist forensic document examiners in expressing conclusions or opinions based on their examinations.

1.2 The terms in this terminology are based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science that was adopted as the recommended guidelines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners.[2]

### 2. Referenced Documents

2.1 *ASTM Standards:*[3]

E444 Guide for Scope of Work of Forensic Document Examiners

### 3. Significance and Use

3.1 Document examiners begin examinations from a point of neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.

3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. The expressions used to differentiate the gradations of opinions should not be considered as strongly defined "categories." These expressions should be guidelines without sharply defined boundaries.

3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the guidelines in this standard, the appropriate definition(s) could be quoted in or appended to reports.

3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, that is, to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any guidelines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no guidelines can cover exactly.

3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in Guide E444, and it may be used by forensic examiners in other areas, as appropriate.

3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

### 4. Terminology

4.1 *Recommended Terms:*

**identification (definite conclusion of identity)**—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.

*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion (or conclusion) that John Doe of the known material wrote the questioned material.

**strong probability (highly probable, very probable)**—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order;

[1] This terminology is under the jurisdiction of ASTM Committee E30 on Forensic Sciences and is the direct responsibility of Subcommittee E30.02 on Questioned Documents.

Current edition approved Aug. 15, 2008. Published October 2008. Originally approved in 1995. Last previous edition approved in 2004 as E1658 – 04. DOI: 10.1520/E1658-08.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

[3] McAlexander T. V., Beck, J., and Dick, R., "The Standardization of Handwriting Opinion Terminology," *Journal of Forensic Science*, Vol. 36, No. 2, March 1991, pp. 311–319.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

E1658 – 08

however, the examiner is virtually certain that the questioned and known writings were written by the same individual.

*Examples*—There is *strong probability* that the John Doe of the known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.

Discussion—Some examiners doubt the desirability of differentiating between strong probability and probable, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

probable—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; however, it falls short of the" virtually certain" degree of confidence.

*Examples*—It has been concluded that the John Doe of the known material probably wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

indications (evidence to suggest)—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.

*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion.

Discussion—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

no conclusion (totally inconclusive, indeterminable)—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another.

*Examples*—No conclusion could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

indications did not—this carries the same weight as the indications term that is, it is a very weak opinion.

*Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence *suggests* that the John Doe of the known material did not write the questioned material, or I

found *indications* that the John Doe of the known material did *not* write the questioned material but the evidence is far from conclusive.

See Discussion after **indications**.

probably did not—the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.

*Examples*—It has been concluded that the John Doe of the known material probably did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material probably did not write the questioned material.

Discussion—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

strong probability did not—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.

*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.

Discussion—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

elimination—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.

*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.

Discussion—This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1  When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.

E1658 – 08

### 4.2 *Deprecated and Discouraged Expressions:*

4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

**possible/could have**—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a handwriting sample is by a specific person. If the evidence is so limited or unclear that no definite or qualified opinion can be expressed, then the proper answer is *no conclusion*. To say that the suspect "could have written the material in question" says nothing about probability and is therefore meaningless to the reader or to the court. The examiner should be clear on the different meanings of "possible" and "probable," although they are often used interchangeably in everyday speech.

**consistent with**—there are times when this expression is perfectly appropriate, such as when "evidence consistent with disguise is present" or "evidence consistent with a simulation or tracing is present, but "the known writing is consistent with the questioned writing" has no intelligible meaning.

**could not be identified/cannot identify**—these terms are objectionable not only because they are ambiguous but also because they are biased; they imply that the examiner's task is only to identify the suspect, not to decide whether or not the suspect is the writer. If one of these terms is used, it should always be followed by "or eliminate[d]".

**similarities were noted/differences as well as similarities**—these expressions are meaningless without an explanation as to the extent and significance of the similarities or differences between the known and questioned material. These terms should never be substituted for gradations of opinions.

**cannot be associated/cannot be connected**—these terms are too vague and may be interpreted as reflecting bias as they have no counterpart suggesting that the writer cannot be eliminated either.

**no identification**—this expression could be understood to mean anything from a strong probability that the suspect wrote the questioned writing; to a complete elimination. It is not only confusing but also grammatically incorrect when used informally in sentences such as." I no identified the writer" or "I made a no ident in this case."

**inconclusive**—this is commonly used synonymously with no conclusion when the examiner is at the zero point on the scale of confidence. A potential problem is that some people understand this term to mean something short of definite (or conclusive), that is, any degree of probability, and the examiner should be aware of this ambiguity.

**positive identification**—This phrase is inappropriate because it seems to suggest that some identifications are more positive than others.

**[strong] reason to believe**—there are too many definitions of *believe* and *belief* that lack certitude. It is more appropriate to testify to our conclusion (or determination or expert opinion) than to our belief, so why use that term in a report?

**qualified identification**—An *identification* is not qualified. However, opinions may be qualified when the evidence falls short of an *identification* or *elimination*.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the ASTM website (www.astm.org/COPYRIGHT/).*

# EXHIBIT N



**DARTMOUTH COLLEGE**
**DEPARTMENT OF COMPUTER SCIENCE**

Hany Farid
Professor
Dartmouth College
Department of Computer Science
6211 Sudikoff Lab
Hanover, NH 03755
T 603.646.2761
F 603.646.1672
farid@cs.dartmouth.edu

www.cs.dartmouth.edu/farid

June 28, 2012

Dean Boland
Boland Legal, LLC
1475 Warren Road
Unit 770724
Lakewood, Ohio 44107

Dear Mr. Boland.

I was retained by Milberg LLP in the matter of Ceglia v. Zuckerberg. I was provided with digital scanned copies of a purported contract (in an uncompressed TIF file format). I was asked to determine if these scanned copies showed signs of manipulation. The digital copies are in my opinion of too low quality to perform a reliable forensic examination.

Sincerely yours,

Hany Farid, Ph.D.

EXHIBIT O

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PAUL D. CEGLIA,

                   Plaintiff,

      v.

MARK ELLIOT ZUCKERBERG and
FACEBOOK, INC.,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 1:10-cv-00569-RJA

**DECLARATION OF MARK
ELLIOT ZUCKERBERG IN
SUPPORT OF DEFENDANTS'
MOTION FOR EXPEDITED
DISCOVERY**

I, MARK ELLIOT ZUCKERBERG, declare and state as follows:

1.     I am the Founder, Chairman, and Chief Executive Officer of Facebook, Inc.

("Facebook").

2.     I respectfully submit this declaration in support of Defendants' Motion for

Expedited Discovery.

3.     I have reviewed the Amended Complaint filed in this lawsuit, as well as the

document attached as Exhibit A to the Amended Complaint.

4.     I understand that Plaintiff Paul Ceglia alleges that Exhibit A is an agreement that

entitles him to partial ownership of Facebook, and that he and I signed this document on April

28, 2003.

5.     I did not sign the document attached as Exhibit A to the Amended Complaint.

6.     In early 2003, while I was a freshman at Harvard University, I saw an online job

listing regarding development of a web site.  I responded to the listing and learned that the

project was for a company called StreetFax, which used the web site StreetFax.com.

7.      In or about April 2003, I entered into a written contract with StreetFax, pursuant to which I agreed to provide limited web site services solely in connection with the development of StreetFax's web site.  The contract was provided to me by Ceglia.

8.      The document attached as Exhibit A to the Amended Complaint is not the written contract that I signed.

9.      The written contract I signed concerned only the development of StreetFax's web site.  It did not mention or concern Thefacebook.com or any related social networking service or web site.

10.      I did not enter into any agreement, written or otherwise, with StreetFax, Ceglia, or anyone affiliated with Ceglia concerning Facebook or any related social networking web site.

11.      I conceived of the idea for Facebook in or about December 2003.

12.      I never referred to Facebook, publicly or privately, as "The Page Book."

13.      I also understand that Ceglia alleges that the text quoted in Paragraphs 32 through 55 of the Amended Complaint comes from e-mails that he and I allegedly sent each other.

14.      I did not write or receive any of the alleged e-mails quoted in the Amended Complaint.


I declare under penalty of perjury that the foregoing is true and correct.  Executed in Palo Alto, California on June 1, 2011.


_____
Mark Elliot Zuckerberg

# EXHIBIT A

# "WORK FOR HIRE" CONTRACT

## SECTION 1- GENERAL PROVISIONS

### 1. Definitions

The following terms have the meaning specified when used herein:

PURCHASER - Paul Ceglia

CONTRACTOR/SELLER – Mark Zuckerberg, his agents, employees, suppliers, or sub-contractors, furnishing materials equipment, or services.

CUSTOMER – StreetFax LLC the entity contracting for construction or other services form the Purchaser or which the goods and/or services provided hereunder are for incorporation into the work or are required to facilitate completion of Purchaser's contract with such entity.

PRIME CONTRACT – This contract between Purchaser and Seller.

### 2. Entire Agreement

The contract between the Purchaser and Seller as a Purchase agreement and "work made for hire" reflects two seperate business ventures, the first being for the work to be performed directly for the StreetFax Database and the Programming language to be provided by Seller.

Second It is for the continued development of the software, program and for the purchase and design of a suitable website for the project Seller has already initiated that is designed to offer the students of Harvard university access to a wesite similar to a live functioning yearbook with the working title of "The Face Book"

It is agreed that Purchaser will own a half interest (50%) in the software, programming language and business interests derived from the expansion of that service to a larger audience.

### 3. Payment Terms

No insurance or premium charges or price increases will be allowed unless authorized by Purchaser in writing.  No increase in price from that stated on the face hereof will be considered throughout the duration of the order.

The Agreed upon Cost that the Seller and the Buyer have agreed upon are as follows: Buyer agrees to pay the seller the Sum of $1000 a piece for the work to be performed for Streetfax and $1,000 for the work to be performed for "The Page Book".

Late fees are agreed to be a 5% deduction for the seller if the project is not completed by the due date and an additional 1% deduction for each day the project is delayed beyond that point.

The agreed upon project due date if for the StreetFax software in May 31, 2003. *Provide web designer's Fund by May 24, 2003*

The agreed upon completion of the expanded project with working title "The Face Book" shall be January 1 2004 and an additional 1% interest in the business will be due the buyer for each day the website is delayed from that date.

Additional funds may be provided for either project on an as needed basis at the sole discretion of the Buyer.

### 4. Changes

a) BY PURCHASER – Purchaser agrees that no further revision shall be implemented until or unless approved by the seller. Those revisions shall be transmitted for written approval to seller.

b) BY SELLER – The Seller agrees that no further revision shall be implemented until or unless approved by Buyer. Those revisions shall be transmitted for written approval to the Street Fax Purchasing Department.

### 5. Purchaser's Property/Seller's Responsibility

For the StreetFax database Buyer agrees to pay for and maintain the cost of upkeep for the servers needed for it's operation.

For "The Face Book" Seller agrees to maintain and act as the sites webmaster and to pay for all domain and hosting expenses from the funds received under this contract, and  Seller agrees that he will maintain control of these services at all times.

Data, drawings, tooling, patterns, materials, specifications, and any other items or information supplied to Seller under this order are the property of the Purchaser and must be returned upon completion of this order. Such items or information are to be used solely in the performance of the work by the seller and shall not be used or disclosed for any other purpose whatsoever without Purchaser's prior express written consent.

### 6. Settlement of Controversies

In the event that this purchase order is for materials or equipment which is excluded from this  Prime Contract, and in the case of disputes between the Purchaser and the Customer or between the Purchaser and the Seller regarding materials or equipment to be furnished by the Seller, the Seller agrees to be bound to the same extent that the Purchaser is bound by the terms of the Prime Contract, and by any and all decisions and determinations made thereunder, provided that the Seller shall have the right to participate in the settlement of any dispute to the extent that the Seller will be affected thereby.

No interest shall accrue on any payment(s) otherwise due the Seller, which is withheld or delayed as a result of any such dispute, except to the extent that the Purchaser is ultimately paid interest on monies due the Seller. The Seller shall not be held liable if the Seller follows instructions of the Purchase and it is later determined that the Purchaser's instructions were not in compliance with the terms and specifications of the Prime Contract. Pending final disposition of a dispute hereunder, the Seller shall carry on the work unless otherwise agreed I writing by the purchaser.

In all iantances the final authority should rest with the final Specifications.

### 7. Patent Indemnity

Purchaser hold seller harmless for an infringement sellers work may constitute on patents held by and third party that result from the direct request for the work made by purchaser in this "work made for hire" agreement.

The Seller hereby agrees to be responsible for all claims against the Purchaser of the Customer for alleged infringement of patents by reason of the Purchaser's or Customer's possession, use, or sake of any materials or equipment furnished hereunder by the Seller or by reason of the performance of any work hereunder by the Seller. The Seller agrees to defend at it's sole expense all suits against the Purchaser and/or the Customer and to save and hold harmless the Purchaser and the Customer from and against all costs, expensed, judgements, and damages of any kind which the Purchaser or the Customer may be obliged to pay or incur by reason of any such alleged or actual infringement of a patent or patents. The Purchaser and the Customer agree to render whatever assistance it reasonably can I the way of information and access to records for the defense of any such suit.

This indemnity shall not extend to alleged or actual infringements resulting from the Seller's compliance with the Purchaser's or Customer's design, instructions, processes, or formulas provided, however, that the Seller agrees to be responsible if it is reasonable to assume that the Seller should have been aware of a possible alleged or actual infringement resulting from the Purchaser's or Customer's design, instructions, processes, or formulas and fails to notify the Purchasers of such possibility.

8. Assignment of Subcontracting

Neither this order nor any rights, obligations, or monies due hereunder are assignable or transferable (as security for advances or otherwise) without the Purchaser's prior written consent, and except as to purchaser of raw materials or standard commercial articles or parts, the Seller shall not subcontract any major portion of the work encompassed by this order without the Purchaser's prior written approval. The Purchaser shall not be required to recognize any assignment or subcontract made without its prior written consent.

The buyer accepts that there will be two other subcontractors working on this project their work will be accepted provided a noncompete and "work made for hire agreement" are in place.

9. Proprietary Rights

It is acknowledged that this is a work made for hire agreement and that all Intellectual property rights or patent rights are that of Streetfax Inc. All code in portion or in its complete form remain the property of StreetFax Inc.If the items to be supplied hereunder have been designed in accordance with specifications or data furnished or originated by the Purchaser or its Customer, such items shall not be reproduced except with the approval of the Purchaser and, as applicable, its Customer and all drawings, photographs, data, software, and other written material or information supplied in connection therewith shall at all times remain the property of the Purchaser or its Customer and be returned promptly upon request at the completion, termination or cancellation of this order. In the event that StreetFax defaults on it payment terms rights would be granted to seller.

10.  Termination

A.  DEFAULT – The Purchaser may terminate this order or any part thereof by written notice if the Seller

a)  fails to make deliveries or to complete performance of its obligations hereunder within the time specified or in accordance with the agreed schedules unless such failure is due to acts of God, strike or other causes which are beyond the control of the Seller.

b)  Fails to comply with the terms and conditions of the purchase order and does not cure such failure within a period of ten (10) calendar days after written notice thereof.

c)  Makes an assignment for the benefit of creditors without prior written consent of the Purchaser, becomes insolvent or subject to proceedings under any law relating to bankruptcy, insolvency, or the relief of debtors.

Should the Purchaser elect to terminate for default, the Purchaser may take possession of all or any of the items to be supplied hereunder which are in the Seller's possession without regard to stage of completion and may complete or cause the work to e completed on such items or may manufacture of procure similar items. Any additional costs or expense incurred by the Purchaser over and above the original purchase price from the Seller plus freight costs shall be for the account of the Seller.

In all events, the Purchaser shall not be or become liable to the Seller or any third party claiming through or under the Seller for any portion of the price of any items that Purchaser elects not to accept following notice of termination for default.

11.  Liens

The Seller agrees to deliver the items to be supplied hereunder free and clear of all liens, encumbrances, and claims of laborers or material men and the Purchaser may withhold payment pending receipt of evidence in form and substance satisfactory to it of the absence of such items, claims and encumbrances.

12.  Governing Law

This Purchase Order and any material relating thereto shall be governed by the laws of the state in which the Purchaser's office that issues the order is located.

13.  Recovery of Damages

If the Seller should recover any damages as a result of antitrust violations in any manner due to price fixing on the part of another manufacturer or Seller, the Seller shall pay over to the Purchaser any ages Purchaser has suffered as a result of the same price fixing within a reasonable time after the damages are recovered by the Seller.

14.  Notice of Labor Disputes

a)  Whenever the Seller has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this order, the Seller shall immediately give notice thereof, including all relevant information with respect thereto, to the Purchaser.

b)  The Seller shall insert the substance of this clause including this paragraph (b) in any subtier supply agreement hereunder as to which a labor dispute may delay the timely performance of this order except that each such subtier supply agreement shall provide that in the event its timely performance is delayed or threatened by delay by an actual or potential labor dispute, the subtier Seller shall immediately notify its next higher tier Seller or Sellers, as the case may be, of all relevant information with respect to such dispute.

15.  Indemnity Requirements for Contractors/Seller

Contractor/Vendor shall defend, indemnity and save Street Fax from any and all claims, suits, losses, damages, or expenses, whether caused or contributed to by the negligence of Street Fax, its agents, or employees, or otherwise, on account of injuries to or death of any and all persons whomsoever, including the Contractor/Vendor, subcontractors, employees of Contractor/Vendor, the subcontractor, and of Street Fax and any and all damage to property to whomsoever belonging, including property owned by, rented to, or in the care, custody, or control of the parties hereto arising or growing out of, or in any manner connected with the work performed under this contract, or caused or occasioned, in whole or in party by reason of or arising during the presence of the person or of the property of Contractor/Vendor, subcontractors, their employees, or agents upon or in proximity to the property of Street Fax Notwithstanding the foregoing, nothing herein contained is to be construed as an indemnification against the sole negligence of Street Fax.

16.  Publicity

Seller shall not publish photographs or articles, give press releases or make speeches about or otherwise publicize the existence or scope of this Purchase Order, or any generalities or details about this Purchase Order without first obtaining the written consent of Buyer.

17.  Seller's Disclosure

Any information relating to the Seller's designs, manufacturing processes or manufactured products which the Seller may disclose to the Buyer in connection with the performance of the contract may be used by the Buyer for any purpose relating to the contract and to its performance without liability therefor to the Seller.

18.  General Notes

Seller shall reference this purchase order number on all documents and/or correspondence related to this order.

The signatures below will execute this contract.

Buyer – Paul Ceglia, StreetFax

_____   4/28/03

Seller – Mark Zuckerberg

_____   04.28.03

EXHIBIT P

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

                      Plaintiff,

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                      Defendants.

Civil Action No. : 1:10-cv-00569-RJA

**DECLARATION
OF PAUL ARGENTIERI**

      DECLARANT, submits this declaration and hereby declares under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

1. I make this declaration upon personal knowledge.

2. I'm filing this declaration to supplement the declaration I filed on November 26, 2012, Doc. No. 610.

3. As a result of additional research following the criminal complaint filed against Plaintiff on October 25, 2012, Doc. No. 581, I have become aware of additional relevant case law and facts that I feel the court should be aware of.

### Additional Case Law

4. In 1996, Congress enacted the False Statements Accountability Act of 1996 to amend the language of 18 USC § 1001 and clarify the judicial function exception.

5.  "The legislative history of the judicial function exception indicates that it was enacted by Congress in 1996 and added to § 1001 for the purpose of codify[ing] the judicial function exception which has long been recognized by many Federal courts as necessary to safeguard from the threat of prosecution statements made in the course of adversarial litigation. Allowing the criminal penalties of section 1001 to apply to statements made in the course of adversarial litigation would chill vigorous advocacy, thereby undermining the adversarial process."  US v. Vreeland, 684 F. 3d 653 - Court of Appeals, 6th Circuit 2012

6.  "The exception, the Report noted, was made sufficiently broad to cover not merely statements, but also "representations, writings or documents" filed in court, since such filings "are already covered by other statutes," such as those prohibiting perjury and obstruction."  US v. Butler, 351 F. Supp. 2d 121 - Dist. Court, SD New York 2004

7.  "We rejected the argument that "a fraudulent statement in a court is ergo a `fraud upon the Government'."  US v. Masterpol, 940 F. 2d 760 - Court of Appeals, 2nd Circuit 1991

8.  The judicial function exception makes it clear that even if the Facebook Contract were forged, and it is not, submission of such contract is NOT a fraud on the court.

9.  Congress has made it clear with both 18 USC § 1001 and FRE 1008 that it is not the role of the Court to interfere with adversarial litigation or to weigh

evidence.

### Further Proof of Defendant Zuckerberg's Emails
### Deleted from Harvard Server

10.   Defendants argue in the Motion to Dismiss for Fraud, "That Ceglia's 'emails' quoted in the Amended Complaint are all fakes is further confirmed by the fact that all purport to have been sent to and from Zuckerberg's Harvard email account — yet not a single one exists on the Harvard server." Doc. No. 319 at 13.

11.   Defendants' arguments that Zuckerberg has produced all his emails from Harvard is false, misleading and a legal non-sequitur.  The Court has received only a portion of the emails that were created between the parties in 2003 and 2004.

12.   Plaintiff has demonstrated with incontestable evidence that Defendant Zuckerberg deleted Harvard emails.   That proof was submitted to the court with Plaintiff's Motion for Discovery, Doc. No. 319.

13.   However, further proof of email deletion by Zuckerberg, or his agents, of a critical email was found in the emails produced by Sidley Austin pursuant to the Court ordered subpoena.

14.   On August 18, 2011, Defendants were authorized by this Court's order, Doc. No. 117 at 4, to subpoena email records from Sidley Austin LLP, the former law firm of Plaintiff's former attorney James Kole.

15.   Defendants received email records from Sidley Austin that were not previously

3

submitted to this Court. that further document the deletion of emails from the Zuckerberg's Harvard account.

16. On March 1, 2004, a StreetFax employee sent an email to Mr. Kole explaining that Defendant Zuckerberg "threatened to take one of the functions off the site this weekend due to nonpayment, and he indeed did." A copy of this email can be found in Exhibit A.

17. Zuckerberg's email of February 28, 2004, shown in Exhibit A, wherein Zuckerberg threatened to hack into the StreetFax website to illegally destroy the site's functionality and further threatened to "shut down the entire site" (Exhibit A) is the "Rosetta Stone" that illuminates and explains Zuckerberg's true identity in real time as a malicious hacker with a disregard for the legal process.

18. This damning email was found on the Sidley Austin Server. a source that Defendants cite as authentic.

19. The email was NOT found on Defendant Zuckerberg's Harvard account.

20. Defendant Zuckerberg's Harvard account contains NO emails sent by Defendant Zuckerberg after October 31, 2003.

21. A Fortiori, Zuckerberg destroyed evidence when he or his agents deleted his Harvard emails.

22. A Priori, the claimed absence of Harvard emails in Zuckerberg's account by Defendants is NOT proof of fraud.

23. In other words, the trier of fact must determine whether Zuckerberg deleted

4

emails from his Harvard account and whether the emails attached to the Amended Complaint were the same ones Zuckerberg deleted.

### Sidley Austin Email Validate the Terms of Facebook Contract

24. The Sidley Austin server also contained an email sent on Friday March 5, 2004 from Plaintiff to Mr. Kole wherein Plaintiff describes the Facebook Contract as, "a contract that so clearly sta[t]es we owe him nothing".   A copy of this email can be found in Exhibit B.

25. This is a clear piece of evidence from Sidley Austin server that references the terms of the Facebook Contract and not the terms of the unauthenticated Street Fax digital images.

26. Assuming arguendo, that the Street Fax digital images contained the terms between the parties, Plaintiff agreed to pay $18,000 to Zuckerberg.

27. Thus, the sentence reaffirming the Facebook Contract terms (wherein Zuckerberg had been fully paid) is a prior recorded statement of the Plaintiff from 2004.

### Defendant Zuckerberg's Recent Memory is in Conflict with His Prior Sworn Statements

28. Defendant Zuckerberg declared under the penalty of perjury in this action that, "I conceived of the idea for Facebook in or about December 2003."   Doc. No. 46.

29. Postal Inspector Veatch swore in his criminal complaint against Plaintiff, that as a result of "speaking with Mark Zuckerberg"  (Doc. No. 581 at 11) Inspector

Veatch learned that "Zuckerberg had not conceived of the idea of the Facebook website as of April 28, 2003" and that "It was only in or about September and October 2003....that Zuckerberg worked on certain projects that ultimately were precursors for the Facebook website." Id at 12.

30. Defendant Zuckerberg, under oath, testified when he was being deposed in the case of Facebook v. ConnectU on April 25, 2006 that, "I also never said that I had the idea in 2003. Really, unsure of like when the moment was that it crystallized and I said I'm going to make Facebook." Zuckerberg Depo. Trans. of 4/25/06 at 75. Exhibit C.

31. Plaintiff has thus far been denied access to Defendants' prior litigation files and sworn statements, but has been able to sufficiently delineate, so far from his public filings, Zuckerberg's inability to state truthfully a consistent set of facts about the circumstances surrounding the idea, coding and the creation of Facebook.

32. Defendants were caught attempting to shift their presentation of the facts surrounding the formation of Thefacebook, LLC formed in April, 2004.

33. In this action, it suited Defendants to state, "Zuckerberg transformed "The Face Book" project into a new commercial entity months earlier, in April 2004, when he and others organized Thefacebook LLC." Doc. No. 321 at 8.

34. In the earlier case of Facebook, Inc. v. Saverin, No. 105CV039867, filed in California Superior Court, Clara County ("Saverin Case"), it suited Defendants to swear in their pleadings that "At no time were the intellectual property

6

rights in the business ever assigned to the LLC. At no time did those rights

ever belong to the LLC." Saverin Case, Third Amended Complaint ¶ 10.

35.  Defendants are entitled to their opinions, but they are not entitled to a new set

of facts for each new lawsuit nor to withhold relevant facts yet to be disclosed.

I hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 and

under the laws of the United States that the following is true and correct:

DATED: December 5, 2012.


                                        /s/ Paul Argentieri
                                        _____
                                        Paul Argentieri


7

| From: | Karin Petersen <KPetersen@StreetFax.com> |
|---|---|
| Sent: | Monday, March 1, 2004 3:18 PM (GMT) |
| To: | Kole, James D. <JKole02@Sidley.com> |
| Subject: | Security breech |

Good morning Jim,

I hope you had a wonderful weekend, as mine was.

Did you receive the seal from Mrs. Ceglia?


We have an issue occuring with our programmer.
Unfortunately we have been unable to meet our end of the contract regarding payment.  And a further unfortunate is that he is a bright, young harvard student who isn't seeking his legal council prior to his actions. [he has a team of lawyers that work for free for him] He threatened to take one of the functions off of the site this weekend due to nonpayment, and he indeed did. We remedied the problem, but he is further threatening to take down the entire site if we do not pay him according to the contract. we have certainly violated our agreement, but have begged for more time. truly he has no chance of ever receiving his money if he destroys our product.

When he takes off the structural components of the site, we can remedy that. But it took months for us to upload all the photos, and if he takes down the photos we will be out of business. Truly. It would risk all of the sales that we currently have open- about 8 companies that are "testing" our service, and one contract that is fully operational. It would certainly ruin and end our relationship with these companies.

Below are my most recent email communications with him.
We would like to not enter into a legal battle regarding the issue, but need to also protect our site.

We offered to pay him smaller amounts than what we agreed upon, and his response was to take off functions, as he clearly spelled out in his emails.

As far as I understand, his actions are illegal. Furthermore, the entire site, which he is threatening to remove, is not solely his work. We've had 3 other contractors working on the site.

What actions do you suggest we take at this point?

Thanks Jim
Karin




-----Original Message-----
From: Mark Elliot Zuckerberg <mzuckerb@fas.harvard.edu>
Date: Sat, 28 Feb 2004 19:11:52 -0500 (EST)
To: Karin Petersen <kpetersen@tmail.com>
CC:
Subject: Re: Payment

Karin,

It seems a little ridiculous to me that you're suggesting I accept $1500
on the month that I need prompt payment when you were supposed to be
paying $2000 each month all along.

At this point I must follow through and remove the scroll search
capability from the site.  I will do this after midnight tonight.

I should note, however, that the payment you owe me is not only for the

scroll search, but also for the rest of the site.  From this point
forward, if for any month you fail to meet your monthly payment of $2000,
I will shut down the entire site.  I will extend the deadline for this
month's payment until March 14.

Mark

On Sat, 28 Feb 2004, Karin Petersen wrote:

> Hi mark
> I'm forwarding paul's message to you.
> Would you be willing to accept $1500 this month with the promise of at
> least that much next month as well as a signed note guaranteeing that
> streetfax will pay you your full amount?
> Please reply to this email adress so I can receive it.
> Karin
>
> --kpetersen
>
-----End Original Message-----

SIP0000659

**From:**        paul ceglia <paulceglia@msn.com>
**Sent:**        Friday, March 5, 2004 5:44 PM (GMT)
**To:**          Kole, James D. <JKole02@Sidley.com>
**Subject:**     RE: marks undone work

Hi Jim,

  Funds are indeed very tight right now and my concern about sending mark
money is two fold, first if I send him cash then I wont have money to give
to another IT person and second are we jeopardixzing ourselves by offering
him money on a contract that so clearly staes we owe him nothing? Mabe I am
a littel to emotionally charged about this but I think that after him
illegally removing functionallity form the site that I dont want to pay this
kid another dime. I am open to reason though.   All the best, Paul


>From: "Kole, James D." <jkole@sidley.com>
>To: "'paul ceglia'" <paulceglia@msn.com>
>CC: "'kpetersen@streetfax.com'" <kpetersen@streetfax.com>
>Subject: RE: marks undone work
>Date: Thu, 4 Mar 2004 10:15:44 -0600
>
>Paul,
>
>Karin suggested she could use some more time to back-up all files, etc.,
>and
>I suspect the brat programmer will turn to this over the weekend, so I
>suggest that I send out the letter Friday afternoon.  If you have any cash
>to spare now, I would be happy to include in the letter a statement that I
>have a payment for him that I will hold in escrow until he provides his
>written assurance that he will not access or disable any portion of the
>site.  If you have the cash to do that, it makes you appear even more
>reasonable, if we have to start a lawsuit.  Obviously, a lawsuit is only a
>worst worst case plan, but if he carries through on his threats, we may
>need
>to get a court order to stop his trespasses.  Let me know your thoughts and
>I'll fire away, Jim
>
>-----Original Message-----
>From: paul ceglia [mailto:paulceglia@msn.com]
>Sent: Thursday, March 04, 2004 9:49 AM
>To: jkole@sidley.com
>Subject: RE: marks undone work
>
>
>Hi Jim Looks great. Much less threatening than I could have mustered. Do
>you
>
>think at this point it i still wise to pay him the money he requests or are
>you just breaking up the battle into skirmishes? Ill be on my tmail account
>the rest of the day heading up to the cemetery. pceglia@tmail.com
>thanks for jumping on this.
>

>I would say to your wonderful holdiay card that it has also been a great
>pleasure geeting to know you as well.  It sounds like you are really
>enjoying being back in Chicago. I hope we manage to cover it this summer.
>All the best,  Paul
>
>
>>From: "Kole, James D." <jkole@sidley.com>
>>To: "'Karin Petersen'" <kpetersen@streetfax.com>,"'paulceglia@msn.com'"
>><paulceglia@msn.com>
>>Subject: RE: marks undone work
>>Date: Wed, 3 Mar 2004 17:21:02 -0600
>>
>>Karin and Paul,
>>
>>Please review the attached draft letter and make sure that it is
>accurate,
>>and that you are as ready as we can be for his counter-attack, if he does
>>not take my advice and talk with an attorney.  I'm around until about 8pm
>>my
>>time, if you want to give me a call or email in the office.  thanks, Jim
>>
>>-----Original Message-----
>>From: Karin Petersen [mailto:KPetersen@StreetFax.com]
>>Sent: Wednesday, March 03, 2004 2:00 PM
>>To: jkole@sidley.com
>>Subject: marks undone work
>>
>>
>>hi jim
>>i've attached the document that i sent to mark a few months ago of what
>was
>>still remaining of his specs to do.
>>
>>everything that is blank in the "completed?" column is not yet done. they
>>are minor little details.
>>those with"NO" in the completed column are the major details that has
>left
>>our database difficult to use.
>>
>>hopefully its all very clear. its just the shorthand for the projects. i
>>can
>>go into greater detail about each item that is still open if that would
>be
>>helpful.
>>
>>karin
>>
>>
>>Sidley Austin Brown & Wood LLP mail server made the following annotations
>>on
>>03/03/2004, 05:21:02 PM
>>--------------------------------------------------------------------
>>
>>This e-mail is sent by a law firm and may contain information that is

> >privileged or confidential. If you are not the intended recipient, please
> >delete the e-mail and any attachments and notify us immediately.
> ><< LETTERTOMARKZUCKERBERG.DOC >>
>
>_____
>Learn how to help protect your privacy and prevent fraud online at Tech
>Hacks & Scams. http://special.msn.com/msnbc/techsafety.armx
>
>
>Sidley Austin Brown & Wood LLP mail server made the following annotations
>on
>03/04/2004, 10:17:19 AM
>-----------------------------------------------------------------
>
>This e-mail is sent by a law firm and may contain information that is
>privileged or confidential. If you are not the intended recipient, please
>delete the e-mail and any attachments and notify us immediately.

_____
One-click access to Hotmail from any Web page – download MSN Toolbar now!
http://clk.atdmt.com/AVE/go/onm00200413ave/direct/01/